STATE OF NORTH CAROLINA    FILED   IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

COUNTY OF DURHAM    2018 NOV -6 A 11: 42    CASE NO. ___ 18 CVS 4034

DURHAM CO. C.S.C.

VALERIE WILLIAMS,
on behalf of herself and all others similarly

situated,    BY_____

|  |  |  |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | **(Class Action)** |
| | ) | |
| PEGASUS RESIDENTIAL, LLC; | ) | |
| INWOOD HOLDINGS, LLC, and MP | ) | |
| BRIDGES AT SOUTHPOINT, LLC d/b/a | ) | |
| BRIDGES AT SOUTHPOINT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Valerie Williams (hereafter "Plaintiff"), on behalf of herself and the proposed

Classes, files this Complaint against Defendants Pegasus Residential, LLC, Inwood Holdings,

LLC, and MP Bridges at Southpoint, LLC d/b/a Bridges at Southpoint (hereinafter

"Defendants") and states:

## NATURE OF THE ACTION

1.     This is an action brought by Plaintiff and others similarly situated due to

unlawful and unfair debt collection practices engaged in by Defendants in their attempts to

collect upon fees, penalties, and other improper charges, when such costs, fees, charges, and

amounts are not owed and expressly prohibited.

2.     This case arises under the Residential Rental Agreements Act, N.C.G.S. § 42-38

*et seq.,* the Uniform Commercial Code - Negotiable Instruments, N.C.G.S. § 25-3-506, the

North Carolina Debt Collection Act, N.C.G.S. § 75-50 *et seq.,* the North Carolina common law

of contracts, and the Uniform Declaratory Judgment Act, N.C.G.S. § 1-253, *et seq.*

3.     This is a class action, filed pursuant to Rule 23 of the North Carolina Rules of Civil Procedure on behalf of all tenants of any North Carolina apartment complex in which Pegasus Residential, LLC ("Pegasus") provides property management services, including but not limited to tenants of the apartment complex owned by MP Bridges at Southpoint, LLC d/b/a Bridges at Southpoint ("Bridges") in Durham, North Carolina who pursuant to Defendants' standardized policies and procedures, have during the past four (4) years (a) received one or more communications from Defendants that violate North Carolina law as further set forth herein, and/or (b) have paid amounts in excess of those allowed by North Carolina law.

## JURISIDICTION AND VENUE

4.     The foregoing allegations are incorporated by reference and realleged herein.

5.     This Court has jurisdiction over the parties and this action pursuant to N.C.G.S. § 42-44, N.C.G.S. § 25-1-305, N.C.G.S. §§ 75-16 and 56, N.C.G.S. § 1-75.4 and N.C.G.S. § 1-253.

6.     Venue is proper under N.C.G.S. § 1-80 and § 1-82 in that Defendants maintain a place of business in Durham County, North Carolina, and have regularly engaged in business in Durham County, North Carolina. In addition, Plaintiff resides in Durham County, North Carolina, and a substantial part of the tortious events or omissions giving rise to Plaintiff's claims occurred in Durham County, North Carolina.

## PARTIES

7.     The foregoing allegations are incorporated by reference and realleged herein.

8.     Plaintiff Valerie Williams is a citizen and resident of Durham County, North Carolina who at all relevant times, leased an apartment at Bridges at Southpoint in Durham County, North Carolina.

2

9. Plaintiff is a "tenant" subject to the protections of N.C.G.S. § 42-46.

10. Plaintiff is a "consumer" as defined by N.C.G.S. § 75-50.

11. Defendant Pegasus Residential, LLC ("Pegasus") is, upon information and belief, a limited liability company organized and existing under the laws of the state of Georgia, maintains a business in Durham County, North Carolina, and has regularly engaged in business in Durham County, North Carolina. Upon information and belief Pegasus owns and/or manages approximately seventeen apartment properties in North Carolina, including Bridges at Southpoint.

12. Defendant Inwood Holdings, LLC ("Inwood") is, upon information and belief, a limited liability company organized and existing under the laws of the state of Georgia, maintains a business in Durham County, North Carolina, and has regularly engaged in business in Durham County, North Carolina. Upon information and belief, Inwood is a manager of Pegasus.

13. Defendant MP Bridges at Southpoint, LLC d/b/a Bridges at Southpoint is, upon information and belief, a limited liability company organized and existing under the laws of the state of Delaware, and has regularly engaged in business in Durham County, North Carolina. Defendant Bridges holds itself out to the public as the "Bridges at Southpoint."

14. Upon information and belief, Pegasus and/or Inwood employ the persons and other entities to operate the properties in North Carolina, including the Bridges at Southpoint apartments.

15. Upon information and belief, Pegasus and/or Inwood are the only property management companies engaged in the work and business of the Bridges apartments and other North Carolina properties.

3

16.     Upon information and belief, with respect to all actions and decisions to this action, Defendants have operated as a single entity. Defendants have held themselves out to the North Carolina public, including Plaintiff, as if each of the entities were operating as a single entity known as "Pegasus," including by way of example, corresponding electronically with tenants as "Pegasus" and in the "Initial Collection Letters" defined below, and in other written correspondence sent to Plaintiffs and other North Carolina residents, the form letters are identified as being sent from "Pegasus."

17.     Upon information and belief, at all times pertinent to this action the finances, policies, and business practices of Defendants are and were dominated and controlled by one another in such a manner that each individual Defendant has no separate mind, will, identity or existence of its own and instead operated as mere instrumentalities and alter egos of one another.

18.     Upon information and belief, Defendants are so closely related in ownership and management, and that each works closely in concert with the other, such that each has become the *alter ego* of the other, in that, among others:

a.      Defendants operate and hold themselves out to the public as a single entity known as "Pegasus;"

b.      With respect to all actions and decisions in North Carolina pertinent to this action, Defendants have operated as a single entity known as "Pegasus;"

c.      Defendants operate and hold themselves out to the public in such a way that members of the public would be unable to identify and distinguish

4

between one "Pegasus" entity and another.

19.    Defendants are each "landlords" as defined by N.C.G.S. §42-40(3).

20.    At all times relevant to this action, Defendants, in the ordinary course of business as the lessors of residential real property, engaged in acts or practices affecting commerce within the meaning of N.C.G.S. §75-1.1.

21.    Defendants are each "debt collectors" as defined by N.C.G.S. § 75-50.

## GENERAL BACKGROUND

22.    The foregoing allegations are incorporated by reference and realleged herein.

23.    Upon information and belief, at all times relevant to the allegations contained herein, Defendants entered into lease agreements with all North Carolina tenants that state in Paragraph 37 that upon a default, Defendants "shall be entitled to collect from [the tenant] any and all expenses, damages, and costs *(including reasonable attorney's fees and court costs)* out of or in any way relating to said default." See attached **Exhibit 1** (emphasis in original). The lease agreements then state in Paragraph 37(F), entitled "Eviction Fees", that "if [Defendants] file a summary ejectment action against [the tenant] *(as described in Paragraph 37(C))*, [the tenant] shall also be liable to [Defendants] for the highest ONE of whichever of the following fees apply." **Exhibit 1** (emphasis in original). Paragraph 37(F) of the lease agreements then identify and describe three fees: a Complaint Filing Fee, a Court Appearance Fee, and a Second Trial Fee.

24.    The Complaint Filing Fee, Court Appearance Fee, and Second Trial Fee are the same fees described in N.C.G.S. § 42-46 (e) through (g).

25.    The "reasonable attorney's fees and court costs" listed in Paragraph 37 of the lease agreements are separate and apart from the Complaint Filing Fee, Court Appearance Fee,

5

and Second Trial Fee.

26.     Upon information and belief, at all times relevant to the allegations contained herein, Defendants have maintained a uniform, statewide policy of requiring any North Carolina tenant who fails to make a full and complete rental payment, or maintains a balance on their account ledger in excess of $0.00 after the 14th day of any given month to pay filing fees ("Filing Fees"), sheriff service fees ("Service Fees"), and attorneys' fees ("Attorneys' Fees") (collectively the Filing Fees, Service Fees, and Attorneys' Fees are referred to as the "Eviction Fees") (herein described as the ("Collection Policy").

27.     Eviction Fees are additional fees separate and apart from the ones expressly authorized by N.C.G.S. § 42-46. [1]

28.     Eviction Fees are fees set by the North Carolina Legislature for filing a complaint in summary ejectment and for service of process by a sheriff.

29.     Upon information and belief, Defendants entered into a legal services agreement with a law firm that charges a flat fee per eviction. Upon information and belief, this legal services agreement limits the scope of the law firm's representation to only seeking possession of the apartment premises on behalf of Defendants and not any money owed.

30.     Upon information and belief, throughout the Relevant Time Period, the Filing Fees were $96.00 and the Service Fees were $30.00. The remaining amount charged comprises the Attorneys' Fee.

---

[1] In direct response to the Honorable A. Graham Shirley, Wake County Superior Court Judge, holding that the claiming of Eviction Fees was unlawful [See Exhibit 7], landlords petitioned and successfully altered the law. On June 25, 2018, S.L. 2018-50, entitled "An Act to Allow Landlords to Recover Out-of-Pocket Expenses in Summary Ejectment Cases" was enacted to amend N.C.G.S. § 42-46 ("the Amendment"). [See attached Exhibit 8]. The Amendment confirms that Defendants were not previously allowed to automatically charge tenants the Eviction Fees.

6

31.     Upon information and belief, pursuant to the Collection Policy, tenants owe, and are required to pay Eviction Fees even if: (a) the complaint in summary ejectment had not yet even been filed; (b) the complaint in summary ejectment is dismissed; or (c) a North Carolina Magistrate Judge orders the Eviction Fees to be assessed against Defendants.

32.     Upon information and belief, each and every tenant of a property owned or managed by Defendants, or either of them, is subject to the Collection Policy.

33.     Upon information and belief, the Collection Policy is uniformly applied to each and every tenant that resides at any of the apartments owned or managed by Defendants.

34.     Upon information and belief, the Collection Policy is mandatory throughout Defendants' properties; individual managers, employees, associates, or other agents of Defendants have no discretion as to the implementation of the Collection Policy.

35.     Pursuant to the Collection Policy, when a tenant fails to make a full and complete rental payment, or maintains a rental balance on their account ledger in excess of $0.00 after approximately the 6th day of any given month, Defendants cause written letters or emails to be delivered to the tenant stating that "WITHIN THREE DAYS after your receipt of this Notice, you are required to pay said delinquent sums in full. Otherwise...legal proceedings will be commenced against you to (1) recover possession of said Apartment, and (3) [sic] recover all damages, all in connection with your default under the rental agreement." (hereinafter "Initial Collection Letter").

36.     The "damages" referred to in the Initial Collection Letter is the same as Eviction Fees described herein.

37.     An exemplar of the Initial Collection Letter is attached as **Exhibit 2**.

38.     Upon information and belief, pursuant to the Collection Policy, when a tenant

7

fails to make a full and complete rental payment, or maintains a balance on their account ledger in excess of $0.00 on or around the 17th day of any given month, Defendants file legal action to evict the tenant.

39.     Immediately before filing legal action to evict a tenant, or shortly thereafter, Defendants post to the tenant's account ledger all Eviction Fees as immediately due and owing.

40.     All the Eviction Fees are posted to a tenant's account ledger are in addition to, and separate from, the late fees and the fees specifically authorized by N.C.G.S. § 42-46(e)-(g), including the "Complaint-Filing Fee."

41.     Upon information and belief, pursuant to the Collection Policy, Eviction Fees are entered into a tenant's account ledger prior to a North Carolina court awarding such amounts to Defendants, and sometimes before a complaint in summary ejectment is even filed.

42.     At the time the Eviction Fees are entered into the account ledger as immediately due and owing, there is no guarantee that Defendants will ever be awarded such fees by a North Carolina court.

43.     Upon information and belief, entering the Eviction Fees on a tenant's account ledger as immediately due and owing is mandatory throughout Defendants' North Carolina properties; individual managers, employees, associates, or other agents of Defendants have no discretion as to the implementation of the Collection Policy.

44.     Upon information and belief, after causing the Eviction to be assessed against the tenant's account ledger, and with no guarantee such amounts will ever be awarded by a North Carolina court, Defendants immediately begin attempting to collect upon the balance contained on the account ledger pursuant to its Collection Policy.

45.     Upon information and belief, the majority of tenants who were charged Eviction

8

Fees were sent Initial Collection Letters.

46. Upon information and belief, after the Eviction Fees are entered onto an individual's account ledger, there are no occasions in which Defendants will review and reconsider whether such Eviction Fees were improperly assessed.

47. Upon information and belief, even if a complaint in summary ejectment filed against a tenant is dismissed or not awarded, there are no occasions in which Defendants will review and reconsider whether such Eviction Fees were improperly assessed.

48. Upon information and belief, after the Eviction Fees are entered onto an tenant's account ledger, there are no occasions in which Defendants will remove such Eviction Fees from an individual tenant's account ledger.

## WILLIAMS' FACTS

49. Williams entered into a lease contract with Defendants for an apartment at Bridges at Southpoint located at 7301 Calibre Park Dr. # 01-308, Durham, North Carolina 27707 ("Williams' Apartment) for a period from September 30, 2017 through September 25, 2018. Williams' lease is attached hereto as **Exhibit 1.**

50. The Lease states that "[i]f We file a summary ejectment action against You . . . You shall be liable to Us for the highest ONE of" the Complaint-Filing Fee, Court Appearance Fee, and Second Trial Fee, which "shall be in addition to late fees, court costs, attorney's fees, and any other monetary damages or costs arising under the terms of this Agreement."

51. Pursuant to the lease, Williams' total monthly rent for her apartment is $1,087.00.

52. Each time Williams was late, she was charged a late fee of $53.35 pursuant to N.C.G.S. § 42-46(a). See attached **Exhibit 2.**

9

53.     On or about March 12, 2018, April 12, 2018 and June 12, 2018, Williams received a Initial Collection Letter substantially identical to **Exhibit 2**. Williams received the Initial Collection Letter on other occasions as well.

54.     Each time Williams was late, she received the attached Initial Collection Letter substantially identical to the one identified as **Exhibit 2.**

55.     Upon information and belief, all other tenants of Defendants who did not make a complete rental payment by the 6th of the month received an Initial Collection Letter substantially identical to **Exhibit 2**.

56.     The Initial Collection Letter stated that: "you are required to pay said delinquent sums in full. Otherwise, your rental deposit will be retained as liquidated damages, your rental agreement shall thereupon immediately terminate and legal proceedings will be commenced against you to (1) recover possession of said Apartment, and (3) [sic] recover damages, all in connection with your default under the rental agreement."

57.     The "damages" referred to in the Initial Collection Letter are Eviction Fees for which Defendants were not entitled.

58.     Defendants placed the Eviction Fees, described on the ledger as "Attorney Or Legal Charges – Williams," on Williams' account ledger in the amount of $201.00 on multiple occasions. See, e.g., attached **Exhibit 3.**

59.     The "Attorney Or Legal Charges - Williams" referred to on Williams' ledger are the same fees described as "court and attorneys fees" in the Ledger, the same fees described as "damages" in the Initial Collection Letter, and are the same as the Eviction Fees described herein.

60.     Upon information and belief, at the time the Eviction Fees were placed on

10

Williams' ledger, Defendants had not paid the $96 filing fee for filing the complaint in summary ejectment nor had Defendants paid the $30 service fee.

61.    Upon information and belief, each time the Eviction Fees were placed on Williams' ledger, no hearing had been held and no attorney had appeared in Court to evict Williams and/or seek the award of Eviction Fees.

62.    Upon information and belief, at the time the Eviction Fees were placed on Williams' ledger, no attorney had been hired by Defendants to collect any debt.

63.    Upon information and belief, at the time the Eviction Fees were placed on Williams' ledger, Defendants had not served Williams with the complaint in summary ejectment.

64.    Upon information and belief, in each of the Complaints in Summary Ejectment actions filed against Williams, Defendants wrote that they "hereby omit[] any claim for rents or damages and is seeking possession of the premises only. [Defendants] reserve[] the right to seek any monetary damages in a separate civil action." See Exhibit 4, 5, and 6.

65.    The amounts included and/or referred to in the Initial Collection Letters are Eviction Fees that Defendants were not entitled.

66.  .  Williams paid the Eviction Fees when they were not owed.

67.    Upon information and belief, there were several occasions that Williams paid the Eviction Fees before she was even served with the Complaint in Summary Ejectment.

68.    Upon information and belief, it was only after Williams paid the Eviction Fees that Defendants filed a notice of voluntary dismissal without prejudice.

69.    Upon information and belief, Defendants only filed notices of voluntary dismissals without prejudice. By filing notices of voluntary dismissals without prejudice,

11

Defendants were not the prevailing party.

70.     Upon information and belief, no court awarded Defendants with Eviction Fees against Williams in any summary ejectment case or thereafter.

71.     Upon information and belief, Defendants only file notices of voluntary dismissals without prejudice when its tenants pay Eviction Fees prior to obtaining a judgment for possession.

72.     At no point did Williams enter into a settlement agreement with Defendants regarding the Eviction Fees during his tenancy with Defendants.

73.     At no point did a North Carolina judge award any portion of the Eviction Fees to Defendants. At no point did a North Carolina judge assess any portion of the Eviction Fees against Williams.

74.     Even though a North Carolina court never awarded any portion of the Eviction Fees to Defendants, but in fact specifically assessed costs against Defendants, Defendants never refunded any portion of the Eviction Fees to Williams.

75.     At no point did Defendants employ a law firm to collect upon any debt alleged to be owed by Williams.

## COMMON CLASS ALLEGATIONS

76.     The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

77.     Pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, Plaintiff brings this action individually and on behalf of the two classes:

**The Initial Collection Letter Class (represented by Plaintiff):**

> All tenants of Defendants' Apartments in North Carolina who (a) at any point within the four (4) year period preceding the filing of

12

Plaintiff's Complaint through June 25, 2018 (b) resided in one of the apartments owned or managed by Defendants' in North Carolina (c) were sent the Initial Collection Letter that (d) threatened to charge Eviction Fees in order to dismiss the eviction action.

**The Fee Class (represented by Plaintiff):**

All tenants of Defendants' Apartments in North Carolina who (a) at any point within the four (4) year period preceding the filing of Plaintiff's Complaint through June 25, 2018 (b) resided in one of the apartments owned or managed by Defendants' in North Carolina (c) were charged and (d) actually paid Eviction Fees prior to a North Carolina court awarding such Eviction Fees to Defendants.

78. Excluded from the classes are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendants and any entity in which Defendants has a controlling interest in Defendants and its legal representatives, assigns and successors; and (c) all persons and entities who properly execute and file a timely request for exclusion from the classes.

79. *Commonality*: All questions concerning Defendants' Collection Policy and Defendants' sending the Initial Collection Letter are common. Whether Defendants may lawfully charge Eviction Fees separate from and in addition to what is authorized by N.C.G.S. § 42-46 is a question that is common for all members of the classes. Each and every member of the proposed Class is subject to Defendants' policies and procedures. Further, the answer to this question will drive other answers in the litigation, including whether the Initial Collection Letter is lawful and whether any portion of Defendants' lease is void and unenforceable.

80. *Predominance*: Common questions of law and fact predominate over any individual issues that may be presented, because Defendants have a pattern, practice and policy of charging tenants Eviction Fees as described herein. These questions include, but are not

13

limited to:

     a.     Whether Defendants' pattern, practice, and policy of collecting and/or attempting to collect debt violates N.C.G.S. §§ 42-46 and 75-50 *et seq.* in that Defendants represented that a specific amount of debt may be increased by Eviction Fees prior to the award of such amounts by a North Carolina court;

     b.     Whether Defendants' pattern, practice, and policy of utilizing the Initial Collection Letters violated N.C.G.S. §§ 42-46 and 75-50 *et seq.* by falsely representing Defendants' ability to collect Eviction Fees;

     c.     Whether Defendants' pattern, practice, and policy of collecting and/or attempting to collect Eviction Fees is illegal under N.C.G.S. §§ 42-46 and 75-50 *et seq.*;

     d.     Whether Defendants' pattern, practice, and policy of collecting and/or attempting to collect Eviction Fees violates N.C.G.S. § 75-1.1 *et seq.*;

     e.     Whether Defendants' pattern, practice, and policy of collecting and/or attempting to collect debt violates N.C.G.S. § 75-1.1 *et seq.* in that Defendants refuse to refund Eviction Fees after a Court taxed the cost of the action against Defendants.

     f.     Whether Defendants' pattern, practice, and policy of collecting and/or attempting to collect Attorneys' Fees are in violation of N.C.G.S. §§ 6-21.2, 42-46, and 75-50 *et seq.* in that Defendants' attorneys were not collecting upon any debt;

     g.     Whether Defendants' pattern, practice, and policy of collecting and/or attempting to collect Eviction Fees constitutes a violation of N.C.G.S. § 75-1.1 *et*

14

*seq.* in that Defendants unlawfully claim Attorneys' Fees were due and owing despite the absence of any statutory authority granting such fees.

h.      Whether any portion of Defendants' lease is void and unenforceable because it contains a fee for filing a complaint for summary ejectment and/or money owed other than the fees expressly authorized by N.C.G.S. § 42-46 (e) through (g).

81.    *Numerosity*: The Class members are so numerous that joinder of all is impractical. The names and addresses of the Class members are readily identifiable through the business records maintained by Defendants, and may be notified of the pendency of this action by published and/or mailed notice. Members of the classes include hundreds of present and former tenants of Defendants' Apartments who have been charged with Eviction Fees in violation of the law.

82.    *Typicality*: The claims of the Plaintiff are typical of the claims of the proposed classes and all are based on the same facts and legal theories, as all such claims arise out of Defendants' conduct in that Defendants have a specific policy of attempting to unlawfully collect debt from each member of the proposed classes Eviction Fees following the expiration of the 15th day of the month.

83.    *Adequate Representation*: The Plaintiff is an adequate representative of the class in that Plaintiff does not have antagonistic or conflicting claims with other members of the class. Plaintiff has also retained counsel experienced in the prosecution of complex class actions and consumer litigation. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted such responsibilities.

15

63.    *Superiority*: A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiff anticipates no difficulty in managing and maintaining this action as a class action. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

64.    Further, Defendants have acted and refused to act on grounds generally applicable to the proposed class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## FIRST CAUSE OF ACTION:
Violation of the North Carolina Residential Rental Agreements Act
N.C.G. S. § 42-46
(on behalf of all classes)

65.    All paragraphs of this complaint are incorporated herein as if fully restated.

66.    Defendants' conduct as described above is subject to N.C.G.S. § 42-46 of the Residential Rental Agreements Act.

67.    N.C.G.S. § 42-46(e)-(h) specifically limits the amounts that can be charged to a tenant for eviction related fees. Any amounts charged in excess of this limitation is against North Carolina's public policy and therefore void and unenforceable.

68.    The Eviction Fees charged by Defendants to Plaintiff and members of the Class were separate from and in excess of the amount allowed under N.C.G.S. § 42-46 and constituted a violation of North Carolina law.

69.    The amount of Eviction Fees charged by Defendants to Plaintiff and other members of the Class are in excess of the amounts allowed under N.C.G.S. § 42-46.

70.    As a proximate result of Defendants' conduct, Plaintiff and all members of the

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 16 of 78

Class were damaged and are entitled to recover all amounts of Eviction Fees paid to Defendants in violation of N.C.G.S. § 42-46. This amount is in excess of $25,000.

## SECOND CAUSE OF ACTION
Violation of North Carolina Debt Collection Act
N.C.G.S. § 75-50, *et seq.*
(on behalf of all classes)

71. All paragraphs of this Complaint are incorporated herein as if fully restated.

72. Plaintiff and each member of the Classes are a "consumers," as that term is defined by N.C.G.S. § 75-50.

73. The amount purportedly owed to Defendants by Plaintiff and each member of the Proposed Class is a "debt," as that term is defined by N.C.G.S. § 75-50.

74. At all times relevant to this action, Defendants, in the ordinary course of business as lessors of residential rental property, engaged in acts or practices affecting commerce within the meaning of N.C.G.S. § 75-1.1.

75. Defendants, in seeking to recover past due rent, fees, and other charges, are "debt collectors" as defined by the North Carolina Debt Collection Act ("NCDCA"), N.C.G.S. § 75-50.

76. Defendants' actions described above constitute the collection of a "debt" under N.C.G.S. § 75-50.

77. Defendants are subject to the requirements of N.C.G.S. § 75-50 *et seq.*, that prohibits certain activities by debt collectors.

78. The Initial Collection Letters violated N.C.G.S. § 75-50 *et seq.* by threatening to take actions that Defendants could not lawfully take.

79. Defendants violated N.C.G.S. § 75-51 by collecting or attempting to collect debt by means of unfair threats, coercions, or attempts to coerce, including by collecting or

17

attempting to collect debt by threatening to take action not permitted by law.

80.    Defendants violated N.C.G.S. § 75-51(8) by threatening to take and taking actions not permitted by law, including, *inter alia*, threatening to assess and collect Eviction Fees without a legal justification.

81.    Defendants violated N.C.G.S. § 75-54 by collecting or attempting to collect a debt by means of fraudulent, deceptive, and/or misleading representations, including, *inter alia*, assessing, threatening to assess, and collect or attempting to collect Eviction Fees without a legal justification.

82.    Defendants' communications to Plaintiff and members of the Class constituted "communications attempting to collect a debt" subject to the disclosure requirement of N.C.G.S. § 75-54(2).

83.    Defendants violated N.C.G.S. § 75-55 by collecting or attempting to collect debt by using unconscionable means.

84.    A violation of N.C.G.S § 42-46 constitutes an unfair debt collection attempt under N.C.G.S.§ 75-50 *et seq*.

85.    Defendants collected or attempted to collect from Plaintiff and members of the class a charge, fee or expense incidental to the principal debt of the monthly rent owed, that was legally prohibited under N.C.G.S. 42-46, in violation of N.C.G.S. § 75-51(8), N.C.G.S. § 75-54, and N.C.G.S. §75-55 (2).

86.    Defendants' actions in violation of North Carolina's Unfair Debt Collection Act were willful.

87.    Plaintiff and each member of the Class were injured by Defendants' actions and are entitled to damages to be established at trial as well as statutory damages per violation in an

18

amount ranging from $500.00 to $4,000.00 per violation resulting from each of Defendants'
unfair debt collection practices pursuant to N.C.G.S. §75-56.

88.　Plaintiff and each member of the Class were injured and sustained damages by
Defendants' actions and are entitled to actual damages to be established at trial as well as
statutory damages for each violation in the maximum amount allowed by law, as well as
reasonable attorneys' fees for an amount in excess of $25,000.00.

### THIRD CAUSE OF ACTION
Violation of the North Carolina Unfair and Deceptive Trade Practices Act
N.C.G.S. § 75-1.1, *et seq.*
(on behalf of all classes)

89.　All paragraphs of this complaint are incorporated herein as if fully restated.

90.　At all times relevant herein, Defendants were engaged in commerce in the State
of North Carolina.

91.　The conduct of Defendants as set forth herein is against the established public
policy of the State of North Carolina; is unethical, oppressive, unscrupulous, and substantially
injurious to the consumers of North Carolina; and has the capacity and tendency to deceive the
average consumer.

92.　Defendants' violations of the UDTPA include, but are not limited to, (a)
assessing and attempting to collect Eviction Fees when such amounts were not owed; (b)
assessing and attempting to collect Eviction Fees when such amounts are expressly prohibited
by N.C.G.S. § 42-46; (c) assessing and attempting to collect Eviction Fees prior to filing or
serving a complaint in summary ejectment; (d) assessing and attempting to collect Eviction Fees
prior to being awarded any such amounts by a North Carolina judge; (e) assessing and
attempting to collect Eviction Fees after dismissing complaints in summary ejectments without
prejudice; (f) failing to refund any portion of the Eviction Fees when a North Carolina

19

magistrate judge orders costs to be assessed against Defendants; (g) misrepresenting the character, amount, or legal status of the obligation alleged to be owed by Plaintiffs and each member of the class; (h) employing a system, policies, and procedures for the collection of debt which is unfair, deceptive, and misleading, and not permitted by both the public policy of North Carolina and the express statutory provisions of N.C.G.S. § 42-46; (i) utilizing false representations and deceptive measures to collect or attempt to collect Eviction Fees which are unlawful; (j) undertaking actions which Defendants knew, or should have known, offends well-established public policy, state law, and was otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to consumers, such as Plaintiff; and (k) employing and otherwise undertaking the aforementioned procedures, policies, actions, and methods with the explicit knowledge that such conduct was in violation of applicable North Carolina law.

93.     The matters alleged herein were done willfully, or with the conscious disregard of the rights of Plaintiff and each member of the Class.

94.     Plaintiff and members of the Class suffered actual injury as a result of Defendants' unfair actions. Such injury consists of, but is not limited to emotional distress damages and money damages resulting from Defendants' demanding and obtaining fees and costs in excess of amounts allowed pursuant to North Carolina law from Plaintiff and each member of the Class.

95.     Defendants' actions were in or affecting commerce and constitute unfair and deceptive trade practices, which are proscribed by Chapter 75 of the North Carolina General Statutes.

96.     Plaintiff and each member of the Class have been damaged and are entitled to recover treble damages and attorneys' fees incurred in this action.

20

## FOURTH CAUSE OF ACTION
### Petition for Declaratory Judgment N.C.G.S. § 1-253, *et seq.*.
### (on behalf of all classes)

97.    All paragraphs of this complaint are incorporated herein as if fully restated.

98.    Plaintiff and the members of the Classes file this Petition for a Declaratory Judgment under N.C.G.S. Chapter 1, Article 25, and the Court has jurisdiction of this matter under such statute.

99.    Plaintiff and the members of the Classes have an actual controversy with Defendants regarding the validity and enforceability of a portion of the Lease.

100.    The Lease states that "[i]f We file a summary ejectment action against You . . . You shall be liable to Us for the highest ONE of whichever of the following fees apply" and immediately identified and described the three fees identified in N.C.G.S. § 42-46 (e) through (g): Complaint Filing Fee, Court Appearance Fee, and Second Trial Fee which "shall be in addition to late fees, court costs, attorney's fees, and any other monetary damages or costs arising under the terms of this Agreement." Upon information and belief, every lease during the Relevant Time Period, including Plaintiff's Lease, contains this same provision.

101.    However, N.C.G.S. § 42-46(h)(3) stated (prior to the enactment of the Amendment) that "[i]t is contrary to public policy for a landlord to put in a lease or claim any fee for filing a complaint for summary ejectment and/or money owed other than the ones expressly authorized by subsections (e) through (g) of this section, and a reasonable attorney's fee as allowed by law."

102.    The Eviction Fees, described in the Lease, constitute a "fee for filing a complaint for summary ejectment" and are separate from and in addition to "the ones expressly authorized by subsections (e) through (g)."

21

103. Under N.C.G.S. § 42-46(h)(4), "[a]ny provision of a residential rental agreement contrary to the provisions of this section is against the public policy of this State and therefore void and unenforceable." Therefore, because Defendants' lease contains a provision that is void and unenforceable, Plaintiff and the members of the classes seek an order declaring the Defendants' North Carolina leases to be void and unenforceable insofar as such leases provide for a fee other than the ones expressly authorized by N.C.G.S. § 42-46 (e) through (g).

104. Plaintiff and the members of the Classes have an actual controversy with Defendants resulting from Defendants' erroneous interpretation of the applicable law.

105. It is established law in North Carolina that N.G.S.S. § 42-33 is "remedial in nature and will apply only where the parties' lease does not cover the issue of forfeiture of the lease term upon nonpayment of rent. Where the contracting parties have considered the issue, negotiated a response, and memorialized their response within the lease, the trial court appropriately should decline to apply these statutory provisions." *Charlotte Office Tower Associates v. Carolina SNS Corp.*, 89 N.C. App. 697, 701 (N.C. App. 1998).

106. Defendants entered into written leases that cover the issue of forfeiture of the lease term upon nonpayment of rent with Plaintiff and members of the classes.

107. Therefore, because the parties have considered the issue, negotiated a response, and memorialized the response within a written lease, Plaintiff and the members of the classes seek an order declaring that N.C.G.S. § 42-33 is not applicable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and members of the proposed Classes respectfully request that this Court:

1. Assume jurisdiction over this action;

2. Certify the Classes and appointing Plaintiff and their counsel to represent the

22

classes;

3.     Issue a declaratory judgment that Defendants' actions as set forth herein violated the rights of Plaintiff and each member of the Proposed Class pursuant to N.C.G.S. § 75-54, or in the alternative N.C.G.S. § 75-1.1;

4.     Issue a declaratory judgment that Defendants' actions as set forth herein violated the rights of Plaintiff and each member of the Proposed Class pursuant to N.C.G.S. § 75-55, or in the alternative N.C.G.S. § 75-1.1;

5.     Issue a declaratory judgment that Defendants' Standard Lease and any substantially similar residential lease agreement used by Defendants is contrary to N.C.G.S. § 42-46 and therefore void and unenforceable as against public policy;

6.     Issue a declaratory judgment that N.C.G.S. § 42-33 is inapplicable in every instance in which Defendants entered into a written lease agreement that addresses forfeiture of the lease term upon the tenant's nonpayment of rent with Plaintiff and the members of the classes;

7.     Award Plaintiff and each member of the Proposed Class compensatory damages in an amount to be determined at trial;

8.     Award Plaintiffs and each member of the Proposed Classes punitive damages amount to be determined at trial;

9.     Award Plaintiff and each class member a statutory penalty in the amount of no more than $4,000 for each violation of N.C.G.S. § 75-50 *et seq.*;

10.     Award Plaintiff and each class member damages calculated pursuant to N.C.G.S. § 75-8 for each week that Defendants' illegal conduct occurred;

11.     Award Plaintiff all statutory and actual damages to which she is entitled separate

23

and apart from the Proposed Class in an amount in excess of $25,000.00;

12.     Treble all damages resulting from a violation of N.C.G.S. § 42-46 in accordance with N.C.G.S. § 75-1.1;

13.     Award attorneys' fees to Plaintiff and members of the Proposed Class pursuant to N.C.G.S. § 75-16.1;

14.     Tax the costs of this action to Defendants, or any of them;

15.     Allow a trial by jury on all issues so triable; and

16.     Grant Plaintiff and the members of the Proposed Class such other and further relief as the Court deems just and proper.

[SIGNATURE ON THE FOLLOWING PAGE]

24

Respectfully submitted on this 31st day of October, 2018.

WHITFIELD BRYSON & MASON LLP

_(signature)_

Scott C. Harris
N.C. Bar No.: 35328
Patrick M. Wallace
N.C Bar No.: 48138
900 W. Morgan Street
Raleigh, North Carolina 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
scott@wbmllp.com
pat@wbmllp.com

MAGINNIS LAW, PLLC
Edward H. Maginnis
N.C. State Bar No. 39317
Karl S. Gwaltney
N.C. State Bar No. 45118
4801 Glenwood Avenue, Suite 310
Raleigh, North Carolina 27612
Telephone: 919-526-0450
Fax: 919-882-8763
emaginnis@maginnislaw.com
kgwaltney@maginnislaw.com

*Attorneys for Plaintiff and the proposed Classes*

25

**APARTMENT ASSOCIATION OF NORTH CAROLINA**
**RESIDENTIAL LEASE AGREEMENT**

**1. SUMMARY OF KEY TERMS OF THIS LEASE AGREEMENT("Agreement"):** The following information ("Paragraph 1" and subparts) is hereby provided for informational purposes and shall be construed contextually with the other terms and conditions contained within this Agreement. This Agreement is a binding contract. This Agreement may be signed electronically. In such an event, all initial blanks shall be deemed initialled by all Lessee(s) listed herein.

**1(A). PARTIES.**

Name of LESSOR (Owner): MP Bridges at Southpoint,

LLC

Lessor's Address: _____

Name(s) of LESSEE(S):

Valerie Williams

For the remainder of this Agreement, Lessee(s) may be referred to as "You," "Yourself," or "Yourselves," or in the possessive forms as "Your" or "Yours." Lessor may also be referred to as "We" or "Us" or in the possessive form as "Our" or "Ours." You shall be responsible for the acts of Your Authorized Occupants, who are listed below. Each Lessee shall be jointly and severally liable (i.e., each Lessee shall be responsible) for full compliance with all the terms and conditions contained in this Agreement.

**AUTHORIZED OCCUPANTS** (Check box for key access; see Paragraph 9):

☐ _____
☐ _____
☐ _____
☐ _____

**1(B). DESCRIPTION OF LEASEHOLD.**
ADDRESS OF LEASED PROPERTY (full mailing address, including zip code):

7301 Calibre Park Dr # 01-308 #01-308, Durham,

NC 27707
In consideration of the terms, conditions, and understandings contained in this Agreement, We agree to lease to You the above-described real property, which shall hereinafter be referred to in this Agreement as the "Home." You agree that Your rental of the Home does not grant You the right to use any Common Area facility; You further agree that We may close any such facility without notice. See Paragraph 10.

**1(C). TERM OF AGREEMENT - GENERALLY.**

BEGINNING DATE OF LEASE TERM: 09/30/2017

ENDING DATE OF LEASE TERM: 09/25/2018

**1(D). RENTS AND LATE FEES.**

| | |
|---|---|
| BASE MONTHLY RENT: | $ 1067.00 |
| ADDITIONAL MONTHLY RENTS: *(if any, describe form and amount of rents below):* | |
| Pet Rent | $ 20.00 |
| Garage/Storage Rent | $ 0.00 |
| Washer/Dryer Rental | $ 0.00 |
| MONTHLY RENT SUBTOTAL: | $ 1087.00 |
| Monthly Discount? ☐ Yes ☒ No | |
| If Yes, list discount per month: | (−) $ |
| TOTAL MONTHLY RENT ("Total Monthly Rent" or "Rent"): *(Base Monthly Rent Plus Additional Monthly Rents minus Monthly Discounts, if any)* | $ 1087.00 |
| LATE FEES: *(5% of the Rent; where a portion of Your Rent is government-housing subsidy, Late Fees will be $15.00 OR 5% of Your post-subsidy share of the Rent, whichever is higher. See Paragraph 3 for details)* | $ 54.35 |

**1(E). PAYMENT OF RENT - GENERALLY.**

**(1) Prorated Rent.** You agree to pay Us $ 46.24 ("Prorated Rent") as stated below(check one, or if zero is due, then check none):

☒ BEFORE We give You possession of the Home; OR

☐ BEFORE We give You possession of the Home PLUS RENT for the first full month of the original term; OR

☐ ON OR BEFORE THE FIRST DAY OF THE FIRST FULL MONTH of the original term.

Prorated Rent is required where the original term begins on a day other than the first calendar day of the month. When required, Prorated Rent equals the Rent divided by the total number of calendar days in the first month of the original term multiplied by the remaining days in the first month of the original term. Where zero Prorated Rent is due, or where the Prorated Rent is due on or before the first day of the first full month of the original term, You agree to pay Us the Rent before We give You possession of the Home. We may, at our option, require You to tender any Prorated Rent or Rent payment in certified funds.
**(2) Rent; Date Paid.** Other than the Prorated Rent and Rent obligations described in Part (1) above, You shall pay Us, without notice or demand, the Rent on or before the first calendar day of (a) each month of the original term and (b) each subsequent month-to-month renewal term, if any. Should You fail to deliver the Rent to Us by the first calendar day of any month in which it is due, You shall be in default of this Agreement, even if You attempt to pay Us in full as soon as one calendar day afterwards: You agree there are no grace periods.
**(3) Location of Payment; No Cash.** You shall not pay Rent in cash. You shall pay Rent to Us using the following location(s)(check those that apply):

☒ OUR ONLINE PAYMENT WEBSITE. See Paragraph 2(B).

☒ OUR ADDRESS. See Paragraph 1(A).

☐ OTHER (describe): _____

**1(F). TERM OF AGREEMENT - AUTOMATIC RENEWAL.**

AUTOMATIC RENEWAL. The term of this Agreement shall begin and end on the dates set forth in Paragraph 1(C)("original term"). This Agreement shall automatically renew on a month-to-month basis unless You or We provide the other with a written notice of termination by a date ("termination deadline") that is 60 DAYS BEFORE THE END OF THE ORIGINAL TERM. In the event this Agreement has renewed on a month-to-month basis, this Agreement shall continuously renew each month thereafter until You or We provide the other with a written notice of termination at least 30 days before the end of a monthly renewal period.

CHANGE OF RENT AND TERMS AT AUTOMATIC RENEWAL. Unless We provide You written notice informing You otherwise, each month-to-month renewal term will be subject to the same terms, conditions, and rate of Rent described in this Agreement. If We provide You with written notice (in this context, "renewal notice") of an increase in Rent and/or any other changes in other terms and conditions of this Agreement AT LEAST TEN (10) DAYS BEFORE THE TERMINATION DEADLINE AND If You do not provide Us a notice of termination by the termination deadline, then this Agreement shall AUTOMATICALLY RENEW on a month-to-month basis at the increased rate of Rent and with any other changes that We specified in Our renewal notice.

**1(G). REFUNDABLE DEPOSITS.**

| | |
|---|---|
| SECURITY DEPOSIT: | $ 229.00 |
| PET DEPOSITS, if any: | $ |
| ADDITIONAL DEPOSITS(if any, describe): | |
| _____ | $ |
| _____ | $ |
| TOTAL OF ALL DEPOSITS: | $ 229.00 |

Name and Full Street Address of Financial Institution Where Deposits Are Held:

Bank of America

DocuSign Envelope ID: A1D7E8C3-A801-4094-BAB3-C114C9841DBF

## 1(H). UTILITIES - GENERALLY.

Unless otherwise provided in this Agreement or in a separate Utilities Addendum to this Agreement, You agree to obtain electric and gas *(where applicable to the Home)* service for the Home. Prior to taking possession of the Home, You shall (i) obtain electric service in Your name and (ii) obtain gas service *(where applicable to the Home)* in Your name; should You fail to do so, or in the event that payments for electricity or gas are not made when due, either failure shall be considered Your default of this Agreement. In any case, We are not liable for failure to supply electric, gas, garbage, water or sewer service(s), nor are We liable for any damage resulting from an interruption or malfunction in service or any utility due to any cause, unless We supplied the utility to You AND We acted with gross negligence regarding same.

**UTILITIES & SERVICES TO BE PAID BY US** *(only if checked by Us)*:

☐ ELECTRICITY    ☐ GAS    ☐ INTERNET    ☐ SEWER
☐ GARBAGE    ☐ CABLE TV    ☐ TELEPHONE    ☐ WATER

*You understand and agree that all utilities not checked will be paid by You.*

### 1(I). UTILITIES - SUBMETERED WATER.

**ARE WATER / SEWER SERVICES SUBMETERED?**   ☒ Yes   ☐ No

**If Yes, Type of Submetering:** ☒ All Water Usage ☐ Hot Water Only

If water and/or sewer services are submetered, You shall receive, and You agree that You shall pay, monthly bills received from Us or from Our billing agent related to Your usage of water and/or sewage services at the Home. *See Paragraph 36.*

Name and address of Our water/sewer services billing agent ("Agent"):

Resolve Partners LLC

2733 Horse Pen Creek Road Suite 101

Greensboro, NC 27410

### 1(J). SMOKE-FREE HOUSING.

**IS THE HOME DESIGNATED AS SMOKE FREE?** ☐ Yes   ☒ No
*If Yes, the Smoke-Free Housing Addendum shall apply.*
*If No, see Paragraph 18(D).*

### 1(K). DUE DILIGENCE AND ASSUMPTION OF RISK.

By initialing this Paragraph 1(K), You acknowledge that have You have read and fully agreed to Paragraph 18 of this Agreement.

*Your Initials:* _____

### 1(L). LIABILITY AND CONTENTS INSURANCE POLICIES.

You ☒ ARE ☐ ARE NOT required to have liability insurance coverage.

**Minimum Liability Insurance Coverage:** $ 100000.00

You ☐ ARE ☒ ARE NOT required to have contents insurance coverage.

**Minimum Contents Insurance Coverage:** $ 0.00
*You understand and agree that We are not responsible for any damage to, or loss of, Your personal property. See Paragraph 22(A) for details.*

### 1(O). SPECIAL PROVISIONS.
The following special provisions ("Special Provisions") shall be considered part of this Agreement:

_____

_____

_____

_____

_____

_____

_____

Where any term or condition of this Agreement and the Special Provisions may conflict, these Special Provisions shall control.

## 1(M). NOTICES AND FORM OF DELIVERY - GENERALLY.

In the event You wish to communicate with You in writing or where written notice may be required by this Agreement or by law, You agree and consent to receiving any communications and written notices from Us via the following methods that We may elect to use in Our discretion *(check which methods apply)*:

☐ E-MAIL *(email address)*: _____

_____

_____

☐ TEXT MESSAGE to *(cellular telephone numbers)*: _____

_____

☐ WRITTEN NOTICE TO HOME *(hand-delivery; posting; U.S. Mail; courier)*

In the event You wish to communicate with Us in writing or where written notice is required by this Agreement, We agree and consent to receiving communications and written notices from You via the following methods *(check which methods apply)*:

☒ E-MAIL to *(email address)*: bridgessouthpoint-cm@

pegasusresidential.com

☐ TEXT MESSAGE to *(telephone number)*: _____

☒ WRITTEN NOTICE TO LESSOR *(hand-delivery; U.S. Mail; or courier)*

☐ OTHER *(describe)*: _____

## 1(N). MISCELLANEOUS FEES/CHARGES.

| | |
|---|---:|
| **COMPLAINT FILING FEE** *(See Paragraph 37(F))*: | $ 54.35 |
| **COURT APPEARANCE FEE** *(See Paragraph 37(F))*: | $ 108.70 |
| **SECOND TRIAL FEE** *(See Paragraph 37(F))*: | $ 130.44 |
| **CHANGE OF LOCKS/KEYS** *(Per set)*: | $ 50.00 |
| **STANDARD PET FEE** *(Per pet)*: | $ 0.00 |
| **ANNUAL RATE OF INTEREST** *(see Paragraph 37(H))*: | ____ % |
| **OTHER PER EVENT FEES / CHARGES** *(describe)*: | |
| Pest Control | $ 5.00 |
| Trash | $ 15.00 |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 27 of 78

## 2. PAYMENT OF RENT – SPECIFICALLY:

**A. Forms of Rent Payment.** Your payment of Rent *(and any other fee or other amount that You owe to Us under this Agreement, and said fees and amounts may also be described collectively with the Rent as "Debt")* shall be made in the form(s) of: written checks; if We so elect, by certified funds; or, if so selected in Paragraph 1(E), made in electronic form on Our online payment website *("payment website")* by credit card, debit card, and/or Automated Clearing House (ACH) debit.

**B. Payment Website.** If the use of Our payment website is selected in Paragraph 1(E), You understand and agree that:

(1) We shall provide You with the website address for the payment website at or before the start of the original term;

(2) We reserve the right to change the web address of the payment website at any time with notice to You;

(3) The payment website may, at Our sole election, be provided by a third-party processor *("payment processor")* who is an independent contractor and not an employee nor agent nor representative of Ours;

(4) Your Use of the payment processor and the payment website is at Your own risk;

(5) We shall have no liability to You for any errors by the payment processor or payment website in processing any payment or for any potential security breaches regarding Your personal financial data;

(6) Your use of the payment processor and payment website shall be completely subject to, and You agree to abide by, any and all terms and conditions posted on such payment website;

(7) Should the payment processor or payment website require You to pay any convenience fee or similar processing fee *("processing fee")* for any payment of Debt submitted by You, You agree that any such processing fee is reasonable, and in the event You pay the processing fee, You also agree You are voluntarily paying such processing fee in consideration of Your convenience in being able to submit Your Debt payment to Us in electronic form;

(8) You further understand and agree that if You object to the payment of such a processing fee, You shall have the right, subject to subsection (9) below, to submit a Debt payment to Us in the form of a check or, if we so elect, in the form of certified funds, at Our address, even if the payment website is the only location selected in Paragraph 1(E); and

(9) Notwithstanding subsection (8) above, if Debt payment to Our online payment website is the only payment location selected in Paragraph 1(E), and if the payment website provides You at least one electronic payment option that does not require you to pay a processing fee of any kind, You agree that Your use of the payment website shall be the only form of Debt payment We shall accept unless We separately consent to another method of payment, and if We do not consent, then We reserve the right to reject any attempt by You to use any other method of Debt payment, and that Your attempt to use any other method of payment shall be considered Your default of this Agreement.

**C. Withholding Rent.** Pursuant to N.C. Gen. Stat. § 42-44(c), You agree that You may not withhold Rent under any circumstances without first obtaining a court order granting You the legal right to do so; absent such a court order, You understand and agree that Your failure to pay Rent when due shall constitute Your instant and material default of this Agreement and, pursuant to N.C. Gen. Stat. § 42-41, shall release Us from any duty to maintain or repair the Home that may be required by law or this Agreement.

**D. Prorated Rent For Last Month of Original Term.** If the original term does not end on the last day of a calendar month, then for the last partial calendar month of the original term, You agree to pay Us a prorated amount of Rent calculated as follows: the Rent divided by the total number of calendar days in the last month of the original term multiplied by the number of calendar days remaining in the last month of the original term *("final prorated rent")*. In the event You and We have entered into a renewal lease for the Home before the end of the original term, or in the event this Agreement has automatically renewed as provided in Paragraph 1(F), You shall pay Us, via a single check or money order or payment on Our payment website, the sum of (a) the final prorated rent and (b) the prorated amount for the first partial month of the renewal lease term calculated using the same method for Prorated Rent described in Paragraph 1(E).

**E. Non-Waiver.**

(1). *Generally.* Our failure to insist upon the strict performance of the terms, covenants, agreements and conditions herein contained, or any of them, shall not constitute or be construed as a waiver or relinquishment of Our rights thereinafter to enforce any such terms, covenants, agreements, or conditions, but the same shall continue in full force and effect including, but

not limited to, all remedies provided in Paragraph 37. You specifically agree that Our endorsement, deposit, or any acceptance of any Rent payment after the first calendar day of the month in which it is due shall not in any way constitute a waiver of Our right to require that You tender any future Rent payment on or before the first day of the calendar month in which it is due.

(2). *No Waiver for Partial Payment of Rent.* Pursuant to N.C. Gen. Stat. § 42-26(c), You and We specifically and expressly agree that We may endorse, deposit, or otherwise accept any partial Rent payment or partial housing subsidy payment from You, or paid on behalf of You, with Our full knowledge of Your default of this Agreement without such payment operating as a waiver of any of Our legal rights, including but not limited to the right to re-enter and re-take possession of the Home. As such, You specifically agree that We may endorse, deposit, or otherwise accept any partial rent payment or partial housing subsidy payment from You, or paid on behalf of You, without waiving Our right to declare a default under Paragraph 37 and without waiving Our right to exercise any of the remedies provided to Us by Paragraph 37 or applicable law. You also agree that Our exercise of the aforementioned rights shall in no way violate Chapter 75 of the N.C. General Statutes.

(3). *No Waiver When Under Duress or Similar Obligation to Other Laws or Regulations or Duties.* You also agree that to the extent We and/or Our agent are required to deposit any payment from You in order to comply with Title 21, Chapter 58A, Section .0107(a) of the N.C. Administrative Code *(21 NCAC 58A.0107(a))* or any other similar law or regulation or fiduciary duty, You agree that Our deposit of any such payment is only made in order to comply with applicable law, regulation, or fiduciary duty, and as such, any act by Us to comply with such law, regulation, or fiduciary duty shall in no way constitute our voluntary waiver of any legal right or of any remedy provided to us by Paragraph 37 or applicable law, and as such, You agree that We shall retain all rights to enforce any default of this Agreement, including but not limited to the right to evict You from the Home via a summary ejectment proceeding. Similarly, if You are in default of this Agreement, and if We inform You that We will reject any attempted Rent payment in order to preserve Our right to evict You from the Home via a summary ejectment proceeding, You agree that while You remain in default of this Agreement, any subsequent payment You may make during such default through Our payment website constitutes an act of duress by You against Us; that We do not willingly accept any such payment; and so long as We reverse or otherwise return such payment to You within seven (7) days of Our receipt of same, Your payment submitted to Our payment website shall in no way constitute Our voluntary waiver of any legal right or of any remedy provided to Us by Paragraph 37 or applicable law including but not limited to the right to evict You from the Home via a summary ejectment proceeding.

## 3. LATE PAYMENTS AND LOST/STOLEN PAYMENTS:

**A.Generally.** You agree that We may reject any attempt by You to pay Rent or any Debt if You are in default of this Agreement. However, should We choose to accept a late Rent payment received from You after the fifth (5th) calendar day of the month, You will also owe Us a late fee *("late fee")* equal to $15.00 or five percent (5%) of the Rent, whichever is greater – or, where Your Rent is subsidized by the United States Department of Housing and Urban Development, by the United States Department of Agriculture, by a State agency, by a public housing authority, or by a local government, the late fee shall not exceed $15.00 or an amount equal to five percent (5%) of Your share of the Rent *(after deducting the value of the rent subsidy received)*, whichever is greater. The late fee shall be considered an additional rent; You will owe Us the late fee without Us having to demand it from You; and You will tender the late fee, together with the late Rent payment, only in the form of a cashier's check or money order or, if We so designate in Paragraph 1(E), through Our payment website.

**B. When Rent is Considered Paid With Negotiable Instruments.** The term "negotiable instrument" shall refer to a check, money order, or cashier's check. Where You attempt to pay Us Rent or Debt by negotiable instrument, You agree that You have not made a Rent or Debt payment to Us, nor have We accepted same, until: (1) We physically receive the negotiable instrument; (2) We endorse *(i.e., sign or stamp the back of)* the negotiable instrument; (3) We deposit the negotiable instrument with Our banking institution; AND (4) Your banking institution honors the negotiable instrument by paying Us through Our banking institution *(this four-step process shall be referred to as the "payment process")*. Unless and until the payment process is complete, You agree that Your delivery of a negotiable instrument to Us does not constitute a payment of any kind nor shall it be considered as Our acceptance of a payment from You. Notwithstanding the above, You shall not owe Us a late fee if: We received Your negotiable instrument on or before the fifth

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 28 of 78

(5th) calendar day of the month In which the Rent payment was due; the negotiable instrument is in an amount equal to paying all Rent due In full; AND after We receive Your negotiable instrument, the payment process is completed, even where the completed payment process may occur after the fifth calendar day of the month.

**C. Effect of Lost or Stolen Negotiable Instruments.** You understand and agree that if You choose to tender Your attempted payment of Rent or Debt through a negotiable instrument as an alternative to using Our payment website, any negotiable instrument may be lost or stolen by criminal third parties outside of Our control, and as such, You agree to tender Your Rent or Debt payment by negotiable instrument at Your own risk. You understand and agree that unless the payment process was completed prior to the loss or criminal theft of the negotiable instrument, You should consider Your rent as unpaid, and that We shall grant you no credit or other consideration related to the loss or theft of the negotiable instrument. In the event Your negotiable instrument is lost or stolen, You agree that it is Your sole responsibility to replace the lost or stolen negotiable instrument in time to comply with Paragraph 1(E)(2) of this Agreement, or else You shall be in default of this Agreement.

**4. RETURNED CHECKS:** You agree to pay a $25.00 *(or the maximum allowed by law, pursuant to N.C. Gen. Stat. § 25-3-506)* processing fee *("returned check fee")* for each check that You submit to Us if said check is returned by the financial institution for any reason, including but not limited to Insufficient funds available to cash the check or If the bank account Is closed or otherwise unavailable. You agree that the returned check fee shall be due without our demand, and as such, You shall tender the returned check fee, together with the Rent and any Debt due, by cashier's check or money order. If a check submitted by You is returned by the financial institution for any reason, We reserve the right to require that You make all future payments only by cashier's check or money order or, If We so elect, by our payment website. In addition, We also reserve the right to seek civil and criminal enforcement of the returned check pursuant to N.C. Gen. Stat. § 6-21.3 and § 14-107, respectively.

**5. SECURITY DEPOSIT:** You agree to tender to Us the Total of All deposits *(the "Deposit")* as described in Paragraph 1(G) of this Agreement prior to taking possession of the Home. This sum shall be held in trust as a Security Deposit at the financial institution listed in Paragraph 1(G). We will hold the Deposit for the period that You occupy the Home, After You move from the Home and remove all items of personal property and surrender possession of the Home back to Us, We will determine whether or not You are eligible for a refund of any or all of the Deposit. The amount of the refund will be determined in accordance with N.C. Gen. Stat. § 42-51 and the following conditions and procedures:

**A. Generally.** You understand that the Deposit is security for Your performance of the terms and conditions of this Agreement, and You agree that the Deposit cannot be applied under any circumstances towards Rent or Debt *(including but not limited to the last month's Rent or final prorated rent, as applicable)* due while You are in possession of the Home.

**B. Lessor to Retain All Accrued Interest.** IF WE PLACE THE DEPOSIT IN AN INTEREST-BEARING BANK ACCOUNT, YOU AGREE THAT ANY INTEREST THAT MAY ACCRUE SHALL BE FOR OUR SOLE BENEFIT AND OWNERSHIP, AND THAT WE MAY WITHDRAW SUCH INTEREST AT ANY TIME WITHOUT NOTICE OF ANY KIND TO YOU.

**C. How We May Refund and/or Apply the Deposit.** Pursuant to N.C. Stat. § 42-51 and § 42-52, We shall refund You the amount of the Deposit LESS any amount needed to pay the cost of: unpaid Rent and costs for water or sewer services provided by Us pursuant to N.C. Gen. Stat. § 62-110(g) and electric service pursuant to N.C. Gen. Stat. § 62-110(h); damage to the Home in excess of normal wear and tear including, but not limited to, damage to or destruction of smoke detectors or carbon monoxide detectors; damages arising from Your failure to fulfil the entire original term or renewal term of this Agreement, except where this Agreement was terminated pursuant to N.C. Gen. Stat. § 42-45 or § 42-45.1; any unpaid bills that become a lien on the Home where such bills arise from Your occupancy of the Home; Our costs incurred in re-renting the Home after Your default of this Agreement, including, but not limited to, reasonable fees or commissions paid to Our licensed real estate broker to re-rent the Home; Our costs incurred in the removal and storage of Your personal property after a summary ejectment proceeding; any court costs incurred by Us as a result of Your default of this Agreement; and unpaid late fees, Eviction Filing Fees, Court Appearance Fees, or Second Trial Fees *(see Paragraph 37)* or any other similar fees or costs authorized by N.C. Gen. Stat. § 42-46.

**D. Timing of Refund and/or Accounting of Deposit.** If We can determine the

extent of all Our potential deductions from the Deposit, We shall, within thirty (30) days after termination of Your tenancy and Your delivery of possession of the Home back to Us, return the balance, if any, of the Deposit, along with an itemization of any deductions from the Deposit, to You at Your last known address. If we cannot determine the extent of Our potential deductions from the Deposit within thirty (30) days after termination of Your tenancy and Your delivery of Possession of the Home back to Us, then We shall provide You with an interim accounting no later than thirty (30) days after termination of Your tenancy and Your delivery of possession of the Home to Us, and We shall provide You with a final accounting within sixty (60) days after termination of Your tenancy and Your delivery of possession of the Home to Us. If Your address is unknown or if Your deposit is returned to Us as undeliverable by the U.S. Postal Service, We will hold the balance of the Deposit for Your collection for a period of six (6) months, after which time any remaining balance of the Deposit may, at Our options, escheat to the State of North Carolina. At such time, Our liability for the return of the Deposit shall cease. You agree that Your delivery of possession of the Home shall not be considered complete until You comply with Paragraphs 34(B) and 34(C), specifically including the removal of all of Your personal property from the Home.

**E. Refund of Deposit to One Lessee or Division Among Lessees.** If the Home is rented by more than one Lessee, You agree that You are responsible for dividing any Deposit refund among all Lessees. We may, in Our discretion, pay the Deposit refund to any one Lessee named in Paragraph 1(A) of this Agreement, and in such an event, You agree to hold Us harmless for such action and further agree that any remedy for any claim for the Deposit may be made solely against the respective Lessee(s) to whom We paid the Deposit refund.

**F. Refund Only To Remaining Lessees.** Absent a separate written agreement or written modification to this Agreement signed by You and Us, in the event a co-Lessee *("departing Lessee")* seeks to terminate their portion of this Agreement and otherwise remove the departing Lessee's name from this Agreement as specifically permitted by N.C. Gen. Stat. § 42-45.1 or a separate addendum to this Agreement, and In the event this Agreement shall continue in full force and effect as to any remaining Lessee(s) *("remaining Lessee(s)")* to the Agreement, You agree that the ownership of the Deposit shall automatically transfer to the remaining Lessee(s), who shall be the only persons eligible for a refund and/or accounting of the Deposit.

**G. Transfer and Termination of Duties Upon Sale.** Upon a sale or conveyance of the Home, We may transfer or assign the Deposit to the new owner, who then shall assume the liability for such Deposit upon the sale or conveyance of the Home, and at that point in time, You agree that Our liability for the Deposit shall terminate.

**H. Impact of Pet Deposits; Pet Fees and Pet Rents Not Applied to Damage.** While the Deposit may be increased as shown in Paragraph 1(G) due to the presence of a pet, the Deposit can be applied as set forth in Paragraph 5(C) and not just to those damages that may be attributed specifically to the presence of a pet. You also agree that no portion of the Deposit is to be considered a pet fee or separate monthly pet rent. In this event a pet fee or monthly pet rent is required by this Agreement or an addendum to this Agreement, You agree that any pet fee or monthly pet rent is non-refundable; that the payment of any such pet fee or monthly pet rent is made only in consideration for Your privilege of maintaining a pet at the Home and not as payment for future damages relating to said pet. As such, You also agree that any pet fee or monthly pet rent is not subject to the deposit itemization requirements the termination of this Agreement.

**6. NOTICES OF TERMINATION; AUTOMATIC RENEWAL OF AGREEMENT:**
**A. Notices of Termination.**

(1).Generally; Notice To/From One Lessee is Notice To/From All Lessees. All notices of termination, as specifically referenced in Paragraph 1(F) or elsewhere in this Agreement, shall be in writing and may be delivered by any method specifically permitted by Paragraph 1(M). Where there is more than one Lessee to this Agreement, a notice of termination submitted by one Lessee *(the "terminating Lessee")* shall be considered a notice of termination submitted by all Lessees; accordingly, in the event We receive conflicting notices *(for a purported renewal or extension of this Agreement or otherwise)* from other Lessee(s), the terminating Lessee's notice of termination shall control. You agree that a notice of termination delivered by Us to any one Lessee shall be considered received by all Lessees.

(2).Effective Date. You agree that any notice of termination from You shall not take effect until the last day of the original term or on the last day of any subsequent month-to-month renewal term, except as otherwise provided in this Agreement. As such, regardless of how many days' notice that You provide to Us, You may not terminate this Agreement before the last day of the original term, unless We specifically consent in writing in a separate

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

signed document. Similarly, if this Agreement has automatically renewed on a month-to-month basis, You may not terminate this Agreement before the last day of any month-to-month term, unless We specifically consent in writing in a separate signed document or except as otherwise specified in this Agreement. If, without Our written consent or as otherwise specified in this Agreement, You attempt to terminate this Agreement prior to the last day of the original term or prior to the last day of any subsequent month-to-month term, You will be in default of this Agreement, and You shall be liable to Us for the payment of Total Monthly Rent until (a) the end of the original term or the end of the subsequent month-to-month renewal term (*whichever is applicable at the time*) or (b) until the date that We receive a rental payment from a subsequent tenant who enters into a lease agreement with Us for the Home, whichever one of these two events occurs first.

(3).Holdover After Our Consent to Terminate Early. In the event We consent in writing to Your termination of this Agreement on a specific date (*"move out date"*) that is prior to the end of either the original term or a month-to-month renewal term, and in the event You fail to vacate the Home and remove all of Your personal property by the move out date, You understand and agree that:

(a) You shall be considered a holdover tenant subject to removal immediately via summary ejectment pursuant to N.C. Gen. Stat. 42-26(a)(1);

(b) You shall be in default of this Agreement;

(c) You shall continue to be liable to Us for the Total Monthly Rent until (i) the end of the original term or the end of the subsequent month-to-month renewal term (*whichever is applicable at the time*) or (ii) until the date that We receive a rental payment from a subsequent tenant who enters into a lease agreement with Us for the Home, whichever one of these two events occurs first; and

(d) You shall be liable to Us for any and all consequential damages arising from Your failure to vacate the Home on or before the move out date, including but not limited to Our loss of income arising from Our inability to market the Home to potential tenants and Our loss of income arising from a subsequent tenant's inability to move into the Home while You remain in possession of the Home, whether by residing at the Home or by Your failure to remove all items of personal property from the Home.

B.Effect of Automatic Renewal of Lease. If this Agreement is automatically renewed on a month-to-month basis, it shall continue to renew automatically each and every subsequent month thereafter until either party provides the other party a notice of termination as provided in Paragraph 1(F). If the original term does not end on the last calendar day of a month, each subsequent month-to-month renewal term shall be exactly thirty (30) days in length, beginning the first calendar day after the end of the original term.

7. NOTICES AND FORM OF DELIVERY – SPECIFICALLY:

A. Verbal/Oral Notices Never Permitted. YOU AGREE THAT ORAL NOTICES, REGARDLESS OF FORM OR CONTENT OR IMPLICATION, SHALL NEVER CONSTITUTE THE TERM "NOTICE" AS DESCRIBED IN THIS AGREEMENT.

B. Certain Form(s) of Notice Required. Any notice required by this Agreement shall only be delivered in one or more of the forms specifically permitted by Paragraph 1(M) of this Agreement. You understand and agree that delivery of any attempted notice that violates the requirements of Paragraph 1(M) or this Paragraph 7 shall not constitute notice of any kind, and as such, We may ignore such attempted notice as invalid and insufficient.

C. Notice to Us.

(1).Paper Format. Where Paragraph 1(M) indicates that You may send written notice to Lessor, such notice ("paper notice") shall be written on letter-sized paper (8 ½" x 11") that is separate from the Agreement itself; such paper notice shall not be in the form of, or written onto, any negotiable instrument (*such as a check or money order*); and such paper notice shall be delivered to Us at the address listed in Paragraph 1(A) (*or to any other address which We may later provide to You*) by one of the following methods: (a) hand-delivery to an employee of Ours during regular business hours inside the management office at the community in which the Home is located, or if We so elect and make available, by delivery to a private mail drop box (*"drop box"*) located at Lessor's address, pursuant to the terms of Paragraph 7(F); (b) U.S. Mail, first class postage; or (c) via a delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2).

(2).Electronic Format. Where Paragraph 1(M) indicates that You may send notice to Us by email or text message, then it shall be delivered to Us at the respective email address(es) or telephone number(s) specifically provided in Paragraph 1(M). We reserve the right to change Our email address(es) or telephone numbers described in Paragraph 1(M) at any time after first providing You with notice of such change. When You send Us notice by either email or text message, You agree that any such notice shall also state the

sender's first and last name and shall originate from Your email address or Your telephone number, respectively, that is specifically provided in Paragraph 1(M), and that any such email or text message shall not be deemed received by Us unless We reply to You confirming Our receipt of same.

(3).Other Forms. Where Paragraph 1(M) indicates an alternative form by which You may send Us notice, You may use the method specified, and You agree that such alternative forms may, at Our sole election, be in electronic form (*including but not limited to a website portal or other message service*), telephonic form, or on paper.

D. Notice to You.

(1). Paper Format. Where Paragraph 1(M) indicates that We may send written notice to You at the Home, such notice ("paper notice") shall be written on letter-sized paper (8 ½" x 11") and delivered to You at the Home by one of the following methods: (a) posting the notice on the front door of the Home; (b) hand delivery to You or any Authorized Occupant of suitable age and discretion; (c) U.S. Mail, first class postage; or (4) by a designated private delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2).

(2). Electronic Format. Where Paragraph 1(M) indicates that We may send notice to You by email or text message, then You agree We may send You notice to any one (*or more in Our sole discretion*) of the respective email address(es) or telephone number(s) specifically provided in Paragraph 1(M), and YOU FURTHER AGREE AND OTHERWISE CONSENT TO THE FOLLOWING:

(a). Email and Telephone Numbers - Generally. By signing this Agreement, You agree and represent that: Your email address ("Email Address") and Telephone Number ("Telephone Number") listed in Paragraph 1(M), if any, are valid; that You shall maintain any such Email Address and Telephone Number for the duration of the original term of this Agreement and any month-to-month renewal term, though You may change Your Email Address or Telephone Number after first requesting, and receiving, written consent from Us. For any Telephone Number listed in Paragraph 1(M), You also agree and represent that any such Telephone Number is able and authorized to receive Short Message Service text messages ("SMS text messages" or "SMS") from Us;

(b). Responsibility for Delivery of Email and SMS Text Messages. You agree that You are solely responsible to ensure that Your respective server or software or private email provider or email system that receives and/or organizes Your email received at the Email Address (*said server or software or private email provider or email system generally referred to as "Email Provider"*) does not treat Our email notices as "junk" or "spam" email or as otherwise undeliverable or rejected; that You fully and freely assume the risk that any of Our email notices to You may be diverted or filtered or deleted as junk or spam by Your Email Provider; and You fully understand and agree that any notice We send to Your Email Address shall be considered valid and otherwise received by You, whether or not Your Email Provider actually delivers such notice to You, and You further agree that any such delay shall not serve as a defense to Our declaring a default of this Agreement or enforcing any termination of this Agreement. Similarly, You agree that You are solely responsible to ensure that Your telephone service provider that owns and manages Your Telephone Number and the information and data delivered to it (*generally, "Telephone Provider"*) does not reject our SMS text messages as "junk" or "spam" as otherwise undeliverable or rejected; that You fully and freely assume the risk that any of Our notices sent by SMS to You may be diverted or filtered or deleted as junk or spam by Your Telephone Provider; and You fully understand and agree that any notices We send to You by SMS shall be considered valid and otherwise received by You, whether or not Your Telephone Provider actually delivers such notice to You, and You further agree that any such delay in delivery of such notice shall not serve as a defense to Our declaring a default of this Agreement or enforcing any termination of this Agreement.

(c). Consent. By signing this Agreement, YOU HEREBY CONSENT to receiving email notices and SMS text messages from Us; that any such notices We provide You are not to be considered unsolicited commercial notices but rather part of Our ongoing and established business relationship with You as Lessor and Lessee(s); and that You understand that Your Telephone Provider may, pursuant to Your existing contract with Your Telephone Provider, charge You fees for Your receipt of SMS text messages from Us, and in such an event, You fully consent and agree to be solely responsible to pay such fees.

E. Receipt of Notice. Notices that You send to Us shall be deemed received by Us only upon Our actual receipt of such notice, regardless of the method of delivery used. To establish Your receipt of Our notice as a matter of law and fact, You and We agree that, in the event there is a dispute between

Case 1:18-cv-01030-LCB-JLW    Document 4    Filed 12/18/18    Page 30 of 78

You and Us as to the specific date You actually received a notice from Us, all notices shall be considered received by You no later than the following time periods: (1) seventy-two (72) hours subsequent to the postmark date of sending written notice via U.S. Mail, First-Class Delivery; (2) twenty-four (24) hours subsequent to the sending of an overnight delivery package via U.S. Mail or via a designated delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2); (3) twelve (12) hours subsequent to the posting of the notice on the door of the Home; or (4) immediately upon: sending a notice to Your Email Address, sending a notice to You by SMS to Your Telephone Number, or by hand-delivery to You or Your Authorized Occupant.

**F. Use of Drop Boxes For Delivery of Notices or Payments to Us.** For the purposes of this Agreement and for the purpose of assessing late fees pursuant to Paragraphs 1(C) and 3, You agree that any notice or payment that You deliver to an after-hours drop box *(that may be located, at Our sole election, on the exterior of Our management office)* shall be deemed received at the time the management office re-opens for business, not before. By using the drop box, You agree that delivery of a notice or payment after business hours on the date any notice or payment is due may result in the notice or payment being considered late by Us, and in such an event, You shall be liable for late fees and/or for an additional month-to-month renewal term, where applicable under the terms of this Agreement.

**8. PETS:**

**A. In General; Pets Prohibited Without Our Consent.** No animals, birds, or pets of any kind shall be permitted in the Home at any time without Our express, written consent, which shall be documented in a separate pet addendum. You understand and agree that We have the sole discretion and absolute right to determine regarding what animals, if any, will be allowed to enter or remain in the Home, although reasonable accommodations will be made where otherwise required by law. You further understand and agree that even if We permit a pet in the Home, the pet must be removed from the Home upon Our request if, in Our sole discretion, We determine that the pet constitutes a nuisance, creates a disturbance, causes damage, poses a threat to the safety of any person or property, or is no longer desirable.

**B. Pet Fee and Pet Rent For Unauthorized Pet(s).** Should We discover that You have or had an unauthorized pet in the Home during Your tenancy (whether or not Our discovery of the unauthorized pet occurs during Your tenancy or thereafter), You agree that You shall be liable to Us for the immediate payment of the standard pet fee described in Paragraph 1(N) *(or as otherwise provided in a pet addendum, if any)* multiplied by the number of pets discovered. If a monthly pet rent is also indicated in Paragraph 1(N) or any addendum to this Agreement, then You shall also be liable to Us for such pet rent. You understand and agree that it is unreasonable for You to demand that We ascertain the exact date and time that any unauthorized pet was present in the Home for the purpose of establishing a prorated sum of any standard pet fee or pet rent; accordingly, for the purposes of assessing the amount of said standard pet fee and pet rent that You owe Us pursuant to this Paragraph, You agree the standard pet fee and any pet rent shall be calculated as though any unauthorized pet was present in the Home on the first day of the original lease term. In the event You fail to tender the standard pet fee and pet rent required by this Paragraph immediately upon Our demand, it will constitute Your default of this Agreement.

**C. Pet Waste and Related Damage.** You understand and agree that the presence of pet urine or other animal waste that may be deposited in the carpeting or on the flooring of the Home during Your tenancy represents certain biological, health, and safety hazards – as well as offensive odors – for Yourself and for future and neighboring tenants. Due to (1) the unique characteristics of animal urine and other animal waste and the damaging effects on carpet, carpet padding, flooring, walls, interior trim, sheetrock, and fixtures and (2) the unlikelihood of cleaning such damages to the satisfaction of future tenants, You agree that the presence of animal urine or animal waste in the carpet, carpet padding, walls, interior trim, flooring, or fixtures of the Home shall not, under any circumstances, be considered normal wear and tear. You understand and agree that, in any event, You shall fully reimburse Us for Our damages arising from Our incurred labor and costs to replace and install carpet, carpet padding, walls, interior trim, flooring, and/or fixtures necessitated by the presence of animal urine or other animal waste, and that the Deposit referenced in Paragraph 1(G) may be applied to such damages, though You shall be fully liable to Us for any deficiency. The replacement value of carpet, carpet padding, walls, interior trim, flooring, and fixtures shall be prorated based on the respective age of the item(s) at the time of replacement as compared to the original expected life of the respective item(s).

**D. Liability for Deodorizing and Removing Pests.** You understand and agree that the presence of pets in the Home may hinder Our ability to re-rent the Home to a future tenant, due to specific odors, dander, fleas, and other

characteristics that may be objectionable to future tenants. As such, You agree that You shall be liable to Us for any costs associated with (1) deodorizing the Home, and (2) professionally treating the Home for the actual or suspected presence of fleas or ticks.

**9. KEYS AND LOCKS:**

**A. No Changing Locks Without Consent; Return of Keys and Devices.** You agree not to install additional or different locks or gates on any doors or windows of the Home, unless We first expressly consent to such installation in writing or as otherwise provided in this Paragraph 9. When this Agreement ends, You agree to return all keys, security access cards and devices, parking gate openers, current security alarm codes, and garage door openers *(as applicable)* to Us. If keys are not returned to Us at the end of the tenancy, You agree to pay the change of lock fee described in Paragraph 1(N) for each lock changed. For the other devices named in this Paragraph, You shall be liable to Us for their replacement value. At the end of Your tenancy, should You fail to provide Us with the then-current alarm codes for the security or entry alarm system *(if any)*, You shall also be liable to Us for Our costs to alter or restore such codes.

**B. Any Co-Lessee May Request Lock Change and Obtain Keys.** You also agree that at any time any Lessee may request, either orally or in writing, that We install new or different locks to the Home. You agree that, whenever We may install replacement locks at the Home at Your request, You shall be responsible to pay Us the change of lock fee listed under Paragraph 1(N) for each set of locks. In the event We install replacement locks, You understand and agree that We shall provide keys for the replacement locks for the Home to any other co-Lessee who may request them, except for persons who may be perpetrators of sexual assault, stalking, or domestic violence and who have been ordered to remain away from the Home by a court of law.

**C. Procedures for Changing of Locks for Victims of Domestic Violence, Sexual Assault, or Stalking.**

(1). <u>Generally.</u> A person who has been ordered to remain away from the Home or is otherwise excluded from entry into same pursuant to a domestic violence restraining order or any other similar governmental order barring the person's re-entry into the Home shall, for the purposes of this Agreement, be referred to as a Perpetrator.

(2). <u>Where the Perpetrator is a Lessee or Authorized Occupant.</u> In the event a co-Lessee or Authorized Occupant or any other household member claims to be the victim of domestic violence, sexual assault, or stalking, and the co-Lessee or Authorized Occupant or household member *(also referred to as the "victim")* seeks to change exterior door locks *(as used in the context of this Paragraph, "Locks")* to bar the Perpetrator or any other person having key access in the Home from re-entering the Home under the terms of this Paragraph, the victim must first provide Us with a copy of an order issued by a court *(the "Order")* that requires the Perpetrator to stay away from the Home. Upon Our actual receipt of the victim's request to change Locks *(which may be in oral or written form)* AND a copy of the Order, We shall either change the Locks within seventy-two (72) hours or give consent for the victim to change the Locks. Should We fail to change Locks within seventy-two (72) hours after receipt of the victim's request and a copy of the Order, such failure shall be construed as Our consent for the victim to change the Locks pursuant to N.C. Gen. Stat. § 42-42.3. In the event the victim changes their own Locks, You shall provide Us with a working key to the replacement Locks within forty-eight (48) hours of the replacement Locks' installation. Pursuant to the terms of this Paragraph and the pertinent provisions of N.C. Gen. Stat. § 42-42.3, You agree that We shall not provide keys for replacement Locks or otherwise grant access to the Home to any Perpetrator, whether or not the Perpetrator may be You, an Authorized Occupant, or any other person. In such an event, You agree that We are not liable for civil damages to any Perpetrator excluded from the Home, including, but not limited to, any claims related to the Perpetrator's loss of use of the Home or loss of use or damage to the Perpetrator's personal property.

(3). <u>Where the Perpetrator does not reside in the Home.</u> In the event You request a change of locks and claim to be the victim of domestic violence, sexual assault, or stalking, We shall either change the locks within forty-eight (48) hours of the request or give consent for You to change the Locks. Should We fail to change Locks within forty-eight (48) hours after receipt of the victim's request and a copy of the Order, such failure shall be construed as Our consent for You to change the locks pursuant to N.C. Gen. Stat. § 42-42.3. In the event You change Your own Locks, You agree to provide Us with a working key to the replacement Locks within forty-eight (48) hours of their installation.

**D. Key Access – Authorized Occupants.** With the exception of the procedures related to Perpetrators described in Paragraph 9(C), You agree that We may, in Our sole discretion, open the Home to any Authorized

Case 1:18-cv-01030-LCB-JLW    Document 4    Filed 12/18/18    Page 31 of 78

DocuSign Envelope ID: A1D7E8C3-A801-4094-BAB3-C114C9841DBF

Occupant listed under Paragraph 1(A) of this Agreement upon the request of such Authorized Occupant *(whether or not said Authorized Occupant is a minor)* where You have indicated that this is acceptable to You by checking the box for key access beside the name of the respective Authorized Occupant(s) listed in Paragraph 1(A) of this Agreement. You understand and agree that this key access authorization imposes no duty upon Us to open the Home for any Authorized Occupant, and You waive any claim for damages resulting from Our act of either opening the Home or failing to open the Home, for any such Authorized Occupant.

**10. COMMON AREAS:** As used in this Agreement, the terms "Common Area" or "Common Areas" shall refer to all land and fixtures and spaces *(other than Our business and management offices)* outside the Home that are owned and maintained by Us and comprise the single place of real property *(or the contiguous parcels of real property)* that form the single community in which the Home is located. You understand and agree that the use of the Common Areas *(including any amenity, swimming pool, exercise room, basketball court, parking areas, laundry facilities, hallways, breezeways, roadways, and so forth)* is subject to any Rules and Regulations set by Us and that such Rules and Regulations may be changed at any time without notice. You understand and agree that Your payment of rent to Us only entitles You to the rental and use of the Home and Your ingress and egress to and from the Home while You remain in legal possession of the Home. You also understand and agree that Your use of any Common Area facility *(also known interchangeably as "facility" or "amenity")* is not included as part of the Rent but instead is a privilege *(not a right)* granted to You by Us. We may revoke Your privilege to use any facility upon Your default of this Agreement, or if we deem, in Our sole discretion, that You or an Authorized Occupant or Your guest has misused the facility in any way or has disturbed the rights or comfort of other people. In the event We revoke Your privilege to use a facility, You agree that We have the right to trespass You and Your Authorized Occupant(s) criminally from the facility. You also further agree that: (a) We may close or eliminate any facility at any time; (b) that We may bar You or any Authorized Occupant or guest from entering or using any facility based on Your *(or their)* misuse of same or based upon Your default of this Agreement, including but not limited to Your failure to pay Rent or any other Debt when due under this Agreement *(including but not limited to any failure by You to pay for submetered water or sewer bills or any other utility for which You are responsible)*; (c) You would not be entitled to any rent reduction or abatement or rescission or damages of any kind whatsoever relating in any way to Your inability to access or use any facility. You also agree that We may remove, or We may request that any law enforcement officer remove or otherwise trespass, any person from the Common Areas where such person cannot or will not establish that they are a Lessee or Authorized Occupant of Your invited guest.

**11. USE OF THE HOME:** You agree to use the Home for residential purposes only and agree not to use the Home in any manner which We deem is injurious to Our reputation, safety, or welfare or is otherwise injurious to the property or to any person whatsoever. Generally, You may not use the Home for business purposes. However, where allowed by law and by Us in Our sole discretion, You may use the Home as a home office if such home office use: (a) is ancillary to the residential use; (b) does not generate any additional pedestrian or vehicular traffic to or from the Home or Common Areas; and (c) does not cause any disturbance to other neighbors or other tenants or occupants of the community in which the Home is located.

**12. ASSIGNMENT AND SUBLETTING/TRANSFER OF INTEREST:** You agree that You may not assign this Agreement or otherwise rent the Home to any other party in any manner or to any extent *(even if for only one day or for a portion of a day)*, nor shall You advertise any possible assignment or sublease or any other rental of the Home, without first obtaining Our prior express written consent, and We reserve the right to require You to pay Us a fee, the amount thereof may be negotiated by the parties to this Agreement, as a precondition of Our granting any written consent to You. It is hereby understood and agreed that any consent obtained from Us as to any assignment or subletting or other rental of the Home shall not constitute Our consent to any future assignment or subletting or rental, nor would any such consent release You from liability under this Agreement. It is understood that We may sell or transfer the Home and transfer this Agreement to any new owner. If We sell or otherwise transfer ownership of the Home, You agree that We are released from all obligations under this Agreement and that Your sole remedy would be against Our successor in rights.

**13. MAINTENANCE:** We agree to maintain the Home in a fit and habitable condition, subject to the reasonable limitations described in N.C. Gen. Stat. § 42-41, § 42-42, § 42-43 and this terms and conditions of this Agreement, including but not limited to Paragraph 18. You understand and agree that We are entitled to a reasonable time to make any necessary repairs or

maintenance and that You shall not be entitled to any claim, whether for abatement or otherwise, relating or otherwise arising from any inconvenience or annoyance during that reasonable time.

**A. Our Obligations.** We Agree To:

(1) Maintain the Common Areas in a reasonably clean condition;

(2) Maintain all equipment and appliances that We provide to You in working order;

(3) Make necessary repairs with reasonable promptness after receiving written notice from You;

(4) Repair or remedy, after Our discovery or receipt of Your notice of, any imminently dangerous condition, as defined by N.C. Gen. Stat. § 42-42(a)(8), within a reasonable period of time based upon the severity of the condition;

(5) Provide routine pest extermination treatment, though if We determine that additional extermination treatments are required due to Your failure to maintain the Home in a clean and safe condition, or if You fail to cooperate with Our routine pest control extermination treatments, including but not limited Your failure to prepare Your unit properly for extermination treatment after receiving notice and instructions from Us or Our pest control contractor, then in either event You will be liable to Us for the cost of additional pest extermination treatments and any other expenses associated with such additional treatments; AND

(6) Provide operable smoke detectors *(and where required by law, carbon monoxide detectors)* and repair or replace the smoke detectors *(and carbon monoxide detectors, where applicable)* when You notify Us in writing that repair or replacement is needed.

**B. Our Obligations.** You agree to:

(1) Keep the Home, including plumbing fixtures, facilities, and appliances, in a clean and sanitary condition;

(2) Comply with all laws, health and policy requirements with respect to the Home, including, but not limited to, N.C. Gen. Stat. § 42-43, and in the event You fail to comply with any duty imposed by N.C. Gen. Stat. § 42-43, You hereby release Us from any duty to comply with N.C. Gen. Stat. § 42-42(a) and Paragraph 13(A);

(3) Use all appliances, fixtures, electrical wiring and outlets, plumbing, sanitation and waste disposal systems, heating, ventilation, air conditioning, and other equipment in a safe and proper manner and only for the purposes for which they are intended;

(4) Not litter the grounds or Common Areas and to keep the sidewalks, entrances, porches, floors, exterior patios, balconies, and front and back yards free from discards, clutter, unsightly items, and other personal articles;

(5) Not destroy, deface, damage or remove any part of the Home or Common Areas;

(6) Give Us prompt written notice of any imminently dangerous condition, as defined by N.C. Gen. Stat. § 42-42(a)(8), or of any unsafe or unsanitary condition, or of any defects in the plumbing, fixtures, appliances, heating and/or cooling equipment or any other part of the Home or Common Areas, except in the event of an emergency, when You are to give notice to Us by the quickest means available;

(7) Remove garbage and other waste from the Home in a clean and safe manner by immediately placing such garbage and waste in receptacles provided by Us for such use, and You shall not place such garbage and waste on patios, balconies, or in any Common Area unless authorized by Us in writing via a separate agreement or an addendum to this Agreement;

(8) Supply all electric light bulbs and fuse replacements as needed and supply and otherwise replace, or pay Us an additional fee to supply and replace pursuant to a separate addendum to this Agreement, all heating and air conditioning filters the earlier of (a) every three months of Your tenancy or (b) at time periods with the respective heating and air conditioning manufacturer's recommended replacement filter schedule;

(9) Periodically inspect the smoke detectors and carbon monoxide detectors to ensure their operability and notify Us in writing of any needed repairs;

(10) Test and replace batteries in any battery-operated smoke detectors and carbon monoxide detectors at the beginning of the tenancy, during the tenancy, and during any renewal thereof;

(11) Do nothing to disable the smoke detectors and carbon monoxide detectors;

(12) Do nothing that would introduce, cause, permit, or otherwise allow or exacerbate any insect infestation *(including bed bugs)* in the Home;

(13) Immediately notify Us in writing of any insect or bed bug infestation in the Home; AND

(14) Comply fully with any insect or bed bug treatment or eradication plan as presented by a licensed pest control company *("pest control vendor")* that

We may retain to treat the Home, and as part of Your compliance with any such treatment or eradication plan, You shall: (a) grant Us or Our pest control vendor necessary access to the Home for pest inspection and treatment; (b) prepare the Home for treatment pursuant to Our specific requests; and (c) permanently remove any infested personal property from the Home per Our request.

**14. MOLD, MILDEW, AND OTHER ENVIRONMENTAL ISSUES:**
You acknowledge and agree that You shall keep the Home clean and shall take other measures to retard and prevent mold and mildew from accumulating in the Home including, but not limited to, Your reasonable usage of the air conditioning and heating systems. Additionally, You agree to:

**A. Clean, Dust, and Remove Moisture.** You shall clean and dust the Home on a regular basis and remove visible moisture accumulation on windows, walls, and other surfaces as soon as such accumulation becomes reasonably apparent;

**B. Notify Us of Leaks and Excessive Moisture/Water.** You shall notify Us immediately of any evidence of a water leak or excessive moisture or standing water inside the Home;

**C. Notify Us of Mold, Mildew or Growth.** You shall notify Us immediately of the presence of mold, mildew, or similar growth in the Home that persists after You have first attempted to remove same through the application of common household cleaning solutions or anti-microbial products;

**D. Notify Us of Any Malfunction of Major Systems or Doors/Windows.** You shall notify Us immediately of any malfunction of any part of the heating, ventilation, air conditioning, plumbing, or laundry systems present on the Home and, and You shall also immediately notify Us of any inoperable doors or windows in the Home; and

**E. Be Responsible for Damages and Injuries Due to Your Failure to Comply.** In any event, You agree that You shall be solely responsible for damages caused to the Home – and to personal property present in the Home, as well as any injuries or adverse medical condition suffered by You or Your occupants, family, or guests – resulting from Your failure to comply with the terms of this Paragraph 14.

**15. DAMAGES, FIRE, AND CASUALTY:**

**A. Generally.** You agree to hold Us harmless and to indemnify Us from all fines, penalties and costs related to Your violations of, or Your noncompliance with, any laws, requirements or regulations and from any liability arising out of such violations or noncompliance.

**B. Strict Liability for Damages; Your Duty to Pay for Damage; Our Right to Declare Default.** You and We expressly agree that N.C. Gen. Stat. § 42-10 shall not apply to Your tenancy. As such, You agree that We shall hold You strictly liable for any damage, including but not limited to an infestation or bed bug infestation that is caused directly or indirectly by You, Your Authorized Occupants, Your guests, and/or Your visitors. In the event of such damage, You agree to pay: (1) the cost of all repairs and remediation and to do so within seven days after receipt of Our demand for the repair charges, and (2) Rent during the period of time the Home is damaged, whether or not the Home is fit or habitable. Whether or not You pay for damage upon Our demand, in the event of damage caused by You, Your Authorized Occupants, and/or Your guests or agents, We may declare a default of this Agreement and terminate Your right of possession without terminating the Agreement, pursuant to Paragraph 37 of this Agreement.

**C. Duty to Notify; Election to Repair Substantial Damage or Terminate.**

(1). **Duty to Notify.** You shall immediately notify Us of any damage to the Home by fire, flooding, or other casualty not caused by Us, including natural disasters, the presence of a bed bug infestation, highly elevated levels of radon gas, the presence of a methamphetamine laboratory and/or toxic chemicals used in, or otherwise related, to the production of methamphetamine, or any other catastrophic damage which, in Our sole opinion, substantially impairs the value of the Home and renders the Home, or a substantial portion of the Home, as uninhabitable (any of the damages described above generally referred to as "substantial damage").

(2). **Election to Repair Substantial Damage or Terminate.** We may, in Our sole discretion, elect to repair substantial damage within a reasonable time under the circumstances, and in such an event, Your obligations under this Agreement shall continue. In the alternative, We may, at Our sole discretion, elect not to repair the Home or to delay the repair of the Home, and in such an event and after We provide notice to You of Our election not to repair the Home or Our election to delay such repair, this Agreement shall terminate as of the date of the substantial damage, and You shall owe no additional Rent after the date of the substantial damage, unless You become a holdover tenant. Where You have paid Rent for a period of time beyond the date of the substantial damage, We shall refund You a prorated share of the Rent for the period of time paid after the date of the substantial damage, unless

the substantial damage was caused or otherwise introduced by You, Your Authorized Occupants, Your guests, and/or Your visitors, in which case You agree that We shall not pay You a refund of any kind.

(3). **Holdover.** Should You remain in possession of the Home after We terminate the Agreement pursuant to this Paragraph, then You agree that You shall be considered a holdover tenant subject to eviction immediately pursuant to N.C. Gen. Stat. § 42-26(a)(1).

(4). **No Compensation or Consideration for Substantial Damage Not Caused by Us.** You understand and agree that in the event of a fire, flood, catastrophe, radon, methamphetamine, bed bugs, or other casualty that was not caused directly by Us, We have NO duty whatsoever to:

(a) Find, provide, or pay for alternate housing for You; AND/OR

(b) Pay for any other related expense(s), including but not limited to any costs for Your relocation to another home.

**D. Smoking in Home.** The contents of this Paragraph shall apply if Paragraph 1(J) indicates the Home is not designated as smoke free. You understand and agree that though We permit You to smoke any lawful inhaled recreational product (including but not limited to tobacco, e-cigarettes, and similar vapor products, and use of any of the above shall be generally referred to as "smoking") in the Home, even moderate smoking can still result in smoke and odor residue (collectively, "smoking residue") throughout the Home, and You agree that such smoking residue will make the Home highly unmarketable to future prospective tenants without significant and expensive treatments to remove the smoking residue from the Home. As such, You agree that the presence of any smoking residue, including any related odors in any area of the Home, shall never, under any circumstances, be considered normal wear and tear. As such, You understand and agree that, in any event, You shall be fully responsible for Our costs to perform necessary deodorization and ozone treatments to ameliorate and otherwise remove the smoking residue caused by Your act of permitting smoking in the Home. Should Our good-faith deodorization efforts fail to remove the smoking residue from any area or surface of the Home, including but not limited to carpets, walls, and fixtures, You understand and agree that You will be liable to Us for the value of the replacement and installation of such carpet, walls, and/or fixtures, and that the Deposit referenced in Paragraph 1(G) may be applied to such damages, though You shall be fully liable to Us for any deficiency. The replacement value of carpet, flooring, and fixtures shall be prorated based on the respective age of the item(s) at the time of replacement as compared to the original expected life of the respective item(s).

**16. RESTRICTIONS AND ALTERATIONS:**

**A. Generally.** You shall not do any of the following without first obtaining Our written permission:

(1) Change or remove any part of the appliances, fixtures or equipment in the Home;

(2) Paint any part of the Home or install paneling, wallpaper or contact paper in the Home;

(3) Attach awnings or window guards inside or outside the Home;

(4) Attach or place any object, appliance, electronic device, fixture, sign, fence or clothesline anywhere in the Common Areas, including, but not limited to, any building, breezeway, stairwell, rooftop, on the exterior side of any patio or balcony or window, or anywhere else outside the Home itself;

(5) Attach any shelves, dividers, screen doors or make any other temporary or permanent improvements in the Home;

(6) Place or attach any aerials, antennas, satellite dishes, or other electrical connections in or on the Home or Common Areas without Our written permission, but in the case of the installation of a satellite dish, We shall not unreasonably withhold written permission, so long as:

(a) The satellite dish remains inside the Home (i.e., the satellite dish and/or its mounting equipment do not hang over the edge of a patio, deck, window or balcony, and the satellite dish and/or its equipment are not placed in any Common Area, including window sills or any other ledge or surface on the exterior of windows or doors of the Home);

(b) The satellite dish is mounted and secured without damaging the Home in any way ("damaging the Home" includes the use of drilling, bolting, or screwing support structures into any portion of the Home or altering windows or doors or their respective frames or structures in any way so as to make the use of a satellite dish possible, and if any damage to the Home occurs, You shall be liable to Us for the full extent of such damages, including but not limited to water damages and mold damages);

(c) No cables or wires of any kind may be installed into or through any wall of the Home;

(d) In consideration for allowing the installation and use of a satellite dish in the Home, You accept any and all risks inherent in installing or maintaining a satellite dish at the Home, and You also indemnify and hold

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 33 of 78

Us harmless for any damage or injury to any person or chattel caused by the use or Installation of the satellite dish in the Home; AND

(a) At Our sole discretion, You agree to provide Us, at Our request, evidence of an existing renter's insurance or other liability insurance policy which provides coverage in an amount not less than $25,000.00 in the event of injury to any other person or person's chattel arising from the use or installation or presence of a satellite dish in the Home. This subsection shall not apply if You are required to maintain insurance policies as provided by Paragraphs 1(L) and 22(O) of this Agreement.

**B. Our Ownership of Improvements; No Claim for Value; No Liens.** In any event, You agree that any improvement or alteration made by You or anyone under Your control shall become a part of the Home and the property and thus owned entirely by Us. You also agree that You shall have no claim against Us to recover the value of any improvements or alterations, even those specifically authorized by Us. In the event We specifically consent to You making an improvement or alteration to the Home, You shall ensure that such improvement or alteration shall be done in a workmanlike manner, and You shall also ensure that, as it relates to any such improvement or alteration, no lien may attach to the Home or to the community in which the Home is located.

**17. YOUR GENERAL RESTRICTIONS & OBLIGATIONS:**

**A. Unauthorized Occupants.** You shall not permit any person other than those listed in Paragraph 1(A) to reside or to stay, even temporarily, in the Home without Our express written permission. Residency in the Home by an unauthorized person may be established by the totality of the circumstances.

**B. Hazardous Use.** You shall not use the Home for any purpose deemed hazardous by any insurance companies carrying insurance covering any part of the Home or the contents therein.

**C. Noise and Other Disturbing Conduct.**

(1). <u>General Prohibitions</u>. You shall not make or permit noises or acts (generally, "disturbing conduct") that will disturb the rights or comfort of anyone, including any other tenant of Ours, any Authorized Occupant, and any employee or representative or contractor of Ours. For the purposes of this Paragraph, such disturbing conduct shall include, but is not limited to:

(a) Verbal or physical abuse, including but not limited to cursing and/ or yelling;

(b) Actual or implied threats, including but not limited to threatening physical or mental injury of any person;

(c) Threatening injury to the employment or reputation of any of Our employees or agents or contractors, or threatening injury to, or diminishment of, Our reputation, whereby through either action You wrongfully seek to obtain anything of value or advantage or immunity or forgiveness of Debt;

(d) Any other form of intimidation, whether physical or verbal; or

(e) Refusing to leave either the management office or any Common Area facility or amenity immediately upon Our request.

(2). <u>Our Enforcement of Default Involving Disturbing Conduct</u>. Any duty that We may have to enforce Paragraph 17(C) against any neighbor of Yours or other tenant shall be subject to, and limited by, the provisions of Paragraph 18. Notwithstanding the provisions of Paragraph 18, We shall have the absolute right to enforce Paragraph 17(C) against You in our sole discretion, and in so doing, You understand and agree that You may not, under any circumstances, employ any of the terms of Paragraph 18 as a defense to Your default of Paragraph 17(C).

**D. Weapons.** You shall not discharge, display, or in any way use in or around the Home or Common Areas any firearm or explosive weapon of any type, including but not limited to air rifles (to include paintball guns, BB guns, and pellet guns), rifles, shotguns, handguns, bows and arrows, knives (other than ones being used for cooking or eating food), swords, electro-shock or similar stun weapons, pepper spray, or any other weapon used for assaulting, stunning, immobilizing, or injuring another person. You further agree that We may further restrict the use and storage of any firearm or weapon described in this Paragraph through changes in our Rules and Regulations. You also agree that the Second Amendment of the U.S. Constitution is inapplicable both to this Agreement and Our fundamental rights to manage and/or own private property, to include the Home and the Common Areas.

**E. Grills; Combustible Materials; Use of Fossil Fuel Units.** You shall not use an open-flame device, including but not limited to any charcoal grill or gas grill or heating unit, within ten (10) feet (or any higher limit imposed by local ordinances) of either the Home or any combustible material not being used for grilling, unless otherwise indicated. You shall not store or use any fossil-fuel-burning heating unit or generator in the Home, nor shall You store any fossil fuels (including but not limited to liquefied petroleum gas [LP] or propane gas) in the Home.

**F. No Storage in Certain Areas.** You shall not Use the exterior patio, balcony, and/or entrance area for storage of any kind unless You first obtain Our express written consent.

**G. Rules and Regulations; Recorded Covenants and Rules.** You agree to comply with any Rules and Regulations which now exist or which may be later established by Us for the maintenance and operation of the Home or for the Common Areas. You understand and agree that such Rules and Regulations are, or otherwise shall be, referenced hereto and incorporated herein as part of this Agreement. Your violation of any one of such Rules or Regulations shall be construed as your immediate default of this Agreement. You also agree that We may amend such Rules and Regulations at any time so long as We have first provided You with at least thirty (30) days' written notice and so long as such amendments to the Rules and Regulations do not increase any monetary amount listed under Paragraph 1 and do not create any other fee neither contemplated by this Agreement nor by any signed addendum during the original term. You also agree to abide by the terms, restrictions, covenants, and rules and regulations that may be promulgated from time to time under the authority of any recorded instrument affecting the Home, including but not limited to homeowners' association covenants. You agree that any such recorded documents affecting the Home are incorporated herein by reference as if set out fully herein as part of this Agreement.

**18. LIMITATIONS ON FITNESS, HABITABILITY, AND PEACEFUL, SAFE & QUIET ENJOYMENT OF THE HOME:** You and We specifically agree to the following:

**A. Smoke and Odors.**

(1). <u>No Duty to Provide Smoke-Free or Odor-Free Environment</u>. You agree that N.C. Gen. Stat. § 42-42 and/or any other similar element of common or municipal law related to fitness and habitability do not impose a duty on Us to make the Home smoke-free or odor-free to Your satisfaction, particularly where said smoke and/or odors and/or smells are caused by Your neighbors.

(2). <u>Inherent Part of Multifamily Living</u>. You agree that certain smells (to include cooking certain types of food), odors, and tobacco smoke caused by Your neighbors (and Yourself) have the capability of penetrating walls, ceilings, and floors, and You further agree that this really is inherent in any multifamily living environment such as condominiums and apartments and any other rental housing property where units are built immediately next to, or on top of, each other. As such, You agree that it is impossible or unreasonably impractical (due to the extraordinary costs that would be involved) for Us to prevent odors, smoke, and other smells from entering the Home from neighboring rental units, even with Our use of modern building materials and Our compliance with applicable building codes.

**B. Noises/Sounds.**

(1). <u>No Duty to Provide Noise-Free Environment; Inherent Part of Multifamily Living</u>. You agree that the concept of peaceful, safe, and quiet enjoyment (as generally defined by applicable common law and provided by N.C. Gen. Stat. § 42-59.1) is not a guarantee that the Home will be perfectly quiet, safe, or peaceful, and due to the inherent nature of multifamily living environments, You agree that certain everyday sounds such as walking, talking, cleaning, using common appliances, and the occasional entertaining of guests will penetrate walls, floors, and ceilings, and as such, You agree that We cannot guarantee that You will have a completely quiet living environment. As such, You agree that it is impossible or unreasonably impractical for Us to prevent noises or sounds from penetrating the walls, floors, and ceilings of the Home, even with Our use of modern building materials and Our compliance with applicable building codes.

(2). <u>Our Response to Your Noise Complaints; Your Affirmative Duties to Remedy Problem; No Compensation Should You Fail to Cooperate</u>. You understand and agree that any complaint made by You, regardless of the number or intensity, that You submit to us regarding elevated noise or other disturbing sounds is inadmissible hearsay for the purposes of an eviction (summary ejectment) lawsuit to the extent that We would attempt to submit Your oral or written statements to a court of law. As such, You understand and agree that We cannot attempt to file a legitimate eviction lawsuit against any offending neighbor unless and until: (a) You first agree to appear in a court of law and testify as an eyewitness against Your neighbor; AND (b) You or We are able to corroborate Your complaints with sworn testimony of at least one other neighbor or eyewitness. If You refuse or fail to comply or to cooperate with requirements (a) and (b) described in this Paragraph, You understand and agree that You have essentially prevented Us from obtaining a legal remedy as to the elevated noises or sounds that may exist in the Home, and as such, You agree that: You do not have any right to obtain any legal remedy or reimbursement or damage against Us under any theory of law whatsoever related to noises or similar disturbances; You do

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 34 of 78

not have any right to demand early termination of this Agreement without liability; and You do not have the right to demand that We allow You transfer to any other rental property or other location in the community in which the Home is located.

**C. Objective Legal Standards.** You agree that (1) the implied warranties of fitness and habitability (as defined by applicable common law and N.C. Gen. Stat. § 42-42) and (2) the concepts of peaceful, safe, and quiet enjoyment are objective *(and not subjective)* concepts judged against the general population. As such, You agree that Our duties to You are based on an objective and reasonable standard, and therefore We cannot be held liable or otherwise responsible under any theory of law for any subjective, unique, or even dangerous sensitivities that You or Your Authorized Occupants may have to any smoke, odor(s), noises, sounds, or other nuisances.

**D. Due Diligence Acknowledgement.** You agree that You had a duty to exercise due diligence regarding any aspects of the Home that are material to You, and by signing the Lease, You acknowledge and agree that You have performed any inquiries regarding the Home that were necessary to satisfy Your duty to exercise due diligence, and that You are completely satisfied. As such, You specifically understand and agree that: We have no duty to compensate You or to change any aspect of the Home to ensure that the Home will be free of any condition that should have been discovered through Your exercise of due diligence; We had no duty to disclose any such condition to You; and We have no duty to ask any neighbor or any other third party to change any lawful aspect of their behavior *(including, but not limited to, smoking inside or outside their home).*

**E. Assumption of Risk; Waiver of Claims.** Given the above, and by signing this Agreement and taking possession of the Home, YOU FREELY AND VOLUNTARILY ASSUME THE RISK OF INCONVENIENCE AND NUISANCE RELATED TO NOISES, SOUNDS, TOBACCO AND SIMILAR FORMS OF SMOKE, COOKING SMELLS, AND SIMILAR ODORS OR SUBSTANCES. YOU UNDERSTAND AND AGREE THAT THE CONCEPTS OF FITNESS AND HABITABILITY AND PEACEFUL, SAFE AND QUIET ENJOYMENT ARE STRICTLY RELATED TO THE PHYSICAL CONDITION(S) OF THE HOME ITSELF AS PROVIDED BY US OR CONDITIONS THAT ARE DIRECTLY *(NOT PROXIMATELY OR INDIRECTLY)* CAUSED BY US. YOU AGREE THAT ISSUES SUCH AS NOISES, SOUNDS, TOBACCO AND SIMILAR FORMS OF SMOKE, COOKING SMELLS, AND SIMILAR ODORS OR SUBSTANCES ARE NOT DIRECTLY CAUSED BY US, BUT INSTEAD THEY ARE CAUSED SOLELY BY THE ACTS OR OMISSIONS OF YOUR NEIGHBOR(S) AND/OR THEIR GUESTS, AND UNLESS SAID ACTS OR OMISSIONS ARE CRIMINAL IN NATURE, YOU AGREE THAT YOUR ONLY LEGAL REMEDY IS AGAINST YOUR NEIGHBOR(S) OR THEIR GUESTS UNDER A LEGAL THEORY OF PRIVATE NUISANCE. AS SUCH, YOU WAIVE ANY AND ALL CLAIMS AGAINST US THAT ARISE OUT OF OR ARE IN ANY WAY RELATED TO NOISES, SOUNDS, TOBACCO OR SIMILAR FORMS OF SMOKE, COOKING SMELLS, AND SIMILAR ODORS OR SUBSTANCES THAT MAY BE CAUSED BY YOUR NEIGHBOR(S) AND/ OR THEIR GUESTS.

**19. RIGHT OF ENTRY:** We reserve the right to enter the Home, with or without notice, during reasonable times for any inspections, maintenance, pest extermination treatments, alterations, or improvements deemed necessary or desirable in Our sole discretion, or to show the Home to prospective residents during the last thirty (30) days of the rental term. We reserve the right to place "For Rent" and/or "For Sale" signs on the Home, at any time deemed necessary or desirable in Our sole discretion. We reserve the right to enter the Home, with or without notice to You, at any time deemed necessary in Our sole discretion to protect life or prevent damage to the Home – including by way of example, but not limited to, turning on utilities at Your expense during periods of cold weather to protect against the possibility of frozen pipes. Should You fail or refuse to honor the requirements of this Paragraph, You will be in default of this Agreement and We may, in addition to all other remedies available under law or otherwise set forth in this Agreement, hold You liable for special damages related to the loss of income and other monetary damages related to Your act of preventing or otherwise discouraging Us from either maintaining or improving the Home or from showing same for sale or lease to third parties.

**20. AUTOMOBILES & PARKING:**

**A. Parking Generally; Restricted Vehicles.** Parking is allowed in the designated areas only for cars and light trucks. Any other type of vehicle or object, including but not limited to motorcycles, boats, trailers, recreational vehicles (RV's), motorhomes, or any container used for moving or storage of personal property, shall not be allowed in the Common Areas unless We grant You prior written permission.

**B. Control of Parking.** We reserve the right to control parking in any manner

we deem necessary in Our sole discretion.

**C. No Obstructions.** Vehicles shall be parked so as not to obstruct spaces for other vehicles, driveways or sidewalks.

**D. Vehicle Maintenance; Washing.** All vehicles must be kept in proper operating condition so as not to be a hazard or a nuisance because of noise, emissions, appearance or otherwise. Except for minor adjustments, no repairs or maintenance shall be conducted on the property or Common Areas. Drainage of any automotive fluids in a Common Area is strictly prohibited. Car washing is not allowed except in such designated area(s) that We specifically establish.

**E. Towing.** At Our direction, any vehicle in the Common Areas that is unlicensed, inoperable, abandoned, or lacking any required permit may be towed away and stored at its owner's expense, and in such an event, You agree that We will not incur any liability to anyone for any reason, including but not limited to You, Your guests, and Your Authorized Occupants. You further agree that We may tow, without notice or demand, any vehicle in violation of any provision of this Paragraph 20. Should We tow any vehicle as a result of a breach of any portion of this Paragraph 20, You agree to hold Us harmless from any liability that arises from the towing away of any such vehicle owned, possessed, or maintained by You, members of Your household, or any of Your guests.

**21. DRUGS AND CRIMINAL ACTIVITY:**

**A. Generally.** You, Your guest(s), Your Authorized Occupant(s), and Your visitors, whether or not they are under Your control or direction, shall not engage in or facilitate criminal activity of any kind *(including, but not limited to, any violation of any local ordinance regulating noise or nuisance)* in the following location(s): on or near the Home, or on or near any property owned and/or operated and/or managed by Us and/or Our agent(s), or anywhere else in the world.

**B. Prohibition of Certain Guests; Duty to Report.** You shall not invite or allow any person to enter the Home, any Common Area, or the community in which the Home and Common Areas are located, when the person in question is:

(1) A person whom We have trespassed, removed, criminally-charged, or otherwise asked to leave from the Home, the Common Areas, or from other property owned or managed by Us or Our agent(s);

(2) A registered sex offender;

(3) Any person who may have an outstanding criminal warrant for their arrest, including but not limited to any arrest warrants related to a failure to appear in court in any criminal matter, regardless of the severity or nature of the criminal offense; or

(4) Any other person to whom We object, in our sole and unlimited discretion, once We have notified You of Our objection via written notice.

**C. Standard of Proof; Our Rights to Enforce a Default; Conviction/ Adjudication Conclusive.** Proof of Your violation of this Paragraph 21 – whether by You, any Authorized Occupant, or any guest of Yours – shall be by preponderance of the evidence. The fact that a criminal prosecution involving criminal activity that violates this Agreement has not commenced or concluded, or has concluded or terminated without a conviction or adjudication of delinquency, shall not prevent either Our termination of this Agreement based on Your default of this Paragraph 21 or Our filing of any civil action against You. In the event any criminal activity has occurred in violation of this Agreement, You agree that We may file a civil action against You whether or not: an arrest has occurred; a criminal prosecution is pending; or whether a criminal action will result, or has resulted, in a finding of innocence or guilt. Where a criminal prosecution involving criminal activity that violates this Agreement results in a final criminal conviction or adjudication of delinquency, such adjudication or conviction shall be considered in any civil action brought by Us as conclusive and irrefutable proof that criminal activity occurred and that You are in default of this Agreement.

**D. Acceptance of Rent Not a Waiver.** Pursuant to N.C. Gen. Stat. § 42-73. We may accept the full amount of Rent due with full and complete knowledge of any criminal acts that violate this Agreement without such acceptance of Rent constituting any waiver of Your default(s) of this Agreement and without waiving any of Our rights to enforce Your default(s), including, but not limited to, Our right to evict You from the Home via a summary ejectment proceeding.

**E. Domestic Violence/Sexual Assault/Stalking a Violation.** For the purposes of this Paragraph 21, any crime involving domestic violence, sexual assault, stalking, or related offenses shall always constitute Your default of this Agreement. If any domestic violence restraining order or similar governmental order is issued by a court of law as a result of such an act or acts, You understand and agree that We shall not provide keys to the Perpetrator for replacement locks for the Home pursuant to the terms of Paragraph 9(C), even where the Perpetrator is the sole Lessee listed in

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

this Agreement.

**F. Our Right to Review Criminal Records Without Consent.** You understand and agree that We reserve the right to check the criminal records of You and Your Authorized Occupants at any time during the original term or renewal terms of this Agreement, though You also agree that We have no affirmative duty to anyone, including You, to research or monitor the criminal records or sex offender records of any person. Similarly, You understand and agree that We have the unfettered right to review, without Your permission or consent, the North Carolina sex offender registry at any time to determine whether or not a registered sex offender is present in the Home.

**22. INSURANCE, RELEASE & INDEMNITY:** Even if You are not required to secure insurance coverage pursuant to Paragraph 1(L), You agree that You should secure insurance to protect all personal property against loss resulting from theft, fire, storm and other hazards and casualties.

**A. We Are Not Liable for Your Personal Property.** You understand and agree that neither We nor Our agents are liable for any damage to, destruction of, or loss of any personal property located or stored in the Home or in Common Areas regardless of the cause of such damage.

**B. You Indemnify Us for Certain Acts or Omissions.** You agree to indemnify, defend and hold Us – our agents – harmless from and against all claims, liabilities and any other costs *(including reasonable attorney's fees and court costs)* arising out of:

(1) Any harm to person or property resulting from the negligent or intentional acts or omissions of You or Your Authorized Occupant(s);

(2) Any injury resulting from any default of this Agreement by You;

(3) Your failure to comply with any requirements imposed by any governmental authority;

(4) Any judgment, fine, lien, penalty, or any encumbrance against Us or the Home as a result of Your actions or the actions of Your guests or Authorized Occupant(s);

(5) The towing of any vehicles belonging to You or Your guests pursuant to Paragraph 20(E) of this Agreement or any state or local law or ordinance; and

(6) Any damages, expenses, and costs – to include reasonable attorney's fees – arising out of or in any way relating to injury to persons or property caused, whether directly or indirectly, by any animals owned or otherwise kept by You, Your Authorized Occupants, or Your guests.

**C. Assumption of Risk in Use of Common Areas.** You also agree that, in consideration for Our allowing You to use any Common Areas and amenities, YOU AND YOUR AUTHORIZED OCCUPANTS AND GUESTS SHALL ASSUME ALL RISKS ASSOCIATED WITH THE USE THEREOF AND SHALL HOLD US AND OUR AGENTS HARMLESS AND INDEMNIFY US AND OUR AGENTS FOR ANY INJURY ARISING OUT OF THE USE THEREOF, unless (i) any such injury was directly caused by Our failure to comply with applicable law AND (ii) You or Your Authorized Occupants or guests were not contributorily negligent in the use of such Common Areas and amenities.

**D. Insurance Requirements.** In the event Paragraph 1(L) of the Agreement indicates that You are required to have a liability insurance policy and/or a contents insurance policy, You agree that any such policy shall remain in effect during the term of the Agreement, and You also specifically understand and agree to the following:

(1). _Minimum Insurance Coverage._ During the term of the Agreement and any subsequent renewal periods, You agree to obtain and maintain, at Your sole expense, liability insurance and/or contents insurance at the respective minimum coverage level(s) specifically described in Paragraph 1(L) *(hereinafter referred to as "Insurance Requirements").* For liability insurance, the Insurance Requirements shall cover each occurrence or incident that arises in any way from Your tenancy at the Home or for the acts or omissions of either You or any Authorized Occupant, guest, or visitor. You shall ensure that We are listed as an additional insured on the liability insurance policy.

(2). _Certificates of Insurance Required Before You Take Possession of Home._ Prior to taking possession of the Home at the beginning of the original term, You shall provide Us with certificates ("certificates") from Your respective insurance company(-ies) or agent(s), and the certificates shall:

(i) Show that You have met the Insurance Requirements and

(ii) Shall require that the insurance company(-ies) will give Us written notice within ten (10) days of the cancellation or non-renewal of any insurance coverage required by Paragraph 1(L).

(3). _You Remain Liable For Damages and Losses._ Your failure to obtain and maintain insurance coverage meeting the Insurance Requirements does not absolve You from Your liability to others, including Us, for damage or loss resulting from the behavior, act, and/or failure to act of You, any Authorized

Occupant, visitor, or guest.

(4). _Choice of Insurance._ You may purchase insurance satisfying the Insurance Requirements through any insurance provider(s) of Your choosing, so long as any and all providers are insurance companies licensed to do business in the State of North Carolina. You are under no commitment or obligation to use the specific insurance provider(s) whose information that We may provide to You as a courtesy, unless You fail to maintain the Insurance Requirements.

**E. Failure to Maintain Insurance Requirements a Default; Our Option to Purchase Insurance Coverage as Additional Monthly Rent.** Your failure to obtain or maintain insurance coverage meeting the Insurance Requirements shall constitute Your default of this Agreement, and in that event, We shall have all remedies available under this Agreement, including but not limited to summary ejectment. In the event of Your failure to maintain the Insurance Requirements, You fully agree and consent that We may, at our sole option and in lieu of filing a summary ejectment against You, elect to purchase liability insurance and/or contents insurance (as generally described in Paragraph 22(D)) on Your behalf and require that You reimburse Us monthly for any related premiums, and such reimbursement ("Reimbursement") shall be considered as additional monthly rent (i.e., added to the Total Monthly Rent), though Our purchase of such insurance shall be subject to the following limitations:

(1) The Reimbursement shall only equal the actual monthly amount (or if purchased on an annual basis by Us, the prorated monthly equivalent) that We pay for such insurance premiums; and

(2) In purchasing any such liability insurance and/or contents insurance on Your behalf, We shall: (a) not receive any commission, profit sharing, share of premium paid, or similar incentive arising directly from the purchase of such insurance coverage on Your behalf; (b) ensure that the insurance coverage level(s) purchased on Your behalf will not exceed the Insurance Requirements specifically described in Paragraph 1(L); and (c) ensure that the Reimbursement reflects an insurance premium rate that is reasonably competitive compared to the then-prevailing rates (at the time of Our purchase) of such liability insurance and/or contents insurance offered by other "A-rated" insurance companies licensed to do business in the State of North Carolina.

**23. SECURITY:**

**A. Generally; No Warranty or Guarantee of Security or Safety; We May Modify Security Systems or Personnel at Any Time Without Notice.** We, Our agents, and Our employees do not make any warranties, guaranties or representations regarding the security or safety of the Home or Common Areas as it relates to the criminal acts of third parties. Any such warranties or representations, whether express or implied, are hereby disclaimed by Us. If security systems and/or personnel are present in the Home or Common Areas, You agree that We make no representation that any personnel or system (including but not limited to gates, doors, locks, or any other security feature) will prevent crime or injury. We reserve the right to modify or eliminate any security system and/or personnel at any time without notice and without such actions constituting a default of this Agreement or any other obligation.

**B. No Reliance on Security Systems/Personnel; You are Responsible for Your Own Safety From Third Parties.** You understand and agree that You and Your Authorized Occupants are exclusively responsible for protecting Yourself, themselves, the Home, and guests from crime, fire and any other danger. If security systems and/or personnel are present in the Home or Common Areas, You agree that the presence of any such system and/or personnel shall not cause You or Your guests to rely upon the security systems and/or personnel or to lower Your or their vigilance in any way. You agree that You are solely responsible for Your own protection and safety as it relates to the actions, whether criminal or otherwise, of any third parties.

**C. Release from Liability for Acts of Third Parties.** By signing this Agreement, You hereby release Us and Our agents and Our employees from any or all liability for the criminal or intentional acts of third parties, and You agree that We have made no representations regarding the safety of the Home and Common Areas as it relates to the actions of third parties.

**24. CONDITION OF DWELLING HOME:** By signing this Agreement, You acknowledge that the Home is safe, clean, and in good condition. You agree that all appliances and equipment in the Home are in good working order, except as described on the Apartment Condition Checklist. You acknowledge and agree that You must carefully inspect the Home for any defective conditions, including but not limited to the presence of any insect/ past infestation, and You must report such defective conditions, pest/insect/ bed bug infestation, and any further discrepancies by providing written notice to Us within seven (7) calendar days (hereinafter "Notice Period") of You first taking possession of the Home. After the expiration of the Notice

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 36 of 78

Period. You agree that any defective condition, insect/pest infestation or other discrepancy arising in the Home shall be deemed to be caused by You alone, and in such an event, We shall hold You personally liable for any damages incurred by Us in remedying any defective condition, insect/pest/ bed bug infestation, or other discrepancy that arises after the Notice Period (except for fixtures or systems that may fail due to normal wear and tear).

**25. DELIVERY OF POSSESSION:**

**A. Generally.** If, for any reason not in Our control, We are unable to deliver possession of the Home to You at the beginning of the original term due to another tenant's unauthorized act of holding over at the Home or construction delays and/or other conditions or damages to the Home that outside of Our control, and if We notify You of same any time prior to the beginning of the original term and immediately upon learning of Our inability to deliver possession (any such notice by Us shall be generally referred to as "Delay Notice"), then You shall have the option to either (1) terminate this Agreement and receive a full refund of all sums paid to Us or (2) take possession of the Home once it is available, subject to the all requirements and conditions of this Paragraph 25.

**B. Termination of Agreement.** Within ten (10) days of the date of Our Delay Notice, You may notify Us in writing of Your election to terminate this Agreement. In such an event, We shall fully refund all sums You have paid to Us within seven (7) days of Our receipt of Your notice.

**C. Agreement to Take Possession of Home When Available.** Within ten (10) days of the date of Our Delay Notice, You may notify Us in writing of Your election to take possession of the Home when it becomes available, and in so doing, You further agree to take possession of the Home within fifteen (15) days after We notify You that the Home is available for Your occupancy. In such an event, You further agree that Your obligation to pay Rent begins: (i) on the last day of the fifteen (15) day period described above OR (ii) the day You enter and take possession of the Home, whichever event occurs first.

**D. Failure to Elect Within Ten Days of Notice Becomes Your Agreement to Take Possession.** Your failure to notify Us in writing of your election (as to whether You shall terminate the Agreement or to take possession of the Home) within ten (10) days of the date of Our Delay Notice shall constitute Your election of Paragraph 25(C).

**E. Limitation of Remedies; Your Release of All Claims Relating to Delivery of Possession.** You understand and agree that Your available legal remedies against Us related to Our inability to deliver possession to You are strictly limited to Your rights under Paragraph 25(B) and Paragraph 25(C) of this Agreement. As such, You also understand and agree that, upon Our providing You Our Delay Notice, You hereby release Us from any liability or damage or cost or obligation that may arise from, or may in any way relate to, Our failure to deliver possession of the Home to You including, but not limited to, moving expenses, lodging, storage, or any other cost or expense or damage whatsoever.

**26. RENTAL APPLICATION:** You understand and agree that We have relied upon the Rental Application ("Application") submitted by You as an inducement for entering into this Agreement, and You warrant that the facts contained in such Application are true. If We determine or learn that any fact or representation in the Application is false or deceptive or omits material facts, You shall be in default of this Agreement, and in such an event, We shall have all of the rights and remedies set forth in this Agreement, including but not limited to Our ability to terminate Your tenancy immediately and seek possession of the Home and collect from You any damages incurred, including reasonable attorney's fees.

**27. SEVERABILITY:** In the event that any provision of this Agreement is deemed by any Court of competent jurisdiction to be unenforceable, void, and invalid or otherwise not binding for any reason, the offending provision shall be severed and all other provisions of this Agreement shall remain in full force and effect.

**28. SUBORDINATION:** You understand and agree that Your interests under this Agreement in the Home are, and shall remain, subject to and subordinate to any liens, deeds of trust, security agreements, or other such liens or security interests in the Home and property. This subordination provision shall be self-operative.

**29. EMINENT DOMAIN:** If the Home or Common Areas or any part thereof shall be taken by eminent domain pursuant to governmental authority, this Agreement shall terminate at Our option, and in such an event, You agree that You shall have no claim against Us or any against any award granted to Us related to the taking.

**30. STATUS AS AGENT:** Responsibility for all Our obligations hereunder rests entirely with Us. The Agent (if Our Agent is identified in Paragraph 38) may exercise, and shall have, Our rights and powers, but the Agent's duties, if any, are solely limited to those duties owed to Us. As the Agent

for Us, the Agent shall benefit from the covenants, waivers, releases and indemnifications contained in the Agreement to the same extent as if the Agent were Us. In the event of conflict between this Paragraph and any other provision, this Paragraph shall control supremely and no consideration shall be given to any contrary provision.

**31. REMEDIES:**

**A. Generally.** All remedies under this Agreement or allowed by law or equity shall be cumulative. We shall have the right, in our sole discretion, to exercise any one, or more, or all of the remedies described in this Agreement as well as any other remedy available at law. You also understand and agree that this Agreement, and any addenda to this Agreement, shall be considered as (1) evidence of Your indebtedness to Us, as generally provided by N.C. Gen. Stat. § 6-21.2(2) and (2) as a writing evidencing Your unsecured debt to Us, as generally provided by N.C. Gen. Stat. § 6-21.2(5). Further, You also understand and agree that the principal balance of any Rent or Debt that is due and owing to Us under this Agreement shall be considered the "outstanding balance" (hereinafter "Outstanding Balance") owed to Us as generally provided by N.C. Gen. Stat. § 6-21.2.

**B. Court Costs.** If Our filing of a lawsuit against You, including any summary ejectment lawsuit, establishes a default of this Agreement by You, You shall pay Us all court costs associated with such action.

**C. Reasonable Attorney's Fees.** Should You be in default of this Agreement, and should We choose to retain an attorney to enforce such default, You shall owe Us reasonable attorney's fees, as specifically defined by N.C. Gen. Stat. § 6-21.2(2) and as generally provided in N.C. Gen. Stat. § 42-46(h)(3), on the Outstanding Balance owed under this Agreement. You understand and agree that, should We choose to enforce this reasonable attorney's fees provision pursuant to N.C. Gen. Stat. § 6-21.2(5), the reasonable attorney's fees shall equal the exact percentage of the Outstanding Balance specified by N.C. Gen. Stat. § 6-21.2(2) and, pursuant to applicable North Carolina law, You also understand and agree that the reasonable attorney's fees assessed against You may not necessarily equal, and may in fact exceed, the actual amount paid by Us to an attorney.

**32. INTERPRETATION:** This Agreement shall be construed consistent with the laws of The State of North Carolina.

**33. DISCLOSURE OF YOUR INFORMATION:** You understand and agree that We possess and maintain personal, nonpublic information obtained from Your rental application, credit reports, rental references, as well as information otherwise obtained during the normal course of Your business relationship with Us. You hereby authorize Our disclosure, at Our sole option, of any and all such information to third parties, without a subpoena or warrant of any kind, at the request of law enforcement, governmental agencies, business entities that own Us in whole or in part or are owned in whole or in part by Us, or business entities engaged in business transactions with You, INCLUDING, BUT NOT LIMITED TO, FINANCIAL INSTITUTIONS OR OTHER BUSINESSES PERFORMING NECESSARY INQUIRIES WITH YOUR CONSENT OR KNOWLEDGE.

**34. YOUR DUTIES UPON TERMINATION:** Upon any termination of Your tenancy and/or the Agreement, whether for default or otherwise, You shall, in addition to any other obligations required by this Agreement perform ALL of the following:

**A. Pay Your Utility Bills.** You shall pay all utility bills due for any utility services to the Home for which You are responsible, including but not limited to electric service, gas service, telephone service, and cable services, if any.

**B. Vacate the Home.** You shall vacate the Home and remove all personal property from the Home and from the community in which the Home is located.

**C. Written Authorization to Dispose of Remaining Personal Property; Failure to Remove Personal Property Grounds for Summary Ejectment Lawsuit.** At the time You vacate and surrender possession of the Home, You will provide Us with written authorization allowing Us to dispose immediately of any personal property left by You, and in so doing, You agree to sign, upon our request, a document that will assign to Us the ownership of any and all property that You intend to abandon in the Home, and You understand and agree that Your failure to remove same may constitute Your continued possession of the Home, which may require Us to file a summary ejectment (eviction) lawsuit against You to secure possession of the Home, and in such an event, You shall continue to be responsible for the Rent until We regain legal possession of the Home seven (7) days after the execution of a Writ of Possession by a Sheriff.

**D. Clean the Home.** You shall clean the Home, including patios, balconies, windows, bathroom showers and bath tubs, plumbing fixtures, refrigerators, stove and sinks, and remove all rubbish and trash.

**E. Repairs.** You shall make, or We shall perform at Your expense, any repairs

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 37 of 78

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

necessary to return the Home to the same condition it was at the beginning of the original term, less ordinary wear and tear.

F. Secure the Premises. You shall fasten and lock all doors and windows of the Home.

G. Return Keys and Similar Devices and Security Codes. You shall return to Us all keys, security access cards and devices, parking gate openers, AND garage door openers *(as applicable to the Home)*, and in so doing, You shall not disclose to any third party any information regarding any security code obtained from Us.

H. Forwarding Address. You shall provide Us with a forwarding address to which We may send a refund of the Deposit and/or Our itemized accounting for the Deposit.

I. Move-Out Inspection of the Home. Immediately prior to vacating the Home but after You have removed all items of personal property *(including trash)*, You shall arrange a meeting with Us at the Home in order to allow Us to perform a move-out inspection *("move-out inspection")*. The purpose of a move-out inspection is for Us to review the condition of the Home and to create an initial, though not final, estimate of the costs to repair damages in the Home that exceed normal wear and tear, if any such damages exist. You agree that the move-out inspection shall never be considered a final estimate of damages present in the Home, and You agree that any oral statement made by Our employee or representative during the move-out inspection shall not bind Us in any way. Instead, You acknowledge and agree that the move-out inspection and its estimate is merely a cursory examination of the Home and that We reserve the right to provide You with a final statement of any damages and costs at a future date.

**35. UTILITIES – GENERAL PROVISIONS.**

A. Generally; Obligation for You to Provide Electric and/or Gas Services in Your Name; Utility Interruption. Unless otherwise provided in a separate addendum to this Agreement, You agree to obtain electric and gas *(where applicable to the Home)* service for the Home. Prior to taking possession of the Home, You shall (i) obtain electric service in Your name and (ii) obtain gas service *(where applicable to the Home)* in Your name; should You fail to do so, or if Your payments for electricity or gas are not made when due, either failure shall be considered Your default of this Agreement. In any case, We are not liable for failure to supply electric, gas, garbage, water or sewer service(s), nor are We liable for any damage resulting from an interruption or malfunction in service or any utility due to any cause, unless We supplied the utility to You AND We acted with gross negligence regarding same.

B. Direct Metering of Water/Sewer to Home. Where water or sewer service(s) are directly metered to the Home by a local governmental entity or similar authority *(instead of submetered through Us, as may be otherwise provided in this Agreement or a separate addendum)*, You shall, prior to taking possession of the Home, obtain such water and sewer services in Your name; should You fail to do so, or in the event that payments for water and/or sewer are not made when due, either failure shall be considered Your default of this Agreement.

C. Internet Services. Where We may agree to provide internet service to You, whether gratuitously or as an additional rent or as otherwise provided by a separate addendum to this Agreement, You understand and agree that: (i) We are paying a third-party to provide such internet service; (ii) as such, We cannot control the quality, speed, or continuity of such service; (iii) We do not represent or otherwise guarantee the quality or speed or continuity of such internet service; (iv) We shall not be liable to You for the quality or speed or continuity of such internet service, nor shall We be liable to You for any damages incurred by You or Your Authorized Occupants or Your guests as a result of the use of, or any interruption of, the internet service; and (v) YOU ACCEPT AND USE SUCH INTERNET SERVICE AT YOUR OWN RISK.

**36. SUBMETERING UTILITY DISCLOSURE:** The contents of this Paragraph shall be considered valid terms and conditions of this Agreement ONLY if Paragraph 1(l) denotes that We are submetering water and/or sewer services to You. If the appropriate check box in Paragraph 1(l) is marked "YES," this Paragraph shall control, as this Agreement relates to the submetering of water and/or sewer services in the Home. You agree that You are solely responsible for paying all charges that You incur for the use of water and/ or sewer services *(hereinafter referred to as "utilities")* that are submetered for the Home and provided to You by Us and billed to You by Us or by our billing agent, as listed in Paragraph 1(l) of this Agreement *(submetering shall include systems where waters measure both hot and cold water sources or, where applicable, hot water sources only with corresponding estimates of cold water usage as permitted by N.C. Gen. Stat. § 62-110(g)(1a))*. Such charges for utilities shall be in addition to Your Rent, and the charges shall not exceed the total of (1) the unit consumption rate charged by the supplier of the service, plus (2) a monthly administrative fee, said amount

representing the cost of billing and collection, said cost not to exceed the maximum administrative fee authorized by the N.C. Utilities Commission. Each bill shall list a billing date, and the Your payment of such a bill shall be considered past due if not received within twenty-five (25) days of the billing date. You agree to allow Us or Our billing agents to have access to the Home during regular business hours if necessary to read the submeter for the Home. If You fail to pay for the utilities when due, You understand that any and all unpaid amounts related to the utilities may be deducted from Your security deposit pursuant to Paragraph 5. Pursuant to N.C. Gen. Stat. § 42-26(b), We shall not use Your failure to pay for submetered water and/or sewer utilities as a basis to terminate either Your lease or Your right of possession during the original term or during any renewal term, though We reserve the right to elect to non-renew this Agreement at the end of the original term or at the end of any renewal term. In the event You fail to pay for submetered water utilities when due, We also reserve the right to (1) sue You in a civil action to recover the unpaid amounts, (2) report Your failure to pay to any credit bureau or collection agency during any lease term, in addition to any other remedies more fully described in Paragraph 10 and Paragraph 37 of this Agreement. In consideration of the receipt of such utilities, You release Us and Our billing agent from any and all liability arising from the use or enjoyment of the utilities or from any interruption or variations in the utilities, unless such injury or damage is the result of Our gross negligence.

**37. DEFAULT:** If You fail to comply with any one or more of the terms and conditions contained herein or referenced hereto, or should You fail to perform any other promise, duty or obligation herein agreed to or imposed by law, any such failure shall constitute Your immediate, material, and instant DEFAULT *("default")* of this Agreement, without notice or warning of any kind to You. Upon any default by You, We shall be entitled to collect from You any and all expenses, damages, and costs *(including reasonable attorney's fees and court costs)* arising out of or in any way relating to said default. Should You desire to terminate Your tenancy of the Home at any time prior to the ending date of the original term stated in Paragraph 1(C) *(or prior to any renewal month-to-month term)*, You specifically understand and agree that, in addition to any other remedies available to Us under this Agreement, You shall be liable to Us for the Rent that accrues through the date of whichever one of the following events occurs first: (i) the date We receive a rental payment from the subsequent tenant who entered into a separate written lease agreement with Us for the Home OR (ii) the end of the original rental term *(or applicable renewal month-to-month term)*. In addition to the foregoing, and in the event of a default of this Agreement by You, the following shall also apply:

A. Our Rights to Terminate and Choose Remedies. Upon Your default of this Agreement, We may, with or without notice to You, do any one or more of the following acts: (1) terminate Your right to possession of the Home without terminating this Agreement, AND/OR (2) exercise any other act or remedy described in this Paragraph 37 or provided by law, OR (3) terminate this Agreement.

B. Our Right to Immediate Possession of the Home. Upon Your default, We shall be entitled to immediate possession of the Home, and as such, You shall peacefully and affirmatively surrender the Home to Us, with or without Our demand.

C. Our Right to Evict. Should You fail to surrender possession of the Home immediately upon default, We shall have the immediate right to re-enter and retake possession of the Home, and We may enforce this right through a summary ejectment proceeding or expedited eviction proceeding authorized by relevant sections of Chapter 42 of the North Carolina General Statutes.

D. Effect of Termination of Agreement. If We terminate this Agreement, all Our duties under this Agreement shall terminate, and We shall be entitled to collect from You all accrued and unpaid rents and damages arising under this Agreement.

E: Effect of Termination of Your Right to Possession of the Home. If We terminate Your right to possession without terminating the Agreement, You shall remain liable for the full performance of all terms and conditions under this Agreement – including, but not limited to, the payment of Rent – and We shall use reasonable efforts to re-let the Home on Your behalf, and in any event, You shall always remain liable for any resulting costs, unpaid Rent and additional rents and any other deficiencies or damages;

F. Eviction Fees. If We file a summary ejectment action against You *(as described in Paragraph 37(C))*, You shall also be liable to Us for the highest ONE of whichever of the following fees apply:

(1). Complaint Filing Fee. If You are in default of the lease, and if We file and serve a summary ejectment complaint or a complaint for money

Case 1:18-cv-01030-LCB-JLW    Document 4    Filed 12/18/18    Page 38 of 78

owed *(generally referred to as the "complaint")* against You and if We elect to dismiss said complaint after entering into a settlement of said complaint with You, then You shall owe Us a Complaint Filing Fee equal to $15.00 or five percent (5%) of the Rent, whichever is higher, and said Fee shall be in addition to late fees, court costs, reasonable attorney's fees, and any other monetary damages or costs arising under the terms of this Agreement. If the Rent is subsidized by a government entity, the Complaint Filing Fee will be $15.00 or 5% of Your share of the Rent, whichever is higher. You also agree that We may require You to pay said Fee as Our condition of dismissing Our complaint.

(2). **Court Appearance Fee.** If (i) We file, serve, and prosecute successfully a summary ejectment complaint or complaint for money owed against You and (ii) a judgment is entered against You in small claims court, You shall immediately owe Us – in lieu of the Complaint Filing Fee – a Court Appearance Fee equal to ten percent (10%) of the Rent, and said Fee shall be in addition to late fees, court costs, reasonable attorney's fees, and any other monetary damages or costs arising under the terms of this Agreement. If the Rent is subsidized by a government entity, the Court Appearance Fee will be 10% of Your share of Rent. You understand and agree that You will owe Us the Court Appearance Fee if We elect to allow You to cure the default after judgment is entered, and You also agree that We may require You to pay said Fee as a condition of allowing You, at our discretion, to cure a default after judgment is entered against You.

(3). **Second Trial Fee.** If (i) You appeal a judgment of a magistrate and (ii) We prove that You are in default of the lease at the new trial and (iii) We obtain a judgment against You at the new trial, You shall owe Us – in lieu of the Complaint Filing Fee and the Court Appearance Fee – a Second Trial Fee equal to twelve percent (12%) of the Rent, and said Fee shall be in addition to late fees, court costs, reasonable attorney's fees, and any other monetary damages or costs arising under the terms of this Agreement. If the Rent is subsidized by a government entity, the Second Trial Fee will be 12% of Your share of the Rent. You understand and agree that You will owe Us the Second Trial Fee if We elect to allow You to cure the default after judgment is entered at the new trial, and You also agree that We may require You to pay said Fee as a condition of allowing You, at our discretion, to cure a default after the new trial.

**G. Offer to Release Personal Property After Writ of Possession.** If We obtain a judgment for possession against You and the Sheriff has executed a Writ of Possession delivering possession of the Home to Us, this Paragraph hereby constitutes our offer to release Your personal property to You, during Our normal business hours, for a period of no more than seven (7) calendar days *(hereinafter the "lockout period")* after the date of the Sheriff's execution of the Writ of Possession. Should You fail to retrieve Your personal property during the lockout period, or in the event the sixth or seventh calendar day of the lockout period fall upon calendar days on which Our office is regularly closed for business, You understand and agree that: (1) We have no duty to open the Home on days that Our office is closed for business; (2) We have no duty to release Your personal property to You after the seventh day of the lockout period; and (3) We have the right to throw away or dispose of Your personal property after the seventh day of the lockout period without any liability to You for the disposal or destruction of Your personal property.
**H. Interest Rate on Debt.** If any default of this Agreement by You results in You owing Debt to Us, the Debt shall accrue interest at the annual rate described in Paragraph 1(N), beginning from the date We obtain legal possession of the Home until the Debt is paid in full.
**I. With or Without Notice.** You understand and agree that the terms "without notice" or "with or without notice" as used in this Agreement grants Us the absolute and sole discretion to perform any one or more of the acts described herein without notice to You of any kind. By signing this Agreement, You freely and voluntarily and expressly acknowledge that We have no duty to notify You regarding any default, nor do We have duty to make any demand in any form or manner whatsoever as a prerequisite to exercising Our right to seek Your summary ejectment from the Home.
**J. Our Additional Remedies for Your Default.** Regardless of Our election of any remedy described herein, We shall always have the right to hold You liable for the Debt, and in so doing, We reserve the right to seek enforcement of the Debt against You through any and all available remedies, including but not limited to (1) a civil lawsuit, (2) the referral of the Debt to a collection agent, and (3) the reporting of the Debt to a consumer credit reporting agency.

## **39. EXECUTION OF AGREEMENT.**

**A. PROTECTION OF COPYRIGHT.** By signing below, We and Our managing agent, if any, acknowledge that pages one through fourteen (1-

14) of this Agreement comprise a lease form *(pages one through fourteen of this Agreement hereinafter generally referred to as the "master lease form")* exclusively created, owned, and copyrighted by the Apartment Association of North Carolina (AANC). We and Our managing agent, if any, also acknowledge that any addendum to this Agreement containing the AANC Logo or noting AANC's copyright at the bottom of the addendum *(any such addendum hereinafter generally referred to singularly and collectively as "authorized addenda")* is also exclusively created, owned, and copyrighted by AANC. As such, We and Our managing agent, if any, hereby represent that this form and any authorized addenda are original master lease form(s) and original authorized addenda (i) purchased from, or otherwise licensed by, AANC or (ii) are computer-generated versions of the master lease form and/or authorized addenda purchased from an authorized licensee of AANC. You and We agree that if this master lease form or authorized addenda signed by You and Us is either a photocopy or a computer-generated version obtained from any source other than one authorized by AANC or an authorized licensee of AANC, then this Agreement, including any addenda, shall be *void ab initio*.
**B. EXECUTION OF AGREEMENT. IN WITNESS HEREOF,** We and You duly execute this Lease Agreement, whether by signing in the respective blanks below or via electronic means, on the respective dates written below or otherwise noted via electronic signature, if applicable. By executing this Agreement, **YOU ACKNOWLEDGE HAVING READ AND AGREED TO ALL THE PROVISIONS OF THIS AGREEMENT.** You further acknowledge having received a copy of this Agreement. You also acknowledge consulting with, or having had the opportunity to consult with, counsel prior to executing this Agreement. Should You execute this Agreement and/or any addenda, whether by signing below or by signing this Agreement electronically, at any time before We execute Our respective portion(s), **You agree that this Agreement and any such addenda shall be considered Your IRREVOCABLE OFFER** *(hereinafter "Your Offer")* **for a period of seven (7) calendar days ("Acceptance Period")** during which We may accept or reject Your Offer, and You may not rescind, revoke, or otherwise withdraw Your Offer during the Acceptance Period. **This Agreement, as well as all addenda to this Agreement, which are hereby incorporated herein by reference, hereby constitute the ENTIRE agreement between the parties and NO statement, oral or written or otherwise, not contained or described herein shall be binding on either party. No subsequent amendment to this Agreement or any statement, oral or otherwise, by either party to this Agreement shall be binding unless it is IN WRITING AND SIGNED BY ALL PARTIES HERETO, with the sole exception of modification to the Rules and Regulations.**

**LESSOR:** MP Bridges at Southpoint, LLC

BY: _____

 **Pegasus Residential, LLC**
 _____
 *Print Name of Management Company (if any)/Agent for Lessor*

 _____
 *Signature of Authorized Person for Management Co., Agent, or Lessor*

 _____
 *N.C. Real Estate License Number (if signed by licensed N.C. broker)*

 Date Signed: _____

**LESSEE(S)** *[signature(s) only, do not print name]:*

 _____(SEAL)
 *Signature*
 _____(SEAL)
 *Signature*
 _____(SEAL)
 *Signature*
 _____(SEAL)
 *Signature*

 Date(s) Signed: _____

Page 14 of 14   © AANC


**AANC**

# PET ADDENDUM

**1. ADDENDUM.** For mutual and proper consideration, the receipt of which is acknowledged by all the undersigned parties to this document, this document shall serve as an addendum ("the Addendum") to the residential lease contract (the "Lease") between

**MP Bridges at Southpoint, LLC**

as Lessor (hereinafter referred to as "We" or "Us" or in similar possessive forms) and

**Valerie Williams**

as Lessee(s) (hereinafter referred to as "You" or in similar possessive forms) for the rental of real property located at a street address of:

**7301 Calibre Park Dr # 01-308 #01-308, Durham,**

**NC 27707**

(said real property hereinafter referred to as "the Home"). Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.

**2. DEFINITION OF PETS.** As used in this Addendum, the term "pet" shall refer to any animal that You keep at the Home or allow into the Home, and for the purposes of this Addendum, the term "pet" shall include any animal – whether such animal is an amphibian, bird, fish, insect, mammal, reptile, or any other creature – that You allow into the Home, whether or not the animal is owned by You (e.g., a guest's animal or an animal that You agree to house temporarily for another person).

**3. DESCRIPTION OF PETS.** By signing this Addendum, You hereby represent that You shall keep or otherwise maintain the following type and description of animal in the Home (check where *applicable and describe where indicated*):

☒ DOG(S).

Number: **1**    Weight(s): _____

Color(s): **Brown**

Describe breed(s): **Mixed**

Age(s): **14**    City license nos.: _____

☐ CAT(S).

Number: _____    Weight(s): _____

Color(s): _____

Describe breed(s): _____

Age(s): _____    City license nos.: _____

☐ FISH.
Number of Fish Tanks: _____
Size(s) of Fish Tanks (Gallons): _____

☐ OTHER. Please describe: _____

The above-described animal(s) shall hereinafter (singularly and collectively) be referred to as "pet."

☐ NO PET. By checking this box, You certify that You do **NOT** have a pet. You also agree that in the event You acquire a pet or allow one to enter the Home, You shall notify Us immediately.

**4. NO OTHER ANIMALS.** By signing this Addendum, You agree that only the specific pet listed herein is permitted to occupy the Home. You understand and agree that no other animal is permitted either to visit or to stay in the Home without Our prior express written permission, although reasonable accommodations will be made as required by law. Should You acquire a new animal, allow another animal to enter the Home, or otherwise seek to replace a pet listed herein with another animal, You must first obtain Our written consent and sign a new Addendum describing the new animal. You understand and agree that We reserve the right to reject any animal for any reason in Our sole discretion. Unless You obtain Our express written permission, You are not permitted to have fish aquariums exceeding twenty (20) gallons in volume, birds, rodents (*including but not limited to gerbils, guinea pigs, mice, rabbits, ferrets, etc.*), reptiles (*including but not limited to lizards, snakes, etc.*), insects (*including but not limited to ants, bees, etc.*) or arachnids (*including but not limited to spiders, scorpions, etc.*).

**5. PET FEES, RENTS, AND DEPOSITS.** You agree to pay Us the following amounts (check where applicable):

☒ Monthly Pet Rent:    $ **20.00**
*This amount shall be in addition to Your monthly rent due under the Lease and shall be due and payable on or before the first calendar day of each month of the term of the Lease. If You and We sign this Addendum when We also sign the Lease, then the additional rent shall be listed in Paragraph 1(D) of the Lease. If this Addendum is signed at any time after the inception of the Lease term, then the additional rent shall be in addition to the Total Monthly Rent listed in Paragraph 1(D) of the Lease, and You shall pay both amounts to Us on or before the first calendar day of each month of the Lease term and shall comply fully with all Rent payment requirements listed in the Lease.*

☒ Non-Refundable Pet Fees:    $ **0.00**
*This amount is paid by You as consideration for Your privilege of maintaining a pet at the Home and not as payment for future damages relating to said pet.*

You agree that Your payment of the monthly pet rent and/or the non-refundable pet fee is neither a deposit nor a payment for future damages relating to said pet. As these payments are not a security deposit, You also agree that they are not subject to any deposit itemization requirements at lease termination.

☐ Refundable Pet Deposits:    $ _____
(said amount shall hereinafter be referred to as "the deposit").

The deposit shall be considered as an additional security deposit subject to the requirements of the N.C. Tenant Security Deposit Act (N.C. GEN. STAT. § 42-50 et seq.) and may be applied as set forth in Paragraph 5 of the Lease. Our application of the deposit to any damages beyond normal wear and tear shall not release You from liability for the total amount of any damages at the Home that exceed the amount of the deposit.

**6. PET WASTE IN HOME.** You understand and agree that the presence of pet urine or other animal waste that may be deposited in the carpeting or on the flooring of the Home during Your tenancy represents certain biological, health, and safety hazards – as well as offensive odors – for Yourself and for future and neighboring tenants. Due to (1) the unique characteristics of animal urine and other animal waste and its damaging effects on carpet, carpet padding, flooring, walls, interior trim, sheetrock, and fixtures and (2) the unlikelihood of cleaning such damages to the satisfaction of future tenants, You agree that the presence of animal urine or animal waste in the carpet, carpet padding, walls, interior trim, flooring, or fixtures of the Home shall not, under any

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 40 of 78

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

circumstances, be considered normal wear and tear. You understand and agree that, in any event, You shall fully reimburse Us for Our damages arising from Our incurred labor and costs to replace and install carpet, carpet padding, walls, interior trim, flooring, and/or fixtures necessitated by the presence of animal urine or other animal waste, and that the deposit may be applied to such damages, though You shall be fully liable to Us for any deficiency. The replacement value of carpet, carpet padding, walls, interior trim, flooring, and fixtures shall be prorated based on the respective age of the item(s) at the time of replacement as compared to the original expected life of the respective item(s).

**7. PET RESTRICTIONS.** You understand and agree to the following pet restrictions:

**A.** Generally. The pet shall be kept inside the Home at all times except for Your act of walking a dog or a cat outside, in which case the dog or cat shall be on a leash at all times and shall be under Your direct control and supervision.

**B.** Walking of Pets.

1. Designated Walking Areas. If there are designated pet walking areas in the community in which the Home is located, then You may only walk Your pet in those specific pet walking areas and not in any other Common Area of the community.

2. Walking Pets in Common Areas. If there are no designated pet walking areas in the community in which the Home is located, then You may walk Your pet in the Common Areas of the community, provided that Your pet: (a) does not disturb the rights or comfort of other people using the Common Areas, (b) is kept away from all shrubs, trees, and landscaped flower and plant beds, (c) is not allowed to enter a swimming pool area, fitness facility, clubhouse, management office, playgrounds, or another residence in the community, and (d) is kept out of traffic areas and parking areas.

3. Pet Waste and Disposal. You shall immediately clean up any solid waste left by Your pet in a Common Area. Your pet shall only be allowed to defecate or urinate in areas specifically designated by Us, and if We do not specifically designate such areas, then You shall ensure that Your pet does not defecate or urinate within 100 feet of any building, traffic or parking area, swimming pool area, fitness facility, clubhouse, management office, playgrounds, or any residence in the community.

4. Location of Pets. You shall not leave any pet to be on a balcony, in a patio, or in any Common Area unless You are in the immediate presence of the pet at all times. You shall not tie up (or otherwise leash) any pet to any stationary object outside the Home.

**C.** Removal of Pet Upon Our Request. If, in Our sole discretion, We determine that the pet constitutes a nuisance, creates a disturbance, causes damage, poses a threat to the safety of any person or property, or is no longer desirable, then You shall remove the pet from the Home within twenty-four (24) hours of Our demand for You to remove said pet.

**8. INDEMNIFICATION.** You understand and agree that You shall indemnify us and hold Us and Our agents harmless from any and all claims, liabilities, costs, rents, fines, fees, attorney's fees, and any other monetary damage that We may incur arising out of, or in any way relating to, injury to persons or property caused, whether directly or indirectly, by any pet owned or otherwise kept by You, Your Authorized Occupants, or Your guests.

**9. PAYMENT OF RENTS, FEES, AND DEPOSITS FOR UNAUTHORIZED PETS.** Should We discover that You have or had an unauthorized pet in the Home during Your tenancy (whether or not Our discovery of the unauthorized pet occurs during Your tenancy or thereafter), You agree that You shall be liable to Us for the immediate payment of any and all non-refundable pet fees and pet rents and pet deposits normally due to Us pursuant to Our rules and regulations, or pursuant to Our normal charges and fees as if You had disclosed such pet to Us at the inception of the Lease. You understand and agree that it is unreasonable for You to demand that We ascertain the exact date and time that any unauthorized pet was present in the Home for the purpose of establishing a prorated sum; accordingly, for the purpose of assessing the amount of said pet fees and pet rents and pet deposits (the deposit) that You owe

to Us, You agree that such amounts shall be calculated as though the unauthorized pet was present in the Home on the first day of the Lease term. In the event You fail to tender these sums immediately upon Our demand, Your failure shall constitute Your default of this Agreement and the Lease.

**10. ANY BREACH OF THIS ADDENDUM A DEFAULT.** Any action or inaction or omission by You or any guest or visitor or occupant that violates any term or condition of this Addendum shall constitute Your default of the Lease.

**11. SEVERABILITY.** Should any court of law consider any provision of this Addendum to be unenforceable, then that provision shall be considered severed from this Addendum and the remainder of this Addendum shall continue in full force and effect. If required, the parties agree that a court of law shall construe the remaining non-severed provisions in a context consistent with the Addendum as a whole.

**12. SPECIAL PROVISIONS.** The following special provisions ("Special Provisions") shall be considered part of this Addendum:

Two (2) pet limit per apartment. No aggressive

breed or Mixed breed with aggressive

tendencies - A Vet letter may be required upon

request.

Where any term or condition of this Addendum and the Special Provisions may conflict, the Special Provisions shall control.

**13. EXECUTION BY PARTIES.** We and You duly execute this Addendum, whether electronically or by signing below, on the respective dates written below or otherwise noted in electronic format. By executing this Addendum, YOU ACKNOWLEDGE HAVING READ AND AGREED TO ALL THE PROVISIONS OF THIS ADDENDUM. You further acknowledge having received a copy of this Addendum. This Addendum constitutes the ENTIRE agreement between the parties and NO statement, oral or written or otherwise, not contained or described herein shall be binding on either party. No subsequent amendment to this Addendum or the Lease or any statement, oral or otherwise, by either party to this Addendum shall be binding unless it is in writing and signed by all parties.

LESSOR:

BY: _____

_Signature of Authorized Person for Lessor or Agent of Lessor_

Date Signed: _____

LESSEES [signature only, do not print name]:

_____(SEAL)
Signature

_____(SEAL)
Signature

_____(SEAL)
Signature

_____(SEAL)
Signature

Date(s) Signed: _____

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF



# BED BUG ADDENDUM

**1. ADDENDUM.** For mutual and proper consideration, the receipt of which is acknowledged by all of the undersigned parties to this document, this document shall serve as an addendum ("the Addendum") to the residential lease contract (the "Lease") between

**MP Bridges at Southpoint, LLC**

as Lessor (hereinafter referred to as "We" or "Us" or in similar possessive forms) and

**Valerie Williams**

es Lessee(s) (hereinafter referred to as "You" or in similar possessive forms) for the rental of real property located at a street address of:

**7301 Calibre Park Dr # 01-308 #01-308, Durham,**

**NC 27707**

(said real property hereinafter referred to as "the Home"). Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.

**2. WHAT ARE BED BUGS?** *(Informational Purposes Only)*
Bed bugs are small, wingless, oval-shaped insects that feed on the blood of warm-bodied animals, though they have a preference for human blood. Hatchling bed bugs are about the size of a poppy seed, and adults can grow to the size of an apple seed. Typically, bed bugs live for a period of approximately six to twelve months and they can survive for extended periods without feeding. Their color ranges from nearly white or a light tan to a deep brown or burnt orange.
**A. Practical Ways to Limit Exposure to Bed Bugs:**
    1. Do not purchase or accept used furniture from unknown .sources.
    2. Protect Your mattress and box springs by encasing them within special mattress bags and insure that they are properly sealed. Make sure Your linens are clean and change Your sheets and bedding often.
    3. When traveling, inspect Your accommodations immediately upon arrival and attempt to store Your luggage on elevated surfaces such as the luggage rack provided by most hotels.
    4. Immediately notify Us of any potential or suspected bed bug sightings.
    5. Never attempt to treat bed bug infestations without the participation of a licensed pest control company approved by Us.
**B. Bed Bug Exposure:** Bed bugs seek out people and are sometimes animals, generally at night while such hosts are sleeping, and painlessly feed on human blood. While feeding, they inject a tiny amount of their saliva into the skin, which can ultimately form an irritant to the skin in some instances, resulting in an allergic response. The skin lesion produced by the bite of a bed bug resembles those caused by many other kinds of blood-feeding insects, such as mosquitoes and fleas. While bed bugs feed on human blood, there is no scientific evidence suggesting that bed bugs carry and/or transmit diseases from one host to another. In fact, the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention have refused to elevate bed bugs to the threat level posed by disease-carrying pests.
**C. Persons Likely to Experience A Bed Bug Infestation:**
Anyone and everyone are subject to experiencing a bed bug infestation as bed bugs do not discriminate in their selection of hosts. Many people mistakenly believe that poor hygiene and/or cleanliness increase the likelihood that you will experience a bed bug infestation. This is fundamentally untrue es bed bugs know no economic or social bounds. Bed bugs can be found in the nicest of apartment communities, five-star hotels and resorts, and even in commercial retail stores. Therefore, You should not be ashamed if You experience a bed bug infestation, as it could happen to anyone. It is crucially important that You immediately report any potential bed bug infestation to Us in order to limit the scope and/or extent of any infestation.
**D. Identifying an Infestation:**
    1. Check whether You have any unexplained welts, bites or skin irritations similar to those found from a mosquito or flea bite. Bed bug bites are generally in linear succession and found on exposed areas of the skin, such as the face, neck, arms and legs.
    2. Inspect the area around your mattress, box springs, headboard and bed frame. Look for any evidence of their presence, such as fecal markings of a red-to-dark brown color, which will generally be visible on or near beds. Check for blood stains on Your mattress because of bed bugs having been crushed during Your sleep. You may also find skin casts as bed bugs are known to shed their skin from time to time.
    3. Regularly inspect Your bedding, bed frames, mattress, box springs, upholstered and wooden furniture both inside and out (including inside and behind drawers), and along ceiling and wall junctions.

**3. ACKNOWLEDGEMENT.** You hereby acknowledge, and We hereby represent that, to Our knowledge, there is not a bed bug infestation present in the Home as of the beginning of the original term of the Lease.

**4. PRIOR RESIDENCE.** You hereby warrant and certify that You are not moving from, and have not lived in, a home, residence and/or apartment that has experienced or been subject to a bed bug infestation within the eighteen (18) month period immediately preceding the beginning of the initial lease term and that prior to taking possession of the Home, You have inspected Your personal property, furniture, mattress, clothing and possessions and found them to be free of bed bugs. You further certify and warrant that You have not been subjected to conditions in which there was a bed bug infestation prior to taking possession of the Home.

**5. RESPONSIBILITIES AFTER DELIVERY OF POSSESSION.** You agree that any infestation of bed bugs in the Home shall constitute damage and defacement of the Home. In consideration of the disclosure provided for herein, if the Home becomes, or is .discovered to be, infested with bed bugs at any time during the lease term, any renewal thereof, or between Your moving out and Our being put in possession of the Home, such infestation shall be conclusively presumed to be caused by You, and in such an event, You agree that You shall be in violation of N.C. GEN. STAT. § 42-43, and You further agree that, pursuant to N.C. GEN. STAT. § 42-41, We shall be released of any duty under N.C. law (including, but not limited to, N.C. GEN. STAT. § 42-42) to make the Home habitable. As such, You shall be responsible for any damages incurred by Us because of such infestation, including but not limited to the cost of treatment for the Home and any surrounding units as recommended by a qualified and licensed pest control company. In the event of an infestation, We shall not be responsible for the cost of treating Your personal property located

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 42 of 78

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

in the Home. Furthermore, We may declare a default of the Lease and pursue all remedies available to Us under the Lease.

**6. DUTY TO REPORT/INSPECT.** You hereby acknowledge Your ongoing obligation, in accordance with the terms of the Lease, to immediately notify Us in writing of any potential bed bug infestation in the Home. You acknowledge and understand that You have a continuing obligation to inspect Your bedding, bed frames, mattress, box springs, and head board on a regular periodic basis. You further agree to immediately notify Us of any signs of a potential bed bug infestation, including but not limited to, any red to dark brown spotting around the bed frame or mattress area, or unexplained bites, stings, irritations or sores. Furthermore, You understand and agree that You are required by the Lease and this Addendum to cooperate and fully comply with all recommendations as set forth in the insect or bed bug treatment or eradication plan as recommended by a licensed pest control company. Your failure to immediately report in writing (or otherwise) the presence of bed bugs in the Home upon discovery of the same, or to fully cooperate with the pest control company, shall constitute Your default of the Lease.

**7. BREACH OF ADDENDUM.** In the event You fail to perform Your obligations under this Addendum, such action and/or inaction shall constitute an immediate and instant default of the Lease and this Addendum. Upon Your default, We may, with or without notice, terminate Your right to possession of the Home without terminating the Lease and/or exercise any other remedy provided by law or described within the Lease. Should We discover that You are in default of the requirements of Paragraph 4 of this Addendum and that You have misrepresented the facts and provided Us with false information, then You agree that such misrepresentation shall constitute Your act of fraud and shall permit Us to recover from You any one or more of the following: (i) compensatory damages, (ii) punitive damages, and (iii) Our attorney's fees.

**8. NO SELF TREATMENT.** Under no circumstances shall You attempt to provide treatment to the Home, whether such treatment is being provided by You or someone hired on behalf of You. In all circumstances, You must first notify Us in writing, and We shall thereafter arrange for treatment of the Home by a licensed pest control company. Any attempt(s) by You to treat the Home or to make arrangements for the treatment of the Home shall constitute Your default of the Lease.

**9. SEVERABILITY.** Should any court of law consider any provision of this Addendum to be unenforceable, then that provision shall be considered severed from this Addendum and the remainder of this Addendum shall continue in full force and effect. If required, the parties agree that a court of law should construe the remaining non-severed provisions in a context consistent with the Addendum as a whole.

**10. INDEMNIFICATION.** You understand and agree that You shall indemnify Us and hold Us and Our Agent(s) harmless from any and all claims, liabilities, costs, rents, fines, fees, attorney's fees, and any other monetary damage that may result from Your breach of the duties arising under this Addendum.

**11. SPECIAL PROVISIONS.** The following special provisions ("Special Provisions") shall be considered part of this Addendum:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Where any term or condition of this Addendum and the Special Provisions may conflict, the Special Provisions shall control.

**12. EXECUTION BY PARTIES.** We and You duly execute this Addendum, whether electronically or by signing below, on the respective dates written below or otherwise noted in electronic format. By executing this Addendum, **YOU ACKNOWLEDGE HAVING READ AND AGREED TO ALL THE PROVISIONS OF THIS ADDENDUM.** You further acknowledge having received a copy of this Addendum. This Addendum constitutes the **ENTIRE** agreement between the parties and NO statement, oral or written or otherwise, not contained or described herein shall be binding on either party. No subsequent amendment to this Addendum or the Lease or any statement, oral or otherwise, by either party to this Addendum shall be binding unless it is in writing and signed by all parties.

**LESSOR:**

BY: _____
    *Signature of Authorized Person for Lessor or Agent of Lessor*

Date Signed:_____

**LESSEES [signature only, do not print name]:**

_____(SEAL)
*Signature*

_____(SEAL)
*Signature*

_____(SEAL)
*Signature*

_____(SEAL)
*Signature*

Date(s) Signed:_____

Last Revised January 2017

© AANC

*Valerie Williams*
—69778811D624433...

*Dana Maddox*
—450C2589C9334A3...

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 43 of 78

# PEGASUS
## RESIDENTIAL

### Authorization for Release of Renters Insurance Information

**AUTHORIZATION:**
I hereby authorize by signing this release, that Pegasus Residential and 370-Bridges At Southpoint have the rights and access to the following information prior to residents' lease starting and at resident renewal date.

**INQUIRES MAY BE MADE REGARDING THE FOLLOWING INFORMATION:**
- Renter Insurance policy coverage

- Renters Insurance Declaration Page

- Coverage terms

**CONDITIONS:**
I agree that photocopies of this authorization may be used for the purpose stated above. If I do not sign the authorization, I also understand that my eligibility to rent with Pegasus Residential may be denied or terminated.

_____
Applicant's Signature          Date

_____
Management Signature Date

_____
Applicant's Signature          Date





DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

## BALCONY AND PATIO ADDENDUM

This addendum is in consideration of the execution or renewal of a lease of the dwelling unit identified on the lease. Management and resident agree as follows:

1. Do not toss, throw or drop objects off your balcony or patio. Do not place or store objects on railings. They could fall off and hurt someone below or damage property.

2. Combustible or flammable goods or materials must not be kept on your balcony or patio. It is prohibited to leave charcoal, lighter fluid, paint, cleaning solutions, gasoline, newspaper, and similar materials.

3. Grill (i.e. charcoal, propane, electric, etc) usage and storage is prohibited on your patio/balcony.

4. Pets are not allowed on your balcony or patio unattended.

5. Do not hang or store rugs, towels, laundry, clothing, clotheslines, flags and or banners. Do not drape these items over the railing.

6. Only outdoor patio furniture may be kept on your balcony or patio. Mops, brooms, toys, cartons, appliances, furniture, machinery, bicycles, or other recreational or exercise equipment or similar "garage" items are prohibited. These items can be an eyesore.

7. Do not leave trash, newspapers, or recyclable on your balcony or patio. They are unsightly and can quickly cause an infestation problem for you and your neighbors.

8. This lease addendum is incorporated into the lease executed or renewed this day between management and resident.

9. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF RESIDENCY. A single violation of any of the provisions of this addendum shall be deemed a serious violation and a material noncompliance with the lease. It is understood and agreed that a single violation shall be good cause for termination of the lease.


---
**Resident Signature**      **Date**

---
**Resident Signature**      **Date**

---
**Resident Signature**      **Date**

---
**Management Signature**      **Date**


# PEGASUS
## RESIDENTIAL



DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

# PEGASUS
### RESIDENTIAL

# RULES AND REGULATIONS / ACKNOWLEDGEMENT OF UNDERSTANDING ADDENDUM

Rules and regulations are incorporated into the agreement to rent or lease and shall be observed by the resident and their GUESTS. New rules or revisions may be adopted upon giving written notice to resident. New rules or revisions may be adopted upon giving notice to lessee.

## GENERAL

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the strictest terms of the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time.

Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.

THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.

## POOL
- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries.
- For their safety, Residents shall not swim alone.
- Pool hours are posted at the pool.
- Children under the minimum age (posted at the pool) must be accompanied at all times by a caretaker that is a parent or legal guardian. Pets are not allowed at the pool at any time.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool.
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in the pool area, disposing of trash, and keeping pool gates closed.
- Radios, tape players, etc. MUST be turned to a volume not to be offensive to those in the immediate area. In consideration of other residents, earphones must be used when listening to radio, cassette players, CD players, or portable TV.
- Resident(s) must accompany their guests. Guests are limited to two guests per unit.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

### IN CASE OF EMERGENCY DIAL 911

## FITNESS CENTER.
- Residents and guest will adhere to the rules and regulations posted in the fitness center and Management policies.
- The fitness center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well as any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the fitness center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep fitness center locked at all times during Resident's visit to the fitness center.
- Resident(s) will not admit any person to the fitness center who has not registered with the Management Office.
- Children under the minimum age (posted at the fitness center) must be accompanied at all times by a parent or legal guardian.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the fitness center.

## PACKAGE RELEASE

Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident(s) agrees that Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same.

## BUSINESS CENTER.

Resident(s) agrees to use the business center at Resident(s) sole risk and according to the Community Rules. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to 30 minutes if others are waiting to use them. Smoking, eating alcoholic beverages, pets, and any disturbing behaviors are prohibited in the Business Center. Children under the age of 18 must be accompanied by a Resident who is that child's parent or legal guardian.

## SECURITY

Management does not provide law enforcement or private protection services for residents. IN CASE OF AN EMERGENCY, YOU SHOULD REQUEST ASSISTANCE FROM THE APPROPRIATE LOCAL AUTHORITY (POLICE DEPARTMENT, FIRE DEPARTMENT, PARAMEDICS, ETC.) We request you also notify the office of the property in which you reside that such disturbance or emergency has occurred.

## AUTOMOBILES/BOATS/RECREATIONAL VEHICLES. The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only vehicles per licensed Resident is allowed.
- All vehicles must be registered at the Management Office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management will be towed at the vehicle owner's expense after a 24 hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense..
- The washing of vehicles is not permitted on the property unless specifically allowed in designated areas.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.

## FIRE HAZARDS. In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of 10 feet from any building. Such devices will not be close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- Fireplaces: Only firewood is permitted in the fireplace. No artificial substances, such as Duro flame logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be stored (including stock for sale) in dwellings, near attic, stairways, breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**EXTERMINATING:** Unless prohibited by statue or otherwise stated in the Lease, Owner may conduct extermination operations of Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Resident(s) in advance of extermination to Residents' dwelling, and give Resident instructions for the preparation of the dwelling and safe control with insecticides. Residents will be responsible to prepare the dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date, Owner will prepare Residents' dwelling and charge Resident(s) accordingly. Resident(s) may request extermination treatments in addition to those regularly provided by Owner in writing. Resident(s) agree to perform the tasks required by the Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to the following:

- Clean all cabinets, drawers and closets in kitchen and pantry,
- If roaches have been seen in closets, remove contents from shelves and floor,
- Remove infants and young children from the dwelling,
- Remove pets or place them in bathrooms, and notify Owner of such placement,
- Remove chain locks or other types of obstruction on day of service.
- Over fish tanks and turn off their pumps.
- Do not wipe out cabinets after treatment.

In case of suspected or confirmed bed bug infestation, Resident(s) will agree to the following:
- Resident(s) will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water,
- Resident(s) will thoroughly clean all premises, all luggage, handbags, shoes and clothes hanging containers.
- Resident(s) will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF PESTICIDES**

**DRAPES AND SHADES.** Drapes or shades installed by Resident when allowed, must be lined in white and present a uniform exterior appearance.

**WATER BEDS.** Resident(s) shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**BALCONY or PATIO.** Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios.
- Grill (i.e. charcoal, propane, electric, etc.) usage and storage is prohibited on your patio/balcony,
- Pets are not allowed on your balcony or patio,
- Combustible or flammable goods or materials must not be kept on your balcony or patio. It is prohibited to leave charcoal, lighter fluid, paint, cleaning solutions, gasoline, newspaper, and similar materials,

**SIGNS.** Resident(s) shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**SATELLITE DISHES/ANTENNAS.** You must complete a satellite addendum and abide by its terms prior to installation or use.

**RESIDENT LOCK OUT.** During office hours, leaseholders who have locked themselves out of their apartment will be allowed to check out a key after their identification has been verified. After office hours, leaseholders should call a locksmith. The leaseholder will incur any fees charged by the locksmith.

**WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, it's finding shall not affect the validity of the remaining portions of this addendum, the Lease Contract or any other addenda to the Lease Contract.

I acknowledge that I have read and understand the 'Rules and Regulations' governing my residency at 370-Bridges At Southpoint and agree that I will abide by rules as stated.

| | |
|---|---|
| Resident Signature | Date |
| Resident Signature | Date |
| Resident Signature | Date |
| Management Signature | Date |

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

## REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

This Addendum is attached to and becomes a part of your Residential Lease Agreement, (the "Lease Agreement"). For the duration of the Lease Agreement, the Resident ("Lessee") is required to maintain and provide the following minimum required insurance coverage:

- **$100,000** Limit of Liability for Lessee's legal liability for damage to the property owner's property for no less than the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump and water damage.

Lessee is required to furnish the Property Owner, or Property Manager acting on behalf of the Property Owner, with evidence of Minimum Required Insurance prior to occupancy of leased premises and at the time of each lease renewal period. If at any time Lessee does not have Minimum Required Insurance, Lessee is in breach of the Lease Agreement and Property Owner shall have, in addition to any other rights under the Lease Agreement, the right but not the obligation to purchase Minimum Required Insurance coverage and seek reimbursement from the Lessee, as additional rent under the Lease Agreement, for all costs and expenses associated with such purchase.

Lessee may obtain Minimum Required Insurance or broader coverage from an insurance agent or insurance company of Lessee's choice. If Lessee furnishes evidence of such insurance and maintains such insurance for the duration of the Lease Agreement, then nothing more is required from Lessee under this Addendum. If Lessee does not maintain Minimum Required Insurance, the insurance requirement of this Addendum may be satisfied by the Property Owner, who may schedule the Lessee's unit for coverage under the Legal Liability to Property Owner's insurance policy ("LLL"). The coverage provided under the LLL will provide the Minimum Required Insurance coverage listed above. An amount equal to the total cost of the LLL coverage (premium, taxes and administrative fee) shall be charged to Lessee by the Property Owner as additional rent under the Lease Agreement. Some important points of this coverage, which Lessee should understand are:

1. LLL is designed to fulfill the Minimum Required Insurance under the Lease Agreement. The Property Owner is the Insured under the LLL. Lessee is not an Insured or Additional Insured under the LLL policy.

2. **LLL coverage is NOT personal liability insurance or renters insurance.** Property Owner specifically represents that LLL does **NOT** cover the Lessee's personal property (contents), additional living expense or liability arising out of Bodily Injury or Property Damage to any third party including other tenants. If Lessee requires coverage for any of Bodily Injury, Property Damage or Personal Property (Contents), then Lessee should contact an insurance agent or insurance company of Lessee's choice to obtain personal liability insurance or renters insurance.

3. Coverage under the LLL policy may be more expensive than the cost of Minimum Required Insurance obtainable by Lessee elsewhere. At any time, Lessee may contact an insurance agent or insurance company of their choice for insurance options to satisfy the Minimum Required Insurance under the Lease Agreement.

4. Licensed insurance agents may receive commission on the LLL policy.

5. The total cost to the Lessee for the Property Owner obtaining LLL coverage shall be $10.00 per month. This includes the $6.672 premium payable to the LLL insurer, $0.328 taxes and fees due to state insurance governing bodies and a $3.00 Administration Expense Fee to the Beacon Real Estate Services, LLC for the expense of processing monthly payments and administering this program.

6. In the event of insufficient limits, Lessee shall remain liable to the Property Owner for any deficiencies.

7. In the event of liability to any party other than the Property Owner for damage to the Property Owner's property, Lessee shall remain liable to such other party.

Scheduling under the LLL policy is not mandatory and Lessee may purchase Minimum Required Insurance or broader coverage from an insurance agent or insurance company of Lessee's choice at any time and coverage under the LLL policy will terminate following delivery to the Property Owner or Property Manager of evidence of such coverage as reasonably required by Property Owner.

| | |
|---|---|
| Lessee Signature | Date |
| Lessee Signature | Date |

DocuSigned by:
*Valerie Williams*
59779B110624483

DocuSigned by:
*Dana Maddox*
450C2699C8534A3

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF



## RENTAL PAYMENT POLICY

Rent payments are due on the first day of each month as stated in the lease agreement. Applicable utility and service charges are due per the utility and/or service addenda.

Fees for late payments will be charged per the lease agreement, and/or applicable utility/service addenda.

Apartment number and daytime phone number are required on all payments.

Cash payments are not accepted.

Post-dated checks are not accepted, and checks cannot be "held" for future deposit.

Personal checks will only be accepted from leaseholders, and/or co-signers/guarantors named in the co-signer/guarantor agreement. Payments from others must be in certified funds.

Partial payments are not accepted. Co-residents are required to present two (2) or more payments together.

All late payments must be in certified funds, and include applicable late fees.

A NSF fee is charged for all returned checks as per the lease agreement.

Returned checks (NSF) must be redeemed with certified funds. The original check will not be resubmitted to the bank.

After two (2) non-sufficient payments (NSF) all future payments must be in certified funds.

Evictions are filed with Durham County on the 15 day of any month rent is not paid in full. All fees including warrant and/or legal fees in the amount of TBD, and late fees will be billed to the resident's account, and must be included with the rent, and paid in certified funds.

| | | | |
|---|---|---|---|
| RESIDENT | DATE | MANAGEMENT | DATE |

| | |
|---|---|
| RESIDENT | DATE |

| | |
|---|---|
| RESIDENT | DATE |

| | |
|---|---|
| RESIDENT | DATE |

Valerie Williams
8977981108244433...

Dana Maddox
450C2609C0634A3...

DocuSign Envelope ID: A1D7E8C3-A801-4094-8AB3-C114C9841DBF

## STATEMENT OF STANDARD CHARGES

| | | |
|---|---|---|
| 1. | Trash/Garbage removal | $50 per bag |
| 2. | Exhaust fan & filter clean up | $10 |
| 3. | General Cleaning | Cost plus labor |
| 4. | Stove clean up | $25 |
| 5. | Broiler pan replacement | $20 |
| 6. | Refrigerator clean up | $25 |
| 7. | Kitchen clean up | $25 |
| 8. | Bathroom clean up | $25 each |
| 9. | Window glass replacement | Cost plus labor |
| 10. | Window screen replacement | $20 each |
| 11. | Mirror replacement | Cost plus labor |
| 12. | Door damage | Cost plus labor |
| 13. | Fire extinguisher replacement | $35 |
| 14. | Microwave clean up | $10 |
| 15. | Microwave repairs/replacement | Cost plus labor |
| 16. | Counter top replacement/repairs | Cost plus labor |
| 17. | Apartment keys (copies or not returned) | $50 each |
| 18. | Mailbox keys (copies or not returned) | $35 each |
| 19. | Gate Cards (extras or not returned) | $35 each |
| 20. | Gate Remotes (to purchase or not returned) | $75 each |
| 21. | Pool Pass (not returned) | $35 |
| 22. | Window blind replacement | $50 each |
| 23. | Door blind replacement | $35 each |
| 24. | Mini blind repairs | $10 each |
| 25. | Smoke detector replacement | $20 |
| 26. | Appliance damages | Cost plus labor |
| 27. | Furniture removal | $100 each |
| 28. | Carpet stain removal | $25 each |
| 29. | Excessive odor (pet, smoke or cooking) | Cost |
| 30. | Large holes | $15 |
| 31. | Extra paint 1 – 24 ounces | $10 each |
| 32. | Extra paint 25 – 48 ounces | $15 each |
| 33. | Extra paint 49 – 72 ounces | $20 each |
| 34. | Prep, patch, paint | $40 each |
| 35. | Extra painting: Due to gloss | $200 |
| 36. | Extra painting: Due to flat | $75 |
| 37. | Extra traffic area carpet cleaning | $40 |
| 38. | Paint (Color Change) | $20-$100 |
| 39. | Vinyl flooring replacement | Prorated Cost plus labor |
| 40. | Carpet and pad replacement | Prorated Cost plus labor |
| 41. | Pad replacement | $150 - $300 |

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Management Signature _____ Date _____

## PEGASUS
### RESIDENTIAL

DocuSigned by:
*Valerie Williams*
897768110824433...

DocuSigned by:
*Dana Maddox*
450C2588C0534A3...

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

# PEGASUS
## RESIDENTIAL

**UTILITY ADDENDUM**
(North Carolina)

This Utility Addendum (the "Addendum") shall be part of the Residential Lease Agreement (the "Lease") dated 08/02/2017 between 370-Bridges At Southpoint Apartments ("Lessor") and Valerie Williams (whether one or more, "Lessee") of Apt. No.01-308 (the "Premises").

1. With respect to utilities, Paragraph 1 of the Lease is hereby supplemented and amended, as applicable, by this Addendum. If there is any conflict between the terms of Paragraph 1 and this Addendum, then the terms of this Addendum shall control.

2. If, in Paragraph 1 of the Lease, Lessor is shown as currently paying for water and sewer services, then Lessor reserves the right, with 30 days prior written notice to Lessee, to start submetering for water and sewer services in the Premises in accordance with applicable laws and regulations, in which event the provisions of Paragraphs 1 and 37 of the Lease regarding submetering of water and sewer services shall become operative. After Lessor starts submetering, Lessee shall pay for water and sewer services in the Premises, as provided in Paragraph 37 of the Lease. Also, to the extent permitted by applicable laws and regulations, Lessor reserves the right to start, or switch from submetering to, an allocation/RUBS system of billing for water and sewer services with 30 days prior written notice to Lessee.

3. Trash collection service for the Premises will be paid by: Lessee __X__ Lessor _____.

If trash collection is to be paid by Lessee, then bills will be calculated using a system based on a flat monthly rate. Lessor may adjust the monthly rate for trash collection at any time during the lease term with 30 days prior written notice to Lessee. If trash collection service is not to be paid by Lessee as of the beginning date of the Lease term, then Lessor reserves the right to begin billing Lessee for trash collection with 30 days prior written notice to Lessee. Trash collection charges must be paid by Lessee within 15 days of the date each bill is issued and if not paid within 15 days then Lessee's payment will be late and subject to the late fee provisions of Paragraph 3 of the Lease. Lessee's failure to make timely payment of trash collection bills shall be a default under the Lease and shall entitle Lessor to exercise all remedies available under the Lease. Lessor shall be entitled to use Lessee's security deposit to recover any and all unpaid trash collection charges.

4. Pest control service for the Premises will be paid by: Lessee __X__ Lessor _____ .

If pest control is to be paid by Lessee, then bills will be calculated using a system based on a flat monthly rate. Lessor may adjust the monthly rate for pest control at any time during the lease term with 30 days prior written notice to Lessee. If pest control service is not to be paid by Lessee as of the beginning date of the Lease term, then Lessor reserves the right to begin billing Lessee for pest control with 30 days prior written notice to Lessee. Pest control charges must be paid by Lessee within 15 days of the date each bill is issued and if not paid within 15 days then Lessee's payment will be late and subject to the late fee provisions of Paragraph 3 of the Lease. Lessee's failure to make timely payment of pest control bills shall be a default under the Lease and shall entitle Lessor to exercise all remedies available under the Lease. Lessor shall be entitled to use Lessee's security deposit to recover any and all unpaid pest control charges.

1

2014 update (W&W)

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

# PEGASUS
## RESIDENTIAL

5.  Lessee shall not tamper with, adjust, or disconnect any utility submetering system or device. Lessee's violation of this provision shall be a default of the Lease and shall entitle Lessor to exercise all remedies available under the Lease.

6.  To the extent that there is a billing fee for the production of any utility bill for the above utilities or services by our billing company you shall pay such fees, not to exceed $3.75 per month. If allowed by state law, we at our sole discretion may amend these fees with written notice to you.

7.  If you fail to timely establish utilities and services in your name as required under the Lease, then we may: (1) charge you for any utilities and services provided to the Premises and billed to us and (2) charge you a $25.00 penalty, per occurrence, for each invoice we receive for utilities and services provided to the Premises.

Date: 08/02/2017

_____
Agent for Lessor

_____
Lessee

_____
Lessee

_____
Lessee

2014 update (W&W)


Valerie Williams


Dana Maddox

## ANIMAL POLICY ADDENDUM

**370-Bridges At Southpoint** does not accept pets of any kind without the written consent of the management. That written consent must be in the form of an 'Animal Addendum' and appropriate fees and deposits must be paid.

The following policies apply to all pets that reside at this community:

1. All pets must be properly licensed with all preventive shots up to date.

2. All residents must provide a signed statement from a licensed Veterinarian that states that the pet is in good health and the letter must state the breed or breeds of the pet in the Veterinarian's best estimation. If the pet is a registered breed, a copy of the registration papers will be accepted in lieu of the Veterinarian's statement.

3. All pets must be under control and leashed at all times

4. No pets are to be left on the balcony at any time unattended.

5. The following is the fee policy for pets that qualify for residency. Allowed maximum of 2 Pets per Apt.
   - $300 Non-Refundable Fee Per Pet
   - Pet Rent $20 Per Pet

_____          _____

Resident Signature                                Date

_____          _____

Resident Signature                                Date

_____          _____

Resident Signature                                Date

_____          _____

Management Signature                              Date

# PEGASUS
## RESIDENTIAL

DocuSign Envelope ID: A1D7E8C3-A901-4094-BAB3-C114C9841DBF

## REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

This Addendum is attached to and becomes a part of your Residential Lease Agreement, (the "Lease Agreement"). For the duration of the Lease Agreement, the Resident ("Lessee") is required to maintain and provide the following minimum required insurance coverage:

- $100,000 Limit of Liability for Lessee's legal liability for damage to the property owner's property for no less than the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump and water damage.

Lessee is required to furnish the Property Owner, or Property Manager acting on behalf of the Property Owner, with evidence of Minimum Required Insurance prior to occupancy of leased premises and at the time of each lease renewal period. If at any time Lessee does not have Minimum Required Insurance, Lessee is in breach of the Lease Agreement and Property Owner shall have, in addition to any other rights under the Lease Agreement, the right but not the obligation to purchase Minimum Required Insurance coverage and seek reimbursement from the Lessee, as additional rent under the Lease Agreement, for all costs and expenses associated with such purchase.

Lessee may obtain Minimum Required Insurance or broader coverage from an insurance agent or insurance company of Lessee's choice. If Lessee furnishes evidence of such insurance and maintains such insurance for the duration of the Lease Agreement, then nothing more is required from Lessee under this Addendum. If Lessee does not maintain Minimum Required Insurance, the insurance requirement of this Addendum may be satisfied by the Property Owner, who may schedule the Lessee's unit for coverage under the Legal Liability to Property Owner's insurance policy ("LLL"). The coverage provided under the LLL will provide the Minimum Required Insurance coverage listed above. An amount equal to the total cost of the LLL coverage (premium, taxes and administrative fee) shall be charged to Lessee by the Property Owner as additional rent under the Lease Agreement. Some important points of this coverage, which Lessee should understand are:

1. LLL is designed to fulfill the Minimum Required Insurance under the Lease Agreement. The Property Owner is the insured under the LLL. Lessee is not an insured or Additional Insured under the LLL policy.

2. **LLL coverage is NOT personal liability insurance or renters insurance.** Property Owner specifically represents that LLL does **NOT** cover the Lessee's personal property (contents), additional living expense or liability arising out of Bodily Injury or Property Damage to any third party including other tenants. If Lessee requires coverage for any of Bodily Injury, Property Damage or Personal Property (Contents), then Lessee should contact an insurance agent or insurance company of Lessee's choice to obtain personal liability insurance or renters insurance.

3. Coverage under the LLL policy may be more expensive than the cost of Minimum Required Insurance obtainable by Lessee elsewhere. At any time, Lessee may contact an insurance agent or insurance company of their choice for insurance options to satisfy the Minimum Required Insurance under the Lease Agreement.

4. Licensed insurance agents may receive commission on the LLL policy.

5. The total cost to the Lessee for the Property Owner obtaining LLL coverage shall be $10.00 per month. This includes the $6.672 premium payable to the LLL insurer, $0.328 taxes and fees due to state insurance governing bodies and a $3.00 Administration Expense Fee to the Beacon Real Estate Services, LLC for the expense of processing monthly payments and administering this program.

6. · In the event of insufficient limits, Lessee shall remain liable to the Property Owner for any deficiencies.

7. In the event of liability to any party other than the Property Owner for damage to the Property Owner's property, Lessee shall remain liable to such other party.

Scheduling under the LLL policy is not mandatory and Lessee may purchase Minimum Required Insurance or broader coverage from an insurance agent or insurance company of Lessee's choice at any time and coverage under the LLL policy will terminate following delivery to the Property Owner or Property Manager of evidence of such coverage as reasonably required by Property Owner.

| Lessee Signature | Date |
|---|---|
| Lessee Signature | Date |

DocuSigned by:
*Valerie Williams*
E97799110324433...

DocuSigned by:
*Dana Maddox*
450C2599C9534A3...

## NOTICE TO PAY

Date:   06/12/2018

From:   Brittany Brooks, Property Manager / Agent for Owner
        370 Bridges At Southpoint
        7304 Calibra Park Dr
        Durham, NC 27707-3070
        (919) 544-4442

To:     Valerie Williams
        7301 Calibra Park Dr # 01-308
        Durham, NC 27707-5071

Apt: 01-308

Dear Valerie Williams:

You are hereby notified that pursuant to the rental agreement dated 08/01/2017, by which you hold possession of the apartment described above (premises), you are in default under the rental agreement in the aggregate amount of the following:

| Date | Code | Description | Amount |
|------|------|-------------|--------|
| 06/01/2018 | CA RENT | Rent - Market | 1087.00 |
| 06/01/2018 | CI PETRENT | PETRENT | 20.00 |
| 06/01/2018 | CK TRASH | TRASH 03/31/2018 - 04/30/2018 | 15.00 |
| 06/01/2018 | CK UTILITY | UTILITY 03/31/2018 - 04/30/2018 | 3.75 |
| 06/01/2018 | CK WATER/SEWER | WATER/SEWER 03/31/2018 - 04/30/2018 | 36.01 |
| 06/01/2018 | CM INSURANCE | Resident Liability Insurance | 10.00 |
| 06/01/2018 | CM PESTFEE | PESTFEE 03/31/2018 - 04/30/2018 | 5.00 |
| 06/06/2018 | CB LATEFEE | Late Charges | 53.35 |

**Total amount due     $ 1210.11**

WITHIN THREE DAYS after your receipt of this Notice, you are required to pay said delinquent sums in full. Otherwise, your rental deposit will be retained as liquidated damages, your rental agreement shall thereupon immediately terminate and legal proceedings will be commenced against you to (1) recover possession of said Apartment, and (3) recover damages, all in connection with your default under the rental agreement.

IF PAYMENT IS NOT MADE AS REQUESTED, DEMAND IS HEREBY MADE FOR YOU TO VOLUNTARILY VACATE THE APARTMENT AND RETURN POSSESSION TO THE OWNER OR ITS AGENT.

By _____

Brittany Brooks, Property Manager / Agent for Owner

OneSite

## 370 Bridges At Southpoint
### Williams, Valerie (Unit 01-308)
### Resident ledger - as of Property date: 09/14/2018

| Unit | Date | Period | Cmit | Code | Description | Doc# | | Charges | Credits | Balance |
|------|------|--------|------|------|-------------|------|---|---------|---------|---------|
| 01-308 | 09/14/2018 | 092018 | | ATTRNY | Attorney Or Legal Charges - Williams | | | $201.00 | | $1422.51 |
| 01-308 | 09/08/2018 | 092018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $1221.51 |
| 01-308 | 09/08/2018 | 092018 | | PETRENT | PETRENT | | | $3.33 | | $1211.51 |
| 01-308 | 09/08/2018 | 092018 | | RENT | Rent - Market | | | $179.50 | | $1208.18 |
| 01-308 | 09/08/2018 | 092018 | | PETRENT | PETRENT | | | $16.67 | | $1028.68 |
| 01-308 | 09/06/2018 | | | LATEFEE | September late fees | | | $61.72 | | $1012.01 |
| 01-308 | 09/01/2018 | 092018 | | TRASH | TRASH 06/30/2018 - 07/31/2018 | 30089876 | | $15.00 | | $950.29 |
| 01-308 | 09/01/2018 | 092018 | | PESTFEE | PESTFEE 06/30/2018 - 07/31/2018 | 30089874 | | $5.00 | | $935.29 |
| 01-308 | 09/01/2018 | 092018 | | UTILITY | UTILITY 06/30/2018 - 07/31/2018 | 30089873 | | $3.75 | | $930.29 |
| 01-308 | 09/01/2018 | 092018 | | WATER/SEWER | WATER/SEWER 06/30/2018 - 07/31/2018 | 30089871 | | $27.37 | | $926.54 |
| 01-308 | 09/01/2018 | 092018 | | RENT | Rent - Market | | | $889.17 | | $899.17 |
| 01-308 | 09/01/2018 | 092018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $10.00 |
| 01-308 | 08/01/2018 | 082018 | | RENT | Rent - Market | | | $1067.00 | | $0.00 |
| 01-308 | 08/01/2018 | 082018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $-1067.00 |
| 01-308 | 08/01/2018 | 082018 | | PETRENT | PETRENT | | | $20.00 | | $-1077.00 |
| 01-308 | 08/01/2018 | 082018 | | TRASH | TRASH 05/31/2018 - 06/30/2018 | 29394064 | | $15.00 | | $-1097.00 |
| 01-308 | 08/01/2018 | 082018 | | PESTFEE | PESTFEE 05/31/2018 - 06/30/2018 | 29394062 | | $5.00 | | $-1112.00 |
| 01-308 | 08/01/2018 | 082018 | | UTILITY | UTILITY 05/31/2018 - 06/30/2018 | 29394061 | | $3.75 | | $-1117.00 |
| 01-308 | 08/01/2018 | 082018 | | WATER/SEWER | WATER/SEWER 05/31/2018 - 06/30/2018 | 29394059 | | $27.47 | | $-1120.75 |
| 01-308 | 07/27/2018 | 082018 | | 404 PMTOPIRD | Check Scan - Valerie Williams | 17-798083503 | | | $500.00 | $-1148.22 |
| 01-308 | 07/27/2018 | 082018 | | 404 PMTOPIRD | Check Scan - Valerie Williams | 17-798083504 | | | $500.00 | $-648.22 |
| 01-308 | 07/27/2018 | 082018 | | 404 PMTOPIRD | Check Scan - Valerie Williams | 17-798083505 | | | $148.22 | $-148.22 |
| 01-308 | 07/04/2018 | 072018 | | 418 PMTOPIRD | Check Scan - Valerie Williams 7/5/2018 | 087833 | | | $1150.00 | $0.00 |
| 01-308 | 07/04/2018 | 072018 | | 418 PMTOPIRD | Check Scan - Valerie Williams 7/5/2018 | 17-789394833 | | | $6.47 | $1150.00 |
| 01-308 | 07/01/2018 | 072018 | | RENT | Rent - Market | | | $1067.00 | | $1156.47 |
| 01-308 | 07/01/2018 | 072018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $89.47 |
| 01-308 | 07/01/2018 | 072018 | | PETRENT | PETRENT | | | $20.00 | | $79.47 |
| 01-308 | 07/01/2018 | 072018 | | TRASH | TRASH 04/30/2018 - 05/31/2018 | 28689724 | | $15.00 | | $59.47 |
| 01-308 | 07/01/2018 | 072018 | | PESTFEE | PESTFEE 04/30/2018 - 05/31/2018 | 28689722 | | $5.00 | | $44.47 |
| 01-308 | 07/01/2018 | 072018 | | UTILITY | UTILITY 04/30/2018 - 05/31/2018 | 28689721 | | $3.75 | | $39.47 |
| 01-308 | 07/01/2018 | 072018 | | WATER/SEWER | WATER/SEWER 04/30/2018 - 05/31/2018 | 28689719 | | $35.72 | | $35.72 |
| 01-308 | 06/24/2018 | 062018 | | 455 PMTOPCARD | WelcomeHome credit card payment – Valerie Williams | 404JH4BJLA1 | | | $1411.11 | $0.00 |
| 01-308 | 06/22/2018 | 062018 | | ATTRNY | Attorney Or Legal Charges - Williams | | | $201.00 | | $1411.11 |

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 56 of 78

| Unit | Date | Period | Ctrl# | Code | Description | Ref# | Charges | Credits | Balance |
|------|------|--------|-------|------|-------------|------|---------|---------|---------|
| 01-308 | 06/06/2018 | | | LATEFEE | June late fees | | $53.35 | | $1210.11 |
| 01-308 | 06/01/2018 | 062018 | | RENT | Rent - Market | | $1067.00 | | $1156.76 |
| 01-308 | 06/01/2018 | 062018 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $89.76 |
| 01-308 | 06/01/2018 | 062018 | | PETRENT | PETRENT | | $20.00 | | $79.76 |
| 01-308 | 06/01/2018 | 062018 | | TRASH | TRASH 03/31/2018 - 04/30/2018 | 27621488 | $15.00 | | $59.76 |
| 01-308 | 06/01/2018 | 062018 | | PESTFEE | PESTFEE 03/31/2018 - 04/30/2018 | 27621486 | $5.00 | | $44.76 |
| 01-308 | 06/01/2018 | 062018 | | UTILITY | UTILITY 03/31/2018 - 04/30/2018 | 27621485 | $3.75 | | $39.76 |
| 01-308 | 06/01/2018 | 062018 | | WATER/SEWER | WATER/SEWER 03/31/2018 - 04/30/2018 | 27621483 | $36.01 | | $36.01 |
| 01-308 | 05/25/2018 | 052018 | 445 | PMTOPIRD | Check Scan - Valerie Williams | 17-266864103 | | $412.01 | $0.00 |
| 01-308 | 05/25/2018 | 052018 | 445 | PMTOPIRD | Check Scan - Valerie Williams | 087058 | | $800.00 | $412.01 |
| 01-308 | 05/06/2018 | | | LATEFEE | May late fees | | $53.35 | | $1212.01 |
| 01-308 | 05/01/2018 | 052018 | | RENT | Rent - Market | | $1067.00 | | $1158.66 |
| 01-308 | 05/01/2018 | 052018 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $91.66 |
| 01-308 | 05/01/2018 | 052018 | | PETRENT | PETRENT | | $20.00 | | $81.66 |
| 01-308 | 05/01/2018 | 052018 | | TRASH | TRASH 02/28/2018 - 03/31/2018 | 26768251 | $15.00 | | $61.66 |
| 01-308 | 05/01/2018 | 052018 | | PESTFEE | PESTFEE 02/28/2018 - 03/31/2018 | 26768249 | $5.00 | | $46.66 |
| 01-308 | 05/01/2018 | 052018 | | UTILITY | UTILITY 02/28/2018 - 03/31/2018 | 26768248 | $3.75 | | $41.66 |
| 01-308 | 05/01/2018 | 052018 | | WATER/SEWER | WATER/SEWER 02/28/2018 - 03/31/2018 | 26768246 | $56.14 | | $37.91 |
| 01-308 | 04/24/2018 | 042018 | 428 | PMTOPIRD | Check Scan - Valerie Williams | 17-760675544 | | $500.00 | $-18.23 |
| 01-308 | 04/24/2018 | 042018 | 428 | PMTOPIRD | Check Scan - Valerie Williams | 17-760675545 | | $500.00 | $481.77 |
| 01-308 | 04/24/2018 | 042018 | 428 | PMTOPIRD | Check Scan - Valerie Williams | 086579 | | $475.00 | $981.77 |
| 01-308 | 04/17/2018 | 042018 | | ATTRNY | Attorney Or Legal Charges - Williams | | $201.00 | | $1456.77 |
| 01-308 | 04/06/2018 | | | LATEFEE | April late fees | | $53.35 | | $1255.77 |
| 01-308 | 04/01/2018 | 042018 | | WATER/SEWER | WATER/SEWER 01/31/2018 - 02/28/2018 | | $85.09 | | $1202.42 |
| 01-308 | 04/01/2018 | 042018 | | RENT | Rent - Market | | $1067.00 | | $1117.33 |
| 01-308 | 04/01/2018 | 042018 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $50.33 |
| 01-308 | 04/01/2018 | 042018 | | PETRENT | PETRENT | | $20.00 | | $40.33 |
| 01-308 | 04/01/2018 | 042018 | | TRASH | TRASH 01/31/2018 - 02/28/2018 | 26099752 | $15.00 | | $20.33 |
| 01-308 | 04/01/2018 | 042018 | | PESTFEE | PESTFEE 01/31/2018 - 02/28/2018 | 26099750 | $5.00 | | $5.33 |
| 01-308 | 04/01/2018 | 042018 | | UTILITY | UTILITY 01/31/2018 - 02/28/2018 | 26099749 | $3.75 | | $0.33 |
| 01-308 | 03/25/2018 | 032018 | 451 | PMTOPIRD | Bulk Processing - Valerie Williams 3/26/2018 | 17723014389 | | $500.00 | $-3.42 |
| 01-308 | 03/25/2018 | 032018 | 451 | PMTOPIRD | Bulk Processing - Valerie Williams 3/26/2018 | 17723014390 | | $500.00 | $496.58 |
| 01-308 | 03/25/2018 | 032018 | 451 | PMTOPIRD | Bulk Processing - Valerie Williams 3/26/2018 | 17723014391 | | $449.00 | $996.58 |
| 01-308 | 03/19/2018 | 032018 | | ATTRNY | Attorney Or Legal Charges - Williams | | $201.00 | | $1445.58 |
| 01-308 | 03/06/2018 | | | LATEFEE | March late fees | | $53.35 | | $1244.58 |
| 01-308 | 03/01/2018 | 032018 | | RENT | Rent - Market | | $1067.00 | | $1191.23 |

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 57 of 78

OneSite

| Unit | Date | Period | Cd# | Code | Description | Doc# | | Charges | Credits | Balance |
|------|------|--------|-----|------|-------------|------|---|---------|---------|---------|
| 01-308 | 03/01/2018 | 032018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $124.23 |
| 01-308 | 03/01/2018 | 032018 | | PETRENT | PETRENT | | | $20.00 | | $114.23 |
| 01-308 | 03/01/2018 | 032018 | | TRASH | TRASH 12/31/2017 - 01/31/2018 | 25466357 | | $15.00 | | $94.23 |
| 01-308 | 03/01/2018 | 032018 | | PESTFEE | PESTFEE 12/31/2017 - 01/31/2018 | 25466355 | | $5.00 | | $79.23 |
| 01-308 | 03/01/2018 | 032018 | | UTILITY | UTILITY 12/31/2017 - 01/31/2018 | 25466354 | | $3.75 | | $74.23 |
| 01-308 | 03/01/2018 | 032018 | | WATER/SEWER | WATER/SEWER 12/31/2017 - 01/31/2018 | 25466352 | | $70.38 | | $70.48 |
| 01-308 | 02/05/2018 | 022018 | | 7 PMTMORD | Payment By Money Order - Williams | 084972 | | | $1145.86 | $0.10 |
| 01-308 | 02/01/2018 | 022018 | | RENT | Rent - Market | | | $1067.00 | | $1145.96 |
| 01-308 | 02/01/2018 | 022018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $78.96 |
| 01-308 | 02/01/2018 | 022018 | | PETRENT | PETRENT | | | $20.00 | | $68.96 |
| 01-308 | 02/01/2018 | 022018 | | TRASH | TRASH 11/30/2017 - 12/31/2017 | 24783376 | | $15.00 | | $48.96 |
| 01-308 | 02/01/2018 | 022018 | | PESTFEE | PESTFEE 11/30/2017 - 12/31/2017 | 24783374 | | $5.00 | | $33.96 |
| 01-308 | 02/01/2018 | 022018 | | UTILITY | UTILITY 11/30/2017 - 12/31/2017 | 24783373 | | $3.75 | | $28.96 |
| 01-308 | 02/01/2018 | 022018 | | WATER/SEWER | WATER/SEWER 11/30/2017 - 12/31/2017 | 24783371 | | $25.21 | | $25.21 |
| 01-308 | 01/17/2018 | 012018 | 437 | PMTOPIRD | Bulk Processing - Valerie Williams | 17693228786 | | | $500.00 | $0.00 |
| 01-308 | 01/17/2018 | 012018 | 437 | PMTOPIRD | Bulk Processing - Valerie Williams | 17693228787 | | | $214.17 | $500.00 |
| 01-308 | 01/17/2018 | 012018 | 437 | PMTOPIRD | Bulk Processing - Valerie Williams | 17693228785 | | | $500.00 | $714.17 |
| 01-308 | 01/06/2018 | | | LATEFEE | January late fees | | | $53.35 | | $1214.17 |
| 01-308 | 01/01/2018 | 012018 | | RENT | Rent - Market | | | $1067.00 | | $1160.82 |
| 01-308 | 01/01/2018 | 012018 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $93.82 |
| 01-308 | 01/01/2018 | 012018 | | PETRENT | PETRENT | | | $20.00 | | $83.82 |
| 01-308 | 01/01/2018 | 012018 | | TRASH | TRASH 10/31/2017 - 11/30/2017 | 24039428 | | $15.00 | | $63.82 |
| 01-308 | 01/01/2018 | 012018 | | PESTFEE | PESTFEE 10/31/2017 - 11/30/2017 | 24039426 | | $5.00 | | $48.82 |
| 01-308 | 01/01/2018 | 012018 | | UTILITY | UTILITY 10/31/2017 - 11/30/2017 | 24039425 | | $3.75 | | $43.82 |
| 01-308 | 01/01/2018 | 012018 | | WATER/SEWER | WATER/SEWER 10/31/2017 - 11/30/2017 | 24039423 | | $40.07 | | $40.07 |
| 01-308 | 12/13/2017 | 122017 | 437 | PMTOPCARD | WelcomeHome credit card payment – Valerie Williams | N84P31NHLA3 | | | $1208.99 | $0.00 |
| 01-308 | 12/06/2017 | | | LATEFEE | December late fees | | | $53.35 | | $1208.99 |
| 01-308 | 12/01/2017 | 122017 | | RENT | Rent - Market | | | $1067.00 | | $1155.64 |
| 01-308 | 12/01/2017 | 122017 | | INSURANCE | Resident Liability Insurance | | | $10.00 | | $88.64 |
| 01-308 | 12/01/2017 | 122017 | | PETRENT | PETRENT | | | $20.00 | | $78.64 |
| 01-308 | 12/01/2017 | 122017 | | WATER/SEWER | WATER/SEWER 09/30/2017 - 10/31/2017 | 23327568 | | $34.89 | | $58.64 |
| 01-308 | 12/01/2017 | 122017 | | UTILITY | UTILITY 09/30/2017 - 10/31/2017 | 23327570 | | $3.75 | | $23.75 |
| 01-308 | 12/01/2017 | 122017 | | TRASH | TRASH 09/30/2017 - 10/31/2017 | 23327573 | | $15.00 | | $20.00 |
| 01-308 | 12/01/2017 | 122017 | | PESTFEE | PESTFEE 09/30/2017 - 10/31/2017 | 23327571 | | $5.00 | | $5.00 |
| 01-308 | 11/15/2017 | 112017 | 430 | PMTOPIRD | Bulk Processing - Valerie Williams | 17634579163 | | | $300.00 | $0.00 |

| Unit | Date | Period | Chrg Code | Description | One # | Charge | Credits | Balance |
|------|------|--------|-----------|-------------|-------|--------|---------|---------|
| 01-308 | 11/15/2017 | 112017 | 430 PMTOPIRD | Bulk Processing - Valerie Williams | 17263290111 | | $500.00 | $300.00 |
| 01-308 | 11/15/2017 | 112017 | 430 PMTOPIRD | Bulk Processing - Valerie Williams | 17263290112 | | $397.19 | $800.00 |
| 01-308 | 11/06/2017 | | LATEFEE | November late fees | | $53.35 | | $1197.19 |
| 01-308 | 11/01/2017 | 112017 | RENT | Rent - Market | | $1067.00 | | $1143.84 |
| 01-308 | 11/01/2017 | 112017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $76.84 |
| 01-308 | 11/01/2017 | 112017 | PETRENT | PETRENT | | $20.00 | | $66.84 |
| 01-308 | 11/01/2017 | 112017 | WATER/SEWER | WATER/SEWER 08/30/2017 - 09/30/2017 | 22629249 | $24.84 | | $46.84 |
| 01-308 | 11/01/2017 | 112017 | UTILITY | UTILITY 08/30/2017 - 09/30/2017 | 22629251 | $3.75 | | $22.00 |
| 01-308 | 11/01/2017 | 112017 | TRASH | TRASH 08/30/2017 - 09/30/2017 | 22629254 | $15.00 | | $18.25 |
| 01-308 | 11/01/2017 | 112017 | PESTFEE | PESTFEE 08/30/2017 - 09/30/2017 | 22629252 | $5.00 | | $3.25 |
| 01-308 | 10/20/2017 | 102017 | 16 PMTMORD | Payment By Money Order - Williams | 17650182922 | | $200.00 | $-1.75 |
| 01-308 | 10/20/2017 | 102017 | 16 PMTCHECK | Payment By Check - Williams | 083102 | | $878.00 | $198.25 |
| 01-308 | 10/20/2017 | 102017 | 16 PMTMORD | Payment By Money Order - Williams | 17634579028 | | $120.00 | $1076.25 |
| 01-308 | 10/06/2017 | | LATEFEE | October late fees | | $53.35 | | $1196.25 |
| 01-308 | 10/01/2017 | 102017 | RENT | Rent - Market | | $1067.00 | | $1142.90 |
| 01-308 | 10/01/2017 | 102017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $75.90 |
| 01-308 | 10/01/2017 | 102017 | PETRENT | PETRENT | | $20.00 | | $65.90 |
| 01-308 | 10/01/2017 | 102017 | WATER/SEWER | WATER/SEWER 07/31/2017 - 08/30/2017 | 21875443 | $22.15 | | $45.90 |
| 01-308 | 10/01/2017 | 102017 | UTILITY | UTILITY 07/31/2017 - 08/30/2017 | 21875445 | $3.75 | | $23.75 |
| 01-308 | 10/01/2017 | 102017 | TRASH | TRASH 07/31/2017 - 08/30/2017 | 21875448 | $15.00 | | $20.00 |
| 01-308 | 10/01/2017 | 102017 | PESTFEE | PESTFEE 07/31/2017 - 08/30/2017 | 21875446 | $5.00 | | $5.00 |
| 01-308 | 09/30/2017 | 092017 | RENT | Rent - Market | | $35.57 | | $0.00 |
| 01-308 | 09/30/2017 | 092017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $-35.57 |
| 01-308 | 09/30/2017 | 092017 | PETRENT | PETRENT | | $0.67 | | $-45.57 |
| 01-308 | 09/22/2017 | 092017 | 444 PMTOPACH | WelcomeHome ACH payment – Valerie Williams | ZNYFC5CHBA1 | | $1390.56 | $-46.24 |
| 01-308 | 09/18/2017 | 092017 | ATTRNY | Attorney Or Legal Charges - Williams | | $201.00 | | $1344.32 |
| 01-308 | 09/06/2017 | | LATEFEE | September late fees | | $52.58 | | $1143.32 |
| 01-308 | 09/01/2017 | 092017 | UTILITY | UTILITY 06/30/2017 - 07/31/2017 | 21187581 | $3.75 | | $1090.74 |
| 01-308 | 09/01/2017 | 092017 | RENT | Rent - Market | | $1015.97 | | $1086.99 |
| 01-308 | 09/01/2017 | 092017 | PETRENT | PETRENT | | $14.50 | | $71.02 |
| 01-308 | 09/01/2017 | 092017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $56.52 |
| 01-308 | 09/01/2017 | 092017 | WATER/SEWER | WATER/SEWER 06/30/2017 - 07/31/2017 | 21187679 | $27.52 | | $46.52 |
| 01-308 | 09/01/2017 | 092017 | TRASH | TRASH 06/30/2017 - 07/31/2017 | 21187684 | $15.00 | | $19.00 |
| 01-308 | 09/01/2017 | 092017 | PESTFEE | PESTFEE 06/30/2017 - 07/31/2017 | 21187682 | $5.00 | | $4.00 |
| 01-308 | 08/23/2017 | 082017 | 36 PMTCHECK | Payment By Check - Williams | 081974 | | $1174.76 | $-1.00 |
| 01-308 | 08/06/2017 | | LATEFEE | August late fees | | $52.55 | | $1173.76 |
| 01-308 | 08/01/2017 | 082017 | RENT | Rent - Market | | $1051.00 | | $1121.21 |
| 01-308 | 08/01/2017 | 082017 | PETRENT | PETRENT | | $15.00 | | $70.21 |

| Unit | Date | Period | Data Code | Description | Doc# | Charges | Credits | Balance |
|------|------|--------|-----------|-------------|------|---------|---------|---------|
| 01-308 | 08/01/2017 | 082017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $55.21 |
| 01-308 | 08/01/2017 | 082017 | WATER/SEWER | WATER/SEWER 05/31/2017 - 06/30/2017 | 20399333 | $25.21 | | $45.21 |
| 01-308 | 08/01/2017 | 082017 | TRASH | TRASH 06/01/2017 - 06/30/2017 | 20399338 | $15.00 | | $20.00 |
| 01-308 | 08/01/2017 | 082017 | PESTFEE | PESTFEE 06/01/2017 - 06/30/2017 | 20399336 | $5.00 | | $5.00 |
| 01-308 | 07/20/2017 | 072017 | 434 PMTOPCARD | WelcomeHome credit card payment – Valerie Williams | SXRL8Q5HBA5 | | $1208.84 | $0.00 |
| 01-308 | 07/06/2017 | | LATEFEE | July late fees | | $52.55 | | $1208.84 |
| 01-308 | 07/01/2017 | 072017 | RENT | Rent - Market | | $1051.00 | | $1156.29 |
| 01-308 | 07/01/2017 | 072017 | PETRENT | PETRENT | | $15.00 | | $105.29 |
| 01-308 | 07/01/2017 | 072017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $90.29 |
| 01-308 | 07/01/2017 | 072017 | WATER/SEWER | WATER/SEWER 04/30/2017 - 05/31/2017 | 19672747 | $60.29 | | $80.29 |
| 01-308 | 07/01/2017 | 072017 | TRASH | TRASH 04/30/2017 - 05/31/2017 | 19672752 | $15.00 | | $20.00 |
| 01-308 | 07/01/2017 | 072017 | PESTFEE | PESTFEE 04/30/2017 - 05/31/2017 | 19672750 | $5.00 | | $5.00 |
| 01-308 | 06/04/2017 | 062017 | 421 PMTOPCARD | WelcomeHome credit card payment – Valerie Williams 6/5/2017 | T7WBP92HBA5 | | $1125.45 | $0.00 |
| 01-308 | 06/01/2017 | 062017 | RENT | Rent - Market | | $1051.00 | | $1125.45 |
| 01-308 | 06/01/2017 | 062017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $74.45 |
| 01-308 | 06/01/2017 | 062017 | PETRENT | PETRENT | | $15.00 | | $64.45 |
| 01-308 | 06/01/2017 | 062017 | WATER/SEWER | WATER/SEWER 03/31/2017 - 04/30/2017 | 19207925 | $29.45 | | $49.45 |
| 01-308 | 06/01/2017 | 062017 | TRASH | TRASH 03/31/2017 - 04/30/2017 | 19207930 | $15.00 | | $20.00 |
| 01-308 | 06/01/2017 | 062017 | PESTFEE | PESTFEE 03/31/2017 - 04/30/2017 | 19207928 | $5.00 | | $5.00 |
| 01-308 | 05/24/2017 | 052017 | 445 PMTOPIRD | Bulk Processing - Valerie Williams | 080118 | | $1000.00 | $0.00 |
| 01-308 | 05/24/2017 | 052017 | 445 PMTOPIRD | Bulk Processing - Valerie Williams | 080189 | | $377.94 | $1000.00 |
| 01-308 | 05/23/2017 | 052017 | ATTRNY | Attorney Or Legal Charges - Williams late rent for May 2017 | | $201.00 | | $1377.94 |
| 01-308 | 05/06/2017 | | LATEFEE | May late fees | | $52.55 | | $1176.94 |
| 01-308 | 05/01/2017 | 052017 | RENT | Rent - Market | | $1051.00 | | $1124.39 |
| 01-308 | 05/01/2017 | 052017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $73.39 |
| 01-308 | 05/01/2017 | 052017 | PETRENT | PETRENT | | $15.00 | | $63.39 |
| 01-308 | 04/27/2017 | 052017 | WATER/SEWER | Sewer 02/28/2017 - 03/31/2017 | 18230599 | $24.64 | | $48.39 |
| 01-308 | 04/27/2017 | 052017 | UTILITY | UTILITY 02/28/2017 - 03/31/2017 | 18230601 | $3.75 | | $23.75 |
| 01-308 | 04/27/2017 | 052017 | TRASH | TRASH 02/28/2017 - 03/31/2017 | 18230604 | $15.00 | | $20.00 |
| 01-308 | 04/27/2017 | 052017 | PESTFEE | PESTFEE 02/28/2017 - 03/31/2017 | 18230602 | $5.00 | | $5.00 |
| 01-308 | 04/05/2017 | 042017 | 429 PMTOPCARD | WelcomeHome credit card payment – Valerie Williams | ZW23H5WGBA2 | | $1145.65 | $0.00 |
| 01-308 | 04/01/2017 | 042017 | RENT | Rent - Market | | $1051.00 | | $1145.65 |
| 01-308 | 04/01/2017 | 042017 | PETRENT | PETRENT | | $15.00 | | $94.65 |
| 01-308 | 04/01/2017 | 042017 | INSURANCE | Resident Liability Insurance | | $10.00 | | $79.65 |

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 60 of 78

| Unit | Date | Period | Ctslp | Code | Description | Doc# | Charges | Credits | Balance |
|------|------|--------|-------|------|-------------|------|---------|---------|---------|
| 01-308 | 03/27/2017 | 042017 | | WATER/SEWER | WATER/SEWER 01/31/2017 - 02/28/2017 | 17559337 | $45.90 | | $69.65 |
| 01-308 | 03/27/2017 | 042017 | | UTILITY | UTILITY 01/31/2017 - 02/28/2017 | 17559339 | $3.75 | | $23.75 |
| 01-308 | 03/27/2017 | 042017 | | TRASH | TRASH 01/31/2017 - 02/28/2017 | 17559342 | $15.00 | | $20.00 |
| 01-308 | 03/27/2017 | 042017 | | PESTFEE | PESTFEE 01/31/2017 - 02/28/2017 | 17559340 | $5.00 | | $5.00 |
| 01-308 | 03/05/2017 | 032017 | 420 | PMTOPCARD | WelcomeHome credit card payment – Valerie Williams | MPXDXFSGBA1 | | $1128.51 | $0.00 |
| 01-308 | 03/01/2017 | 032017 | | RENT | Rent - Market | | $1051.00 | | $1128.51 |
| 01-308 | 03/01/2017 | 032017 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $77.51 |
| 01-308 | 03/01/2017 | 032017 | | PETRENT | PETRENT | | $15.00 | | $67.51 |
| 01-308 | 03/01/2017 | 032017 | | WATER/SEWER | Water 12/31/2016 - 01/31/2017 | 17015384 | $16.19 | | $52.51 |
| 01-308 | 03/01/2017 | 032017 | | UTILITY | UTILITY 12/31/2016 - 01/31/2017 | 17015385 | $3.75 | | $36.32 |
| 01-308 | 03/01/2017 | 032017 | | TRASH | TRASH 12/31/2016 - 01/31/2017 | 17015388 | $15.00 | | $32.57 |
| 01-308 | 03/01/2017 | 032017 | | WATER/SEWER | Sewer 12/31/2016 - 01/31/2017 | 17015383 | $12.57 | | $17.57 |
| 01-308 | 03/01/2017 | 032017 | | PESTFEE | PESTFEE 12/31/2016 - 01/31/2017 | 17015386 | $5.00 | | $5.00 |
| 01-308 | 02/16/2017 | 022017 | 443 | PMTOPCARD | WelcomeHome credit card payment – Valerie Williams | YH7HKQPGBA2 | | $1183.96 | $0.00 |
| 01-308 | 02/06/2017 | | | LATEFEE | February late fees | | $52.55 | | $1183.96 |
| 01-308 | 02/03/2017 | 022017 | | WATER/SEWER | Water 11/30/2016 - 12/31/2016 | 16781128 | $-28.09 | | $1131.41 |
| 01-308 | 02/03/2017 | 022017 | | WATER/SEWER | Water 11/30/2016 - 12/31/2016 | 16781251 | $28.09 | | $1159.50 |
| 01-308 | 02/03/2017 | 022017 | | UTILITY | Billing Fee 11/30/2016 - 12/31/2016 | 16781253 | $7.32 | | $1131.41 |
| 01-308 | 02/03/2017 | 022017 | | TRASH | TRASH 11/30/2016 - 12/31/2016 | 16781256 | $15.00 | | $1124.09 |
| 01-308 | 02/03/2017 | 022017 | | PESTFEE | PESTFEE 11/30/2016 - 12/31/2016 | 16781254 | $5.00 | | $1109.09 |
| 01-308 | 02/02/2017 | 022017 | | WATER/SEWER | Water 11/30/2016 - 12/31/2016 | 16768906 | $28.09 | | $1104.09 |
| 01-308 | 02/01/2017 | 022017 | | RENT | Rent - Market | | $1051.00 | | $1076.00 |
| 01-308 | 02/01/2017 | 022017 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $25.00 |
| 01-308 | 02/01/2017 | 022017 | | PETRENT | PETRENT | | $15.00 | | $15.00 |
| 01-308 | 01/23/2017 | 012017 | 440 | PMTOPIRO | Bulk Processing - Valerie Williams | 077763 | | $1177.36 | $0.00 |
| 01-308 | 01/06/2017 | | | LATEFEE | January late fees | | $52.55 | | $1177.36 |
| 01-308 | 01/01/2017 | 012017 | | RENT | Rent - Market | | $1051.00 | | $1124.81 |
| 01-308 | 01/01/2017 | 012017 | | PETRENT | PETRENT | | $15.00 | | $73.81 |
| 01-308 | 01/01/2017 | 012017 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $58.81 |
| 01-308 | 12/26/2016 | 012017 | | MISCUTILITY | Billing Fee 11/01/2016 - 11/30/2016 (1/1/2017) | 875890891193053040 | $3.75 | | $48.81 |
| 01-308 | 12/26/2016 | 012017 | | PESTFEE | Pest Control 11/01/2016 - 11/30/2016 (1/1/2017) | 875890891193053020 | $4.00 | | $45.06 |
| 01-308 | 12/26/2016 | 012017 | | TRASH | Trash 11/01/2016 - 11/30/2016 (1/1/2017) | 875890891193053000 | $14.99 | | $41.06 |

OneSite

| Unit | Date | Period | Ctr# | Code | Description | Doc # | Charges | Credits | Balance |
|------|------|--------|------|------|-------------|-------|---------|---------|---------|
| 01-308 | 12/26/2016 | 012017 | | WATER/SEWER | Water/Sewer 11/01/2016 - 11/30/2016 (1/1/2017) | 875890891158567550 | $26.07 | | $26.07 |
| 01-308 | 12/21/2016 | 122016 | | 438 PMTOPCARD | WelcomeHome credit card payment – Valerie Williams 12/25/2016 | 8ZXMCBLGBA3 | | $1439.88 | $0.00 |
| 01-308 | 12/21/2016 | 122016 | | ATTRNY | Attorney Or Legal Charges - Williams | | $201.00 | | $1439.88 |
| 01-308 | 12/06/2016 | | | LATEFEE | December late fees | | $52.55 | | $1238.88 |
| 01-308 | 12/01/2016 | 122016 | | RENT | Rent - Market | | $1051.00 | | $1186.33 |
| 01-308 | 12/01/2016 | 122016 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $135.33 |
| 01-308 | 12/01/2016 | 122016 | | PETRENT | PETRENT | | $15.00 | | $125.33 |
| 01-308 | 11/30/2016 | 122016 | | 404 PMTOPIRD | Bulk Processing - Valerie Williams 12/1/2016 | 5722 | | $400.00 | $110.33 |
| 01-308 | 11/30/2016 | 122016 | | 404 PMTOPIRD | Bulk Processing - Valerie Williams 12/1/2016 | 5704 | | $300.00 | $510.33 |
| 01-308 | 11/30/2016 | 122016 | | 404 PMTOPIRD | Bulk Processing - Valerie Williams 12/1/2016 | 5725 | | $111.00 | $810.33 |
| 01-308 | 11/30/2016 | 122016 | | 404 PMTOPIRD | Bulk Processing - Valerie Williams 12/1/2016 | 5699 | | $300.00 | $921.33 |
| 01-308 | 11/30/2016 | 122016 | | 404 PMTOPIRD | Bulk Processing - Valerie Williams 12/1/2016 | 5692 | | $300.00 | $1221.33 |
| 01-308 | 11/23/2016 | 112016 | | MISCUTILITY | Billing Fee 10/01/2016 - 10/31/2016 (12/1/2016) | 874809243193053040 | $3.75 | | $1521.33 |
| 01-308 | 11/23/2016 | 112016 | | PESTFEE | Pest Control 10/01/2016 - 10/31/2016 (12/1/2016) | 874809243193053020 | $4.00 | | $1517.58 |
| 01-308 | 11/23/2016 | 112016 | | TRASH | Trash 10/01/2016 - 10/31/2016 (12/1/2016) | 874809243193053000 | $14.99 | | $1513.58 |
| 01-308 | 11/23/2016 | 112016 | | WATER/SEWER | Water/Sewer 10/01/2016 - 10/31/2016 (12/1/2016) | 874809243158567550 | $43.70 | | $1498.59 |
| 01-308 | 11/17/2016 | 112016 | | ATTRNY | Attorney Or Legal Charges - Williams | | $191.00 | | $1454.89 |
| 01-308 | 11/06/2016 | | | LATEFEE | November late fees | | $52.55 | | $1263.89 |
| 01-308 | 11/01/2016 | 112016 | | RENT | Rent - Market | | $1051.00 | | $1211.34 |
| 01-308 | 11/01/2016 | 112016 | | INSURANCE | Resident Liability Insurance | | $10.00 | | $160.34 |
| 01-308 | 11/01/2016 | 112016 | | PETRENT | PETRENT | | $15.00 | | $150.34 |
| 01-308 | 10/26/2016 | 112016 | | MISCUTILITY | Billing Fee 09/01/2016 - 09/30/2016 (11/1/2016) | 872959346193053040 | $3.75 | | $135.34 |
| 01-308 | 10/26/2016 | 112016 | | PESTFEE | Pest Control 09/01/2016 - 09/30/2016 (11/1/2016) | 872959346193053020 | $4.00 | | $131.59 |
| 01-308 | 10/26/2016 | 112016 | | TRASH | Trash 09/01/2016 - 09/30/2016 (11/1/2016) | 872959346193053000 | $14.99 | | $127.59 |
| 01-308 | 10/26/2016 | 112016 | | WATER/SEWER | Water/Sewer 09/01/2016 - 09/30/2016 (11/1/2016) | 872959346193052960 | $45.85 | | $112.60 |

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 62 of 78

| Unit | Date | Period | Grid Code | Description | Data | Charges | Credits | Balance |
|---|---|---|---|---|---|---|---|---|
| 01-308 | 10/20/2016 | 102016 | 445 PMTOPIRD | Bulk Processing - Valerie Williams 10/21/2016 | 076049 | | $428.00 | $66.75 |
| 01-308 | 10/19/2016 | 102016 | 443 PMTOPIRD | Bulk Processing - Valerie Williams | 9727 | | $500.00 | $494.75 |
| 01-308 | 10/12/2016 | 102016 | INSURANCE | Resident Liability Insurance | | $10.00 | | $994.75 |
| 01-308 | 10/06/2016 | | LATEFEE | October late fees | | $46.89 | | $984.75 |
| 01-308 | 10/01/2016 | 102016 | RENT | Rent - Market | | $1051.00 | | $937.86 |
| 01-308 | 10/01/2016 | 102016 | PETRENT | PETRENT | | $15.00 | | $-113.14 |
| 01-308 | 09/26/2016 | 102016 | MISCUTILITY | Billing Fee 08/01/2016 - 08/31/2016 (10/1/2016) | 871490485193053040 | $3.75 | | $-128.14 |
| 01-308 | 09/26/2016 | 102016 | PESTFEE | Pest Control 08/01/2016 - 08/31/2016 (10/1/2016) | 871490485193053020 | $4.00 | | $-131.89 |
| 01-308 | 09/26/2016 | 102016 | TRASH | Trash 08/01/2016 - 08/31/2016 (10/1/2016) | 871490485193053000 | $14.99 | | $-135.89 |
| 01-308 | 09/26/2016 | 102016 | WATER/SEWER | Water/Sewer 08/01/2016 - 08/31/2016 (10/1/2016) | 871490485193052960 | $49.12 | | $-150.88 |
| 01-308 | 09/14/2016 | 092016 | 428 PMTOPIRD | Bulk Processing - Valerie Williams | 7614 | | $200.00 | $-200.00 |
| 01-308 | 09/12/2016 | 092016 | 424 PMTOPACH | WelcomeHome ACH payment – Valerie Williams | V532LR6G8A3 | | $1161.81 | $0.00 |
| 01-308 | 09/06/2016 | | LATEFEE | September late fees | | $50.05 | | $1161.81 |
| 01-308 | 09/01/2016 | 092016 | RENT | RENT | | $1001.00 | | $1111.76 |
| 01-308 | 09/01/2016 | 092016 | PETRENT | PETRENT | | $15.00 | | $110.76 |
| 01-308 | 08/26/2016 | 092016 | MISCUTILITY | Billing Fee 07/01/2016 - 07/31/2016 (9/1/2016) | 869925808193053040 | $3.75 | | $95.76 |
| 01-308 | 08/26/2016 | 092016 | PESTFEE | Pest Control 07/01/2016 - 07/31/2016 (9/1/2016) | 869925808193053020 | $4.00 | | $92.01 |
| 01-308 | 08/26/2016 | 092016 | TRASH | Trash 07/01/2016 - 07/31/2016 (9/1/2016) | 869925808193053000 | $14.99 | | $88.01 |
| 01-308 | 08/26/2016 | 092016 | WATER/SEWER | Water/Sewer 07/01/2016 - 07/31/2016 (9/1/2016) | 869925808193052960 | $34.36 | | $73.02 |
| 01-308 | 08/08/2016 | 082016 | 426 PMTOPIRD | Bulk Processing - Valerie Williams 8/10/2016 | 074766 | | $773.12 | $38.66 |
| 01-308 | 08/06/2016 | | LATEFEE | August late fees | | $38.66 | | $811.78 |
| 01-308 | 08/03/2016 | 082016 | 413 PMTOPIRD | Bulk Processing - Valerie Williams | 17434575528 | | $300.00 | $773.12 |
| 01-308 | 08/01/2016 | 082016 | RENT | RENT | | $1001.00 | | $1073.12 |
| 01-308 | 08/01/2016 | 082016 | PETRENT | PETRENT | | $15.00 | | $72.12 |
| 01-308 | 07/26/2016 | 082016 | MISCUTILITY | Billing Fee 06/01/2016 - 06/30/2016 (8/1/2016) | 868440816193053040 | $3.75 | | $57.12 |
| 01-308 | 07/26/2016 | 082016 | PESTFEE | Pest Control 06/01/2016 - 06/30/2016 (8/1/2016) | 868440816193053020 | $4.00 | | $53.37 |
| 01-308 | 07/26/2016 | 082016 | TRASH | Trash 06/01/2016 - 06/30/2016 (8/1/2016) | 868440816193053000 | $14.99 | | $49.37 |

OneSite

| Unit | Date | Period | Chg? Code | Description | Docs | Charges | Credits | Balance |
|------|------|--------|-----------|-------------|------|---------|---------|---------|
| 01-308 | 07/26/2016 | 082016 | WATER/SEWER | Water/Sewer 06/01/2016 - 06/30/2016 (8/1/2016) | 868440816193052960 | $34.38 | | $34.38 |
| 01-308 | 07/11/2016 | 072016 | 422 PMTOPIRD | Bulk Processing - Valerie Williams | 074084 | | $600.00 | $0.00 |
| 01-308 | 07/11/2016 | 072016 | 422 PMTOPIRD | Bulk Processing - Valerie Williams | 074085 | | $60.00 | $600.00 |
| 01-308 | 07/11/2016 | 072016 | 422 PMTOPIRD | Bulk Processing - Valerie Williams | 5398 | | $413.58 | $660.00 |
| 01-308 | 07/06/2016 | | LATEFEE | July late fees | | $50.05 | | $1073.58 |
| 01-308 | 07/01/2016 | 072016 | RENT | RENT | | $1001.00 | | $1023.53 |
| 01-308 | 07/01/2016 | 072016 | PETRENT | PETRENT | | $15.00 | | $22.53 |
| 01-308 | 06/27/2016 | 072016 | MISCUTILITY | Billing Fee 05/01/2016 - 05/31/2016 (7/1/2016) | 867598075193053040 | $3.75 | | $7.53 |
| 01-308 | 06/27/2016 | 072016 | PESTFEE | Pest Control 05/01/2016 - 05/31/2016 (7/1/2016) | 867598075193053020 | $4.00 | | $3.78 |
| 01-308 | 06/27/2016 | 072016 | TRASH | Trash 05/01/2016 - 05/31/2016 (7/1/2016) | 867598075193053000 | $14.99 | | $-0.22 |
| 01-308 | 06/27/2016 | 072016 | WATER/SEWER | Water/Sewer 05/01/2016 - 05/31/2016 (7/1/2016) | 867598075193052960 | $33.23 | | $-15.21 |
| 01-308 | 06/06/2016 | 062016 | 414 PMTOPIRD | Changed account from: Baldwin, Myria | FM9KJWXFLA2 | | $216.00 | $-48.44 |
| 01-308 | 06/06/2016 | 062016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 3668 | | $48.44 | $167.56 |
| 01-308 | 06/06/2016 | 062016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1578 | | $300.00 | $216.00 |
| 01-308 | 06/06/2016 | 062016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1577 | | $500.00 | $516.00 |
| 01-308 | 06/01/2016 | 062016 | RENT | RENT | | $1001.00 | | $1016.00 |
| 01-308 | 06/01/2016 | 062016 | PETRENT | PETRENT | | $15.00 | | $15.00 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1496 | | $200.00 | $0.00 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1523 | | $500.00 | $200.00 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1513 | | $151.23 | $700.00 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1483 | | $200.00 | $851.23 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1522 | | $500.00 | $1051.23 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1495 | | $500.00 | $1551.23 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1511 | | $500.00 | $2051.23 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1482 | | $500.00 | $2551.23 |
| 01-308 | 05/20/2016 | 052016 | 414 PMTOPIRD | Bulk Processing - Valerie Williams | 1512 | | $300.00 | $3051.23 |
| 01-308 | 05/06/2016 | | LATEFEE | May late fees | | $50.05 | | $3351.23 |
| 01-308 | 05/01/2016 | 052016 | RENT | RENT | | $1001.00 | | $3301.18 |
| 01-308 | 05/01/2016 | 052016 | PETRENT | PETRENT | | $15.00 | | $2300.18 |
| 01-308 | 04/25/2016 | 052016 | WATER/SEWER | SEWER | | $18.09 | | $2285.18 |
| 01-308 | 04/25/2016 | 052016 | UTILITYREBILL | UTILITY REBILL | | $3.75 | | $2267.09 |
| 01-308 | 04/25/2016 | 052016 | TRASH | TRASH | | $14.99 | | $2263.34 |
| 01-308 | 04/25/2016 | 052016 | PESTCONTROLREBILL | PEST CONTROL | | $4.00 | | $2248.35 |
| 01-308 | 04/25/2016 | 052016 | WATER/SEWER | WATER | | $11.78 | | $2244.35 |
| 01-308 | 04/21/2016 | 042016 | RENT | RENT | | $2232.57 | | $2232.57 |
| | | | | | | Balance | | $1,422.5? |

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 64 of 78

MAR 2 1 2018

`18 CV M 2206`

| File No. | |
|---|---|

**STATE OF NORTH CAROLINA**

**COMPLAINT**
**IN SUMMARY EJECTMENT**

G.S. 7A-216, 7A-232; Ch. 42, Art. 3 and 7

In The General Court Of Justice
District Court Division–Small Claims

DURHAM County

**Name And Address Of Plaintiff**
MP Bridges at Southpoint LLC

dba The Bridges at Southpoint
7304 Calibre Park Dr

Durham                    NC    27707

| County | Telephone No. |
|---|---|
| DURHAM | (919)544-4442 |

**VERSUS**

**Name And Address Of Defendant 1**  ☒ Individual  ☐ Corporation
Valerie Williams
7301 Calibre Park Drive
Apt 308

DURHAM                   NC    27707

| County | Telephone No. |
|---|---|
| DURHAM | |

**Name And Address Of Defendant 2**  ☒ Individual  ☐ Corporation

**Name And Address Of Plaintiff's Attorney Or Agent**
Cara Bridwell
Loebsack & Brownlee, PLLC
P.O. Box 78058
Charlotte                 NC    28271
(704)970-3900

| County | Telephone No. |
|---|---|

1. The defendant is a resident of the county named above.

2. The defendant entered into possession of premises described below as a lessee of plaintiff.

**Description Of Premises (Include Location)**
7301 Calibre Park Drive,Apt 308,DURHAM,NC 27707

| Rate Of Rent (tenant's share) | | Date Rent Due |
|---|---|---|
| $  1067.00  per  ☒ Month  ☐ Week | | 03/01/2018 |

| Date Lease or Possession Terminated |
|---|
| 03/01/2018 |

☒ Conventional
☐ Public Housing
☐ Section 8

**Type Of Lease**
☐ Oral  ☒ Written

3. ☐ The defendant failed to pay the rent due on the above date and the plaintiff made demand for the rent and waited the 10-day grace period before filing the complaint.

☐ The lease period ended on the above date and the defendant is holding over after the end of the lease period.

☒ The defendant breached the condition of the lease described below for which re-entry is specified.

☐ Criminal activity or other activity has occurred in violation of G.S. 42-63 as specified below.

**Description Of Breach/Criminal Activity (give names, dates, places and illegal activity)**
Failure to pay monthly rent when due/in full, from the date above through the hearing date.

4. The plaintiff has demanded possession of the premises from the defendant, who has refused to surrender it, and the plaintiff is entitled to immediate possession.

5. Pursuant to G.S. 42-28, Plaintiff hereby omits any claim for rents or damages and is seeking possession of the premises only. Plaintiff reserves the right to seek any monetary damages in a separate civil action.

6. Plaintiff therefore requests to be put in possession of the Premises.

**Description Of Any Property Damage**

| Amount Of Damage (If Known) | Amount Of Rent Unpaid | Total Amount Due | |
|---|---|---|---|
| $  CLAIMS RESERVED | $  1,067.00 | $ | POSSESSION ONLY |

| Date | Name Of Plaintiff/Attorney/Agent (Type Or Print) | Signature Of Plaintiff/Attorney/Agent |
|---|---|---|
| 3/19/2018 | Cara Bridwell | Cara Bridwell |

**CERTIFICATION WHEN COMPLAINT SIGNED BY AGENT OF PLAINTIFF**

I certify that I am an agent of the plaintiff and have actual knowledge of the facts alleged in this Complaint.

| Date | Name Of Agent (Type Or Print) | Signature Of Agent |
|---|---|---|
| 3/19/2018 | | |

AOC-CVM-201, As Revised by Counsel for Plaintiff

(Over)

2018 MAR 20  11:23
DURHAM COUNTY, C.S.C.

## STATE OF NORTH CAROLINA

*18·29*

FILED

**DURHAM** County

18 APR -2 PM 1:

DURHAM COUNTY C.S.C.

BY——

File No.

18CVM2206

In The General Court Of Justice
☑ Small Claims ☐ District ☐ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>MP Bridges at Southpoint LLC<br>dba The Bridges at Southpoint | **NOTICE OF<br>VOLUNTARY DISMISSAL** |
| **VERSUS** | ☑ **COMPLAINT**<br>☐ **COUNTERCLAIM**<br>☐ **OTHER** _____ |
| *Name of Defendant*<br>Valerie Williams | |

G.S. 1A-1, Rule 41

*Complete the following information if known:*

| Court Date | Time | | Location |
|---|---|---|---|
| 4/2/2018 | 9:00 | ☑ AM ☐ PM | 3rd Floor; 510 South Dillard Street, Durham, NC 27701 |

☑ The plaintiff gives notice of voluntary dismissal    ☐ with prejudice    ☑ without prejudice
in this case as to all of the defendants.

☐ The plaintiff gives notice of voluntary dismissal    ☐ with prejudice    ☐ without prejudice
in the case only as to the defendants named below and this case remains open as to defendants not listed. *(Name of defendants for whom dismissal taken.)*

☐ The defendant gives notice of voluntary dismissal    ☐ with prejudice    ☐ without prejudice
of the counterclaim in this case as to all of the plaintiffs.

☐ The defendant gives notice of voluntary dismissal    ☐ with prejudice    ☐ without prejudice
in the case only as to the plaintiffs named below and the counterclaim remains open as to plaintiffs not listed. *(Name of plaintiffs for whom dismissal taken.)*

☐ Other:

| Date | Plaintiff Or Attorney |
|---|---|
| 3/29/2018 | *Shaina Amoywoto* |
| Date | Defendant Or Attorney |
| | |

**NOTE TO CITY OR COUNTY PLAINTIFF:** *If, pursuant to G.S. 7A-317, you were not required to advance costs when filing the complaint to which you are taking a voluntary dismissal, you must pay the costs to the Clerk of Superior Court upon taking a voluntary dismissal. You may not refile this lawsuit without paying the costs. G.S. 1A-1, Rule 41.*

AOC-CV-405, Rev. 11/02
© 2002 Administrative Office of the Courts

257804

18 CV 002206

# STATE OF NORTH CAROLINA

_____DURHAM_____ County

In The General Court Of Justice
District Court Division - Small Claims

Plaintiff(s)
MP Bridges at Southpoint LLC

dba The Bridges at Southpoint        008168

2018 MAR 21 A 11:41

**VERSUS**

Defendant(s)
Valerie Williams

**MAGISTRATE SUMMONS**
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rule 4; 7A-217, -232

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

TO

Name And Address Of Defendant 1
Valerie Williams
7301 Calibre Park Drive
Apt 308
DURHAM                    NC      27707

TO

Name And Address Of Defendant 2

## A Small Claim Action Has Been Commenced Against You!

You are notified to appear before the magistrate at the specified date, time, and location of trial listed below. You will have the opportunity at the trial to defend yourself against the claim stated in the attached complaint.

You may file a written answer, making defense to the claim, in the office of the Clerk of Superior Court at any time before the time set for trial. Whether or not you file an answer, the plaintiff must prove the claim before the magistrate.

If you fail to appear and defend against the proof offered, the magistrate may enter a judgment against you.

| Date Of Trial | Time Of Trial | Location Of Court |
|---|---|---|
| 4/2/2018 | 9:00 ☒ AM ☐ PM | 3rd Floor; 510 South Dillard Street, Durham, NC 27701 |

Name And Address Of Plaintiff Or Plaintiff's Attorney
MP Bridges at Southpoint LLC d/b/a The Bridges at Southpoint

7304 Calibre Park Dr

Durham                    NC      27707

Date Issued
MAR 2 0 2018

Signature
*Jerry A Perry*

☐ Deputy CSC      ☐ Assistant CSC      ☐ Clerk Of Superior Court

AOC-CVM-100, Rev. 10/14
© 2014 Administrative Office of the Courts

(Over)

APR 2 5 2018

# COMPLAINT
# IN SUMMARY EJECTMENT

G.S. 7A-216, 7A-232; Ch. 42, Art. 3 and 7

**Name And Address Of Plaintiff**
MP Bridges at Southpoint LLC

dba The Bridges at Southpoint
7304 Calibre Park Dr

Durham                          NC   27707

**County** DURHAM          **Telephone No.** (919)544-4442

## VERSUS

**Name And Address Of Defendant 1**        ☒ Individual  ☐ Corporation
Valerie Williams
7301 Calibre Park Drive
Apt 308

DURHAM                          NC   27707

**County** DURHAM          **Telephone No.**

**Name And Address Of Defendant 2**        ☒ Individual  ☐ Corporation

DURHAM

**County**                      **Telephone No.**

**Name And Address Of Plaintiff's Attorney Or Agent**
Shanae Auguste
Loebsack & Brownlee, PLLC
P.O. Box 78058

Charlotte                       NC   28271
(919)792-1690

AOC-CVM-201, As Revised by Counsel for Plaintiff

---

## STATE OF NORTH CAROLINA

DURHAM County

In The General Court Of Justice
District Court Division-Small Claims

☒ Conventional
☐ Public Housing
    Section 8

**Type Of Lease**
☐ Oral  ☒ Written

**File No.**

1. The defendant is a resident of the county named above.

2. The defendant entered into possession of premises described below as a lessee of plaintiff.

**Description Of Premises (Include Location)**
7301 Calibre Park Drive Apt 308,DURHAM,NC 27707

| Rate Of Rent (tenant's share) | Date Rent Due |
|---|---|
| $ 1067.00 per ☒ Month ☐ Week | 04/01/2018 |

**Date Lease or Possession Terminated**

3. ☐ The defendant failed to pay the rent due on the above date and the plaintiff made demand for the rent and waited the 10-day grace period before filing the complaint.

☐ The lease period ended on the above date and the defendant is holding over after the end of the lease period.

☒ The defendant breached the condition of the lease described below for which re-entry is specified.

☐ Criminal activity or other activity has occurred in violation of G.S. 42-63 as specified below.

**Description Of Breach/Criminal Activity (give names, dates, places and illegal activity)**
Failure to pay monthly rent when due/In full, from the date above through the heading date.

4. The plaintiff has demanded possession of the premises from the defendant, who has refused to surrender it, and the plaintiff is entitled to immediate possession.

5. Pursuant to G.S. 42-28, Plaintiff hereby omits any claim for rents or damages and is seeking possession of the premises only. Plaintiff reserves the right to seek any monetary damages in a separate civil action.

**Description Of Any Property Damage**

| Amount Of Damage (if Known) | Amount of Rent Unpaid | Total Amount Due |
|---|---|---|
| $ CLAIMS RESERVED | $ 1,063.58 | $ POSSESSION ONLY |

6. Plaintiff therefore requests to be put in possession of the Premises.

| Date | Name Of Plaintiff's Attorney/Agent (Type Or Print) | Signature Of Plaintiff's Attorney/Agent |
|---|---|---|
| 4/19/2018 | Shanae Auguste | Shanae Auguste |

## CERTIFICATION WHEN COMPLAINT SIGNED BY AGENT OF PLAINTIFF
I certify that I am an agent of the plaintiff and have actual knowledge of the facts alleged in this Complaint.

| Date | Name Of Agent (Type Or Print) | Signature Of Agent |
|---|---|---|
| 4/19/2018 | | |

(Over)

18.39

# STATE OF NORTH CAROLINA

<table>
<tr><td></td><td>File No.</td></tr>
<tr><td></td><td>18CVM3089</td></tr>
</table>

**DURHAM** _____ County

FILED

☑ Small Claims ☐ District ☐ Superior Court Division

In The General Court Of Justice

*Name Of Plaintiff*
MP Bridges at Southpoint LLC
dba The Bridges at Southpoint

18 MAY 10 PM 3: 29

DURHAM COUNTY, C.S.C

**VERSUS**

*Name Of Defendant*
Valerie Williams

BY_____

# NOTICE OF
# VOLUNTARY DISMISSAL

☑ COMPLAINT
☐ COUNTERCLAIM
☐ OTHER _____

G.S. 1A-1, Rule 41

*Complete the following information if known:*

| Court Date | Time | | Location |
|---|---|---|---|
| 5/10/2018 | 9:00 | ☑ AM ☐ PM | 3rd Floor; 510 South Diliard Street, Durham, NC 27701 |

☑ **The plaintiff gives notice of voluntary dismissal** ☐ with prejudice ☑ without prejudice
in this case as to all of the defendants.

☐ **The plaintiff gives notice of voluntary dismissal** ☐ with prejudice ☐ without prejudice
in this case only as to the defendants named below and this case remains open as to defendants not listed. *(Name of defendants for whom dismissal taken.)*

☐ **The defendant gives notice of voluntary dismissal** ☐ with prejudice ☐ without prejudice
of the counterclaim in this case as to all of the plaintiffs.

☐ **The defendant gives notice of voluntary dismissal** ☐ with prejudice ☐ without prejudice
in this case only as to the plaintiffs named below and the counterclaim remains open as to plaintiffs not listed. *(Name of plaintiffs for whom dismissal taken.)*

☐ **Other:**

| *Date* | *Plaintiff Or Attorney* |
|---|---|
| 5/8/2018 | |
| *Date* | *Defendant Or Attorney* |

**NOTE TO CITY OR COUNTY PLAINTIFF:** *If, pursuant to G.S. 7A-317, you were not required to advance costs when filing the complaint to which you are taking a voluntary dismissal, you must pay the costs to the Clerk of Superior Court upon taking a voluntary dismissal. You may not refile this lawsuit without paying the costs. G.S. 1A-1, Rule 41.*

AOC-CV-405, Rev. 11/02
© 2002 Administrative Office of the Courts

259207

PAID APR 24 2018
$70

File No.

# STATE OF NORTH CAROLINA

In The General Court Of Justice
District Court Division - Small Claims

_____DURHAM_____ County

| | |
|---|---|
| *Plaintiff(s)*<br>MP Bridges at Southpoint LLC<br><br>dba The Bridges at Southpoint<br>2018 APR 24 P 3: 31    0 1 0 5 5 2 | **MAGISTRATE SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**<br><br>G.S. 1A-1, Rule 4; 7A-217, -232 |

| **VERSUS** | |
|---|---|
| *Defendant(s)*<br>Valerie Williams | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

| **TO** | **TO** |
|---|---|
| *Name And Address Of Defendant 1*<br>Valerie Williams<br>7301 Calibre Park Drive<br>Apt 308<br>DURHAM     NC   27707 | *Name And Address Of Defendant 2* |

## A Small Claim Action Has Been Commenced Against You!

You are notified to appear before the magistrate at the specified date, time, and location of trial listed below. You will have the opportunity at the trial to defend yourself against the claim stated in the attached complaint.

You may file a written answer, making defense to the claim, in the office of the Clerk of Superior Court at any time before the time set for trial. Whether or not you file an answer, the plaintiff must prove the claim before the magistrate.

If you fail to appear and defend against the proof offered, the magistrate may enter a judgment against you.

| *Date Of Trial*<br>5/10/2018 | *Time Of Trial*<br>9:00 | ☒ AM ☐ PM | *Location Of Court*<br>3rd Floor; 510 South Dillard Street, Durham, NC 27701 |
|---|---|---|---|
| *Name And Address Of Plaintiff Or Plaintiff's Attorney*<br>MP Bridges at Southpoint LLC d/b/a The Bridges at Southpoint<br><br>7304 Calibre Park Dr<br><br>Durham     NC  27707 | | | *Date Issued*<br>APR 2 3 2018<br><br>*Signature*<br>*Jerry A Perry*<br>☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court |

BY _____

DURHAM CO., C.S.C.

2018 APR 26 P 3 41

FILED

(Over)

AOC-CVM-100, Rev. 10/14
© 2014 Administrative Office of the Courts

nat

JUN 2 2 2018

18 CV M\:606

**COMPLAINT**
**IN SUMMARY EJECTMENT**

G.S. 7A-216, 7A-232; Ch. 42, Art. 3 and 7

**STATE OF NORTH CAROLINA**

DURHAM _____ County

In The General Court Of Justice
District Court Division-Small Claims

Name And Address Of Plaintiff
MP Bridges at Southpoint LLC

dba The Bridges at Southpoint
7304 Callibre Park Dr

| County | | |
|---|---|---|
| Durham | NC | 27707 |

| County | Telephone No. |
|---|---|
| DURHAM | (919)544-4442 |

**VERSUS**

Name And Address Of Defendant 1    ☒ Individual    ☐ Corporation
Valerie Williams
7301 Callibre Park Drive
Apt 308

| County | | |
|---|---|---|
| DURHAM | NC | 27707 |

Name And Address Of Defendant 2    ☒ Individual    ☐ Corporation

| County | Telephone No. |
|---|---|

Name And Address Of Plaintiff's Attorney Or Agent
Emma Wingfield
Loebsack & Brownlee, PLLC
P.O. Box 78058

| | | |
|---|---|---|
| Charlotte | NC | 28271 |

| County | Telephone No. |
|---|---|
| (704)970-3900 | |

AOC-CVM-201, As Revised by Counsel for Plaintiff

1. The defendant is a resident of the county named above.

2. The defendant entered into possession of premises described below as a lessee of plaintiff.

Description Of Premises (Include Location)
7301 Callibre Park Drive,Apt 308,DURHAM,NC 27707

| Rate Of Rent (tenant's share) | Date Rent Due |
|---|---|
| $ 1067.00 per ☒ Month ☐ Week | 06/01/2018 |

| Date Lease or Possession Terminated |
|---|
| |

| Type Of Lease |
|---|
| ☐ Oral ☒ Written |

3. ☐ The defendant failed to pay the rent due on the above date and the plaintiff made demand for the rent and waited the 10-day grace period before filing the complaint.

☐ The lease period ended on the above date and the defendant is holding over after the end of the lease period.

☒ The defendant breached the condition of the lease described below for which re-entry is specified.

☐ Criminal activity or other activity has occurred in violation of G.S. 42-63 as specified below.

Description Of Breach/Criminal Activity (give names, dates, places and illegal activity)
Failure to pay monthly rent when due/in full, from the date above through the hearing date.

4. The plaintiff has demanded possession of the premises from the defendant, who has refused to surrender it, and the plaintiff is entitled to immediate possession.

5. Pursuant to G.S. 42-28, Plaintiff hereby omits any claim for rents or damages and foreseeing possession of the premises only. Plaintiff reserves the right to seek any monetary damages in a separate civil action.

Description Of Any Property Damage

| Amount Of Damage (If Known) | Amount Of Rent Unpaid | Total Amount Due |
|---|---|---|
| $ CLAIMS RESERVED | $ 1,067.00 | $ POSSESSION ONLY |

6. Plaintiff therefore requests to be put in possession of the Premises.

| Date | Name Of Plaintiff/Attorney/Agent (Type Or Print) | Signature For Plaintiff/Attorney/Agent |
|---|---|---|
| 6/19/2018 | Emma Wingfield | |

**CERTIFICATION WHEN COMPLAINT SIGNED BY AGENT OF PLAINTIFF**

I certify that I am an agent of the plaintiff and have actual knowledge of the facts alleged in this Complaint.

| Date | Name Of Agent (Type Or Print) | Signature Of Agent |
|---|---|---|
| 6/19/2018 | | |

(Over)

FILED
DURHAM COUNTY C.S.C.
JUN 21 2018

18-53

# STATE OF NORTH CAROLINA

**FILED**

18 JUL -6 AM 11:01

DURHAM COUNTY, C.S.C.

BY_____

_____ **DURHAM** _____ County

**VERSUS**

18CVM4-608

In The General Court Of Justice
☑ Small Claims ☐ District ☐ Superior Court Division

Name Of Plaintiff
MP Bridges at Southpoint LLC
dba The Bridges at Southpoint

Name Of Defendant
Valerie Williams

# NOTICE OF
# VOLUNTARY DISMISSAL

☑ COMPLAINT
☐ COUNTERCLAIM
☐ OTHER _____

G.S. 1A-1, Rule 41

*Complete the following information if known:*

| Court Date | Time | | Location |
|---|---|---|---|
| 7/6/2018 | 9:00 | ☑ AM ☐ PM | 3rd Floor; 510 South Dillard Street, Durham, NC 27701 |

☑ The plaintiff gives notice of voluntary dismissal    ☐ with prejudice    ☑ without prejudice
in this case as to all of the defendants.

☐ The plaintiff gives notice of voluntary dismissal    ☐ with prejudice    ☐ without prejudice
in the case only as to the defendants named below and this case remains open as to defendants not listed. *(Name of defendants for whom dismissal taken.)*

☐ The defendant gives notice of voluntary dismissal    ☐ with prejudice    ☐ without prejudice
of the counterclaim in this case as to all of the plaintiffs.

☐ The defendant gives notice of voluntary dismissal    ☐ with prejudice    ☐ without prejudice
in this case only as to the plaintiffs named below and the counterclaim remains open as to plaintiffs not listed. *(Name of plaintiffs for whom dismissal taken.)*

☐ Other:

| Date | Plaintiff Or Attorney |
|---|---|
| 7/5/2018 | *Samantha Holland* |
| Date | Defendant Or Attorney |

**NOTE TO CITY OR COUNTY PLAINTIFF:** *If, pursuant to G.S. 7A-317, you were not required to advance costs when filing the complaint to which you are taking a voluntary dismissal, you must pay the costs to the Clerk of Superior Court upon taking a voluntary dismissal. You may not refile this lawsuit without paying the costs. G.S. 1A-1, Rule 41.*

AOC-CV-405, Rev. 11/02
© 2002 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

DURHAM County

File No.

In The General Court Of Justice
District Court Division - Small Claims

Plaintiff(s)
MP Bridges at Southpoint LLC

dba The Bridges at Southpoint

2018 JUN 22 P 1: 32

**MAGISTRATE SUMMONS**
0 ☐ ALIAS AND PLURIES SUMMONS (AS SESS FEE)
☐ JOINT

VERSUS

G.S. 1A-1, Rule 4; 7A-217, -232

Defendant(s)
Valerie Williams

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

TO

TO

Name And Address Of Defendant 1
Valerie Williams
7301 Calibre Park Drive
Apt 308
DURHAM          NC    27707

Name And Address Of Defendant 2

## A Small Claim Action Has Been Commenced Against You!

You are notified to appear before the magistrate at the specified date, time, and location of trial listed below. You will have the opportunity at the trial to defend yourself against the claim stated in the attached complaint.

You may file a written answer, making defense to the claim, in the office of the Clerk of Superior Court at any time before the time set for trial. Whether or not you file an answer, the plaintiff must prove the claim before the magistrate.

If you fail to appear and defend against the proof offered, the magistrate may enter a judgment against you.

| Date Of Trial | Time Of Trial | | Location Of Court |
|---|---|---|---|
| 7/6/2018 | 9:00 | ☒ AM ☐ PM | 3rd Floor, 510 South Dillard Street, Durham, NC 27701 |

Name And Address Of Plaintiff Or Plaintiff's Attorney
MP Bridges at Southpoint LLC d/b/a The Bridges at Southpoint

7304 Calibre Park Dr

Durham          NC    27707

Date Issued
JUN 2 1 2018

Signature
Cynthia Bell

☒ Deputy CSC     ☐ Assistant CSC     ☐ Clerk Of Superior Court

BY

DURHAM CO., C.S.C.

2018 JUN 26 A 11: 55

FILED
(Over)

AOC-CVM-100, Rev. 10/14
© 2014 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF WAKE

JORDON HARGROVE,

     Plaintiff,

     v.

GRUBB MANAGEMENT, INC.;
GRUBB FUND MANAGEMENT, LLC;
GRUBB RESIDENTIAL
DEVELOPMENT FUND III, LLC; and
GLENWOOD RALEIGH
APARTMENTS, LLC d/b/a STERLING
GLENWOOD APARTMENTS,

     Defendants.

**Order**

This matter, coming on to be heard and being heard during the March 20, 2018 civil session of Wake County Superior Court by the Honorable Judge A. Graham Shirley, II, sitting as a specially-designated judge pursuant to North Carolina General Rule of Practice 2.1, on Plaintiff Jordan Hargrove's Motion for Partial Judgment on the Pleadings against Defendant Glenwood Raleigh Apartments, LLC d/b/a Sterling Glenwood Apartments ("Plaintiff's Motion") and on Defendants' Grubb Management, Inc., Grubb Fund Management, LLC, Grubb Residential Development Fund III, LLC, and Glenwood Raleigh Apartments, LLC d/b/a Sterling Glenwood Apartments's Motion for Judgment on the Pleadings ("Defendants' Motion").

Plaintiff was represented by Edward Maginnis of Maginnis Law, PLLC and Scott C. Harris of Whitfield, Bryson & Mason, LLP and Defendants were represented by Jonathan R. Reich of Womble Bond Dickinson (US), LLP.

After having reviewed the pleadings (and any attachments thereto), the Court's file, the motions submitted, and the briefs of the parties, and having taken into account the arguments of counsel, the Court finds that Plaintiff's Motion and Defendants' Motion present only a question of law. The Court finds that North Carolina General Statute §42-46(e), (f), (g) and (h) are unambiguous; the only fees that can be claimed by a landlord for filing a complaint for summary ejectment and/or money owed are set forth in §42-46.

By imposing and then collecting a fee of $191 from Mr. Hargrove for reimbursement of the filing fees, attorney fees, and other fees reflected in N.C.G.S. §7A-305(a), Sterling violated N.C.G.S. §42-46. The Court further finds that attorney's fees can only be charged (or subsequently

awarded) on a note or evidence of indebtedness when an attorney is employed to actually collect on the evidence of indebtedness. Sterling could not claim an attorney's fee under N.C.G.S. §6-21.2 because it only sought possession by summary ejectment, and did not seek to collect any sums for unpaid rent. The Court also concludes that by imposing, and then collecting $191 from Mr. Hargrove, Sterling violated N.C.G.S. §75-54.

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Plaintiff's Motion against Defendant Glenwood Raleigh Apartments, LLC d/b/a Sterling Glenwood Apartments is granted in its entirety. Plaintiff is entitled to partial judgment on the pleadings with regard to Sterling's liability under N.C.G.S. §42-46 and partial judgment on the pleadings on his claim under the North Carolina Debt Collection Act, N.C.G.S. §75-50 *et seq.* in that Sterling violated N.C.G.S. §75-54 on at least one occasion. Defendants' Motion is denied in its entirety.

This the 23 day of March, 2018.

THE HONORABLE A. GRAHAM SHIRLEY, II
PRESIDING SUPERIOR COURT JUDGE

# EXHIBIT

# 8

# GENERAL ASSEMBLY OF NORTH CAROLINA
## SESSION 2017

### SESSION LAW 2018-50
### SENATE BILL 224

## AN ACT TO ALLOW LANDLORDS TO RECOVER OUT-OF-POCKET EXPENSES IN SUMMARY EJECTMENT CASES.

The General Assembly of North Carolina enacts:

**SECTION 1.1.(a)** G.S. 42-46(h)(3) reads as rewritten:
"(3)     It is contrary to public policy for a landlord to put in a lease or claim any fee for filing a complaint for summary ejectment and/or money owed other than the ones expressly authorized by subsections (e) through (g) and (i) of this section, and a reasonable attorney's fee as allowed by law."

**SECTION 1.1.(b)** G.S. 42-46 is amended by adding two new subsections to read:
"(i)     Out-of-Pocket Expenses. – In addition to the late fees referenced in subsections (a) and (b) of this section and the administrative fees of a landlord referenced in subsections (e) through (g) of this section, a landlord is also permitted to charge and recover from a tenant the following actual out-of-pocket expenses:

(1)     Filing fees charged by the court.

(2)     Costs for service of process pursuant to G.S. 1A-1, Rule 4 of the North Carolina Rules of Civil Procedure and G.S. 42-29.

(3)     Reasonable attorneys' fees actually incurred, pursuant to a written lease, not to exceed fifteen percent (15%) of the amount owed by the tenant, or fifteen percent (15%) of the monthly rent stated in the lease if the eviction is based on a default other than the nonpayment of rent.

(j)     The out-of-pocket expenses listed in subsection (i) of this section are allowed to be included by the landlord in the amount required to cure a default."



**SECTION 2.** This act is effective when it becomes law.

In the General Assembly read three times and ratified this the 14th day of June, 2018.

s/ Philip E. Berger
President Pro Tempore of the Senate

s/ Tim Moore
Speaker of the House of Representatives

This bill having been presented to the Governor for signature on the 14th day of June, 2018 and the Governor having failed to approve it within the time prescribed by law, the same is hereby declared to have become a law. This 25th day of June, 2018.

s/ Karen Jenkins
Enrolling Clerk

Case 1:18-cv-01030-LCB-JLW   Document 4   Filed 12/18/18   Page 78 of 78